# EXHIBIT 1

{4585430:}

**INDEX**

Unreported Opinions Cited in Defendants' Memorandum in Support of Motion to Dismiss
Counts III, IV, V, VI, VII, VIII, IX, X, and XI of Plaintiff's Second Amended Complaint

*Allbritton v. Village of Dolton*,
2012 WL 10516 (N.D. Ill., Jan. 3, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . **Exhibit 1 – Page 1**


*In re Crescent Resources LLC*,
2012 WL 195528 (W.D. Tex., Jan. 23, 2012) . . . . . . . . . . . . . . . . . . . . . . **Exhibit 1 – Page 9**


*Innocent OBI v. Chase Home Finance, LLC*,
2012 WL 1802450 (N.D. Ill., May 15, 2012) . . . . . . . . . . . . . . . . . . . . . . . **Exhibit 1 – Page 11**


*In re Innovative Communication Corp.*,
2013 WL 1795940 (D. Virgin Islands, April 29. 2013) . . . . . . . . . . . . . . . . **Exhibit 1 – Page 24**


*Polyad Co. v. Indopco Inc.*,
2007 WL 2893638 (N.D. Ill., Sept. 25, 2007) . . . . . . . . . . . . . . . . . . . . . . **Exhibit 1 – Page 32**


*RBS Citizens v. Gammonley*,
2013 WL 5753783 (N.D. Ill., Oct. 23, 2013) . . . . . . . . . . . . . . . . . . . . . . . **Exhibit 1 – Page 40**


*SE Property Holdings, LLC v. Braswell*,
2013 WL 4498700 (S.D. Ala., Aug. 21, 2013) . . . . . . . . . . . . . . . . . . . . . . **Exhibit 1 – Page 47**


*Source One Global Partners, LLC v. KGK Synergize, Inc.*,
2009 WL 2192791 (N.D. Ill., July 21, 2009) . . . . . . . . . . . . . . . . . . . . . . . **Exhibit 1 – Page 54**


*Timothy & Thomas LLC v. Viral Genetics, Inc.*,
2010 WL 3155972 (N.D. Ill., Aug. 10, 2010) . . . . . . . . . . . . . . . . . . . . . . . **Exhibit 1 – Page 63**


*Western Microtechnology, Inc. v. Goold Elecs. Corp.*,
1993 WL 424244 (N.D. Ill., Oct. 19, 1993) . . . . . . . . . . . . . . . . . . . . . . . . **Exhibit 1 – Page 89**

{4585430:}



Not Reported in F.Supp.2d, 2012 WL 10516 (N.D.Ill.)
**(Cite as: 2012 WL 10516 (N.D.Ill.))**

H
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Preston ALLBRITTON, et al., Plaintiffs,
v.
VILLAGE OF DOLTON, et al., Defendants.

No. 10 C 7581.
Jan. 3, 2012.

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge.

**\*1** The Court previously granted in part, and denied in part, Defendants' motion to dismiss the Second Amended Complaint. Plaintiffs have since amended their pleading, and Defendants now seek to dismiss Counts I, IV, and V of the Third Amended Complaint. For the reasons explained below, the Court grants Defendants' motion as to Counts IV and V, and accordingly dismisses Counts IV and V, but denies Defendants' motion as to Count I.

### INTRODUCTION

Ten Village of Dolton, Illinois police officers (collectively, "Plaintiffs") FN1 bring the present civil rights lawsuit against Defendants Village of Dolton, Illinois ("Village"), Village employee Gail Towers ("Towers"), and six members of the Village Board of Trustees (collectively, "Trustees"). FN2 (R. 81, Third Am. Compl. ¶¶ 1–13.) In their Third Amended Complaint, Plaintiffs claim that Defendants violated their constitutional federal rights to equal protection and free association, in violation of 42 U.S.C. § 1983 (Counts I and II.) Plaintiffs also bring a *Monell* policy claim against the Village (Count III), and state common law claims of fraud (Count IV), and

conspiracy (Count V).

> FN1. Plaintiffs are Preston Allbritton, Michelle Archer, Steven Biddle, Bryan Caridine, David Crudup, Stephen Curry, John Frasure, Charles Hampton, Darryl Hope, and Kevin Rene. (Third Am. Compl. ¶¶ 1–10.)

> FN2. The Trustees are Ronnie Lewis, James T. Jefferson, Garry Lambert, Willie L. Lowe, Samalla H. McClellan and Eva M. Nicholson. Plaintiffs sue the Trustees in their individual and official capacities. (*Id.* ¶¶ 1–13, 281 Ill.Dec. 215, 803 N.E.2d 619.)

### LEGAL STANDARD

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir.2009). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *AnchorBank, FSB v. Hofer,* 649 F.3d 610 (7th Cir.2011) (internal quotation and citation omitted). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

As the Seventh Circuit has explained, this "[r]ule reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities[.]" *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir.2009) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 1**

Not Reported in F.Supp.2d, 2012 WL 10516 (N.D.Ill.)
**(Cite as: 2012 WL 10516 (N.D.Ill.))**

which it rests." *Bell Atl. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also Graczyk v. West Pub. Co.,* 660 F.3d 275, 279 (7th Cir.2011) (stating in the context of a motion to dismiss, that the court will "construe the complaint in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor").

## BACKGROUND

**\*2** Plaintiffs allege the following facts in the Third Amended Complaint. At some point prior to October 13, 2007, Defendants the Village and the Trustees posted a notice that the Village intended to offer a promotional examination for police sergeant on October 13, 2007. (Third Am. Compl. ¶ 32.) Plaintiffs met all of the requirements to sit for the exam, and registered to take the exam. (*Id.* ¶ 33.) On October 13, 2007, Plaintiffs and other similarly situated applicants took the written portion of the sergeant's promotional examination. (*Id.* ¶ 47.)

Unlike Plaintiffs, however, two of the other "similarly situated applicants"—Village Police Officers Robert Fox and Curtis Rempson—actively participated in the Cook County Democratic Party and made campaign donations to "Citizens to Re–Elect William 'Bill' Shaw" (the then-mayor of the Village) and "Citizens to Re–Elect Robert 'Bob'

Shaw" (the mayor's twin brother, who the mayor appointed to be the Inspector General of the Village) in the several months leading up to the sergeant's examination. (*Id.* ¶¶ 34–42.) Between March 2006 and August 2007, Fox donated $3,700 to the mayor's reelection campaign. (*Id.* ¶¶ 35–42, 43 (additional donations in 2008)). In contrast, Plaintiffs "actively chose not to associate with the Cook County Democratic Party or to give political contributions [to the mayor]." (*Id.* ¶ 45.)

Resource Management Associates proctored and graded the examination. (*Id.* ¶ 48.) Pursuant to Chapter III, Section (C) (a) of the Village Board of Fire and Police Commissioners Rules and Regulations, an applicant needed to score a minimum of seventy (70) points to pass the written portion of the exam and advance to oral interviews, absent the Village or the Board of Fire and Police Commissioners using a "grading curve." (*Id.*) According to the results Resource Management Associates provided to Defendant Towers, Robert Fox and Curtis Rempson both scored below 70 on the exam, receiving scores of 63 and 60, respectively. (*Id.* ¶ 49.) Plaintiffs allege, upon information and belief, that Mayor Shaw asked Defendant Towers to change Fox and Rempson's test scores and to falsify a "Tentative Eligibility List." (*Id.* ¶ 51.) Plaintiffs further allege that Defendant Towers complied with the mayor's request, adding twenty (20) points to Fox's and Rempson's written test scores so that they would appear to have earned the highest and third-highest scores on the examination. (*Id.* ¶ 52 .)

Each of the Plaintiffs scored above 60 on the written portion of the promotional examination, and received scores higher than Fox and/or Rempson. (*Id.* ¶ 55.) Nevertheless, Defendants refused to allow eight of the Plaintiffs to continue to the oral interview. (*Id.* ¶ 56.)

Following the oral interviews, on or about December 5, 2007, Defendants Towers and the

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 2**

Not Reported in F.Supp.2d, 2012 WL 10516 (N.D.Ill.)
**(Cite as: 2012 WL 10516 (N.D.Ill.))**

Village produced a Tentative Eligibility List that ranked Fox first. (*Id.* ¶ 53.) Rempson ranked second on that list. (*Id.*) Plaintiffs claim that Defendants Towers and the Village fabricated that list. (*Id.*) At the time (i.e, in 2007), a minimum of four commissioners on the Village Board of Fire and Police Commissioners needed to sign the Village's promotional eligibility list in order for it to be valid. (*Id.* ¶ 58.) Plaintiffs allege that the Board of Fire and Police Commissioners never met to approve the December 5, 2007 Tentative Eligibility List, and that at least three of the four commissioners' signatures on the list were forged. (*Id.* ¶¶ 59, 60.)

**\*3** Defendants Towers and the Village posted a "Final Eligibility List" on or about December 21, 2007. (*Id.* ¶ 61.) That list factored in "Seniority Points" and "Military Points." (*Id.*) Fox ranked first on the Final Eligibility List, and Rempson ranked fourth. (*Id.*) Plaintiffs claim that Defendants Towers and the Village fabricated that list, too, and that the commissioners' signatures on that list are photocopies of the (forged) signatures found on the December 5, 2007 Tentative Eligibility List. (*Id.* ¶ 62.) According to Plaintiffs, the Village Board of Fire and Police Commissioners did not hold an official meeting on either December 5 or December 21, 2007 to approve the promotional lists. (*Id.* ¶ 63.)

Defendants promoted Robert Fox to sergeant on or about December 31, 2007. (*Id.* ¶ 65.) The following week, Defendants promoted Fox to the position of Chief of Police. (*Id.* ¶ 66.) Plaintiffs allege that Defendants knew Fox's true score of 63 when they voted to promote him. (*Id.*) On or about March 15, 2008, Defendants promoted Rempson to the rank of sergeant. (*Id.* ¶ 67 .) Plaintiffs allege that Defendants knew Rempson's true score of 60 when they voted to promote him. (*Id.*)

Plaintiffs claim that Defendants refused to promote Plaintiffs because Plaintiffs chose not to associate with, or donate to, the Cook County

Democratic Party.[FN3] (*Id.* ¶ 91.) Plaintiffs further allege that the Village, the Trustees, and Towers voted to promote Fox and Rempson because of their association with the Cook County Democratic Party and/or Mayor Shaw." (*Id.* ¶¶ 34, 69, 91–92.) Plaintiffs also claim that Defendants lowered Plaintiff Kevin Rene's score on the written examination from seventy-two (72) to seventy (70) without justification before they posted the Tentative Eligibility List. (*Id.* ¶ 71.) Defendants never promoted Plaintiff Rene. (*Id.*)

> FN3. Defendants did, in fact, promote Plaintiff Preston Allbritton to the rank of sergeant on or about February 1, 2009. (*Id.* ¶ 70, 281 Ill.Dec. 215, 803 N.E.2d 619.) Plaintiffs complain that Defendants delayed that promotion despite the fact that Plaintiff Allbritton received a higher score on the written examination than either Fox or Rempson. (*Id.*)

Plaintiffs submit that Chapter III, Section (A)(7) of the Village Board of Fire and Police Commissioners Rules and Regulations expressly prohibits "any other board or tribunal of any kind or description" from reviewing the grading of the promotional exams. (*Id.* ¶ 72.) Plaintiffs further claim that Defendants fabricated the Tentative Eligibility List and the Final Eligibility List pursuant to a custom, policy and practice of fabricating eligibility lists to facilitate the hiring of "favored individuals" over "more qualified candidates, including fire department eligibility lists in 2005 and 2006." (*Id.* ¶ 74.)

### ANALYSIS

Defendants move to dismiss Counts I, IV and V of the Third Amended Complaint. The Court addresses each claim in turn.

**I. Count I (Equal Protection under 42 U.S.C. §**

Not Reported in F.Supp.2d, 2012 WL 10516 (N.D.Ill.)
**(Cite as: 2012 WL 10516 (N.D.Ill.))**

[1983](#))

In Count I of the Third Amended Complaint, Plaintiffs allege that Defendants deprived Plaintiffs of equal protection of the laws under the Fourteenth Amendment, in violation of 42 U.S.C. § 1983. Plaintiffs allege that they "were part of an identifiable class of candidates for sergeant—they all chose not to affiliate with the Cook County Democratic Party and/or Mayor Shaw." (Third Am. Compl. ¶ 84.) Plaintiffs further allege that Defendants' "refusal to promote Plaintiffs entirety or in a timely manner was due to their membership in the class of candidates that chose not to affiliate with the Cook County Democratic Party." (*Id.* ¶ 91.) Likewise, according to Plaintiffs, "the Board voted to promote Robert Fox and Curtis Rempson rather than Plaintiffs due to their being members of the class of candidates that refused to affiliate with the Cook County Democratic Party and/or Mayor Shaw." (*Id.* ¶ 92.)

**A. Legal Standard**

**\*4** The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "All equal protection claims, regardless of the size of the disadvantaged class, are based on the principle that, under 'like circumstances and conditions,' people must be treated alike, unless there is a rational reason for treating them differently." *LaBella Winnetka v. Vill. of Winnetka,* 628 F.3d 937, 941–42 (7th Cir.2010) (citing *Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 601–02, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (quoting *Hayes v. Missouri,* 120 U.S. 68, 71–72, 7 S.Ct. 350, 30 L.Ed. 578 (1887))).

Equal protection "most typically reaches state action that treats a person poorly because of the person's race or other suspect classification, such as sex, national origin, religion, political affiliation, among others, ... or because the person is a member of a group that is the target of irrational government discrimination." *Abcarian v. McDonald,* 617 F.3d 931, 938 (7th Cir.2010) (citing *Engquist,* 553 U.S. 591, 128 S.Ct. 2146, 170 L.Ed.2d 975; *Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Srail v. Village of Lisle,* 588 F.3d 940, 943 (7th Cir.2009)). To state a classification-based equal protection claim, a plaintiff must allege purposeful discrimination on account of her membership in an identifiable group. *See, e.g., Engquist,* 553 U.S. at 605; *Personnel Admin. of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Pirela v. Vill. of N. Aurora,* 966 F.Supp. 661, 667 (N.D.Ill.1997) (citing *Sims v. Mulcahy,* 902 F.2d 524, 538 (7th Cir.1990)).

In addition to classification-based equal protection claims, courts recognize equal protection claims proceeding under a so-called "class of one" theory. *See Reget v. City of LaCrosse,* 595 F.3d 691, 695 (7th Cir.2010) (citing *Engquist,* 553 U.S. 591, 128 S.Ct. 2146, 170 L.Ed.2d 975). To succeed under this theory, a plaintiff must establish that she has been intentionally treated differently than others similarly situated, and there is no rational basis for the difference in treatment. *See Reget v. City of La Crosse,* 595 F.3d 691, 695 (7th Cir.2010). The "class-of-one" theory, however, is unavailable in the public employment context. *See Abcarian,* 617 F.3d at 938 (citing *Engquist,* 553 U.S. 591, 128 S.Ct. 2146, 170 L.Ed.2d 975)). Such a claim is a " 'poor fit' with employment decisions, which are themselves 'often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify.' " *Id.* (quoting *Engquist,* 553 U.S. at 604–05).

**B. Analysis**

The Court previously dismissed Plaintiffs' equal protection claim as alleged in the Second Amended Complaint, reasoning that Plaintiffs pleaded a "class-of-one" theory that is not actionable following the Supreme Court's decision in *Engquist v. Oregon Department of Agriculture.* In an attempt to cure this pleading defect, Plaintiffs have amended their equal protection claim to allege class-based discrimination,

Not Reported in F.Supp.2d, 2012 WL 10516 (N.D.Ill.)
**(Cite as: 2012 WL 10516 (N.D.Ill.))**

namely that Defendants treated Plaintiffs less favorably "due to their membership in the class of candidates [for sergeant] that chose not to affiliate with the Cook County Democratic Party." (Third Am. Compl. ¶ 91.)

**\*5** Defendants move to dismiss the amended claim on the basis that "Plaintiffs have failed to define a class, and there still maintain a class of one claim" (Defs.' Mem. at 3), and that Plaintiffs have failed to "plead that Plaintiffs were singled out for disparate treatment and that the Defendants actions were selected for the purpose of causing adverse effects on the Plaintiffs." (*Id.* at 6.) The Court disagrees on both accounts.

Defendants first argue that the allegations in the Third Amended Complaint fail to adequately define a class for purposes of equal protection because "Plaintiffs cannot simply take their allegations and craft a class based on those allegations." (*Id.* at 4.) Defendants explain that Plaintiffs "derive their 'class' from the Defendants' alleged tortuous conduct," and for that reason, Plaintiffs cannot adequately plead a class. (*Id.* at 5 (citing *McDorman v. Smith*, 437 F.Supp.2d 768, 775 (N.D.Ill.2008) and *Brown v. City of Chicago*, 573 F.Supp. 1375, 1380 (D.C.Ill.1983).)

Although the Court does not quibble with Defendants' premise that membership in a class defined by those who are victims of tortuous conduct may not be sufficient to state an equal protection claim, *see McDorman*, 437 F.Supp.2d at 776, Plaintiffs have not defined their class in that manner. Instead, Plaintiffs define their class based their pre-existing status as individuals who "actively chose not to associate with the Cook County Democratic Party or to give political contributions [to the mayor]." (Third Am. Compl. ¶ 45.) Although Plaintiffs, as a class, may have been victims of Defendants' alleged tortuous conduct, their class definition includes an external political nexus, namely nonaffiliation with certain political forces, that distinguishes it from

classes defined exclusively by the tortuous conduct of another. *Cf. McDorman v. Smith,* 437 F.Supp.2d at 775 (victims of specific police misconduct); *Brown,* 573 F.Supp. at 1380 (same).

Alternatively, Defendants argue that even if Plaintiffs adequately pleaded membership in an identifiable class, Plaintiffs "have failed to show that Defendants acted with nefarious purpose to discriminate against Plaintiffs." (*Id.* at 5.) In its opinion denying Defendants' motion to dismiss Plaintiffs' First Amendment claim pleaded in the Second Amended Complaint, the Court previously held that Plaintiffs had plausibly alleged that their political nonaffiliation was the but-for cause of Defendants' allegedly unlawful actions against them. (R. 79, at 13 (citing, inter alia, *Branti v. Finkel,* 445 U.S. 507, 517, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980); *Hermes v. Hein,* 742 F.2d 350, 354 n. 3 (7th Cir.1984)). The Court explained: "The entire thrust of Plaintiffs' Complaint is that Defendants discriminated against Plaintiffs because of their non-affiliation with the Cook County Democratic Party." (R. 79, at 13.) So too here, where Plaintiffs' alleged non-affiliation forms the basis of their equal protection claim, Plaintiffs have plausibly alleged the element of intent for purposes of surviving a motion to dismiss their equal protection claim.

**\*6** Accordingly, the Court denies Defendants' motion to dismiss as to Count I.[FN4]

> FN4. In denying the motion to dismiss, the Court expresses no view on whether a plaintiff may maintain a classification-based equal protection claim on the basis of political patronage in the public workplace. Because neither party has raised or briefed that issue, the Court has assumed that such a claim is viable. In that regard, the Court simply observes that the Supreme Court and the lower courts have developed a significant body of law under the First

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 5**

Not Reported in F.Supp.2d, 2012 WL 10516 (N.D.Ill.)
**(Cite as: 2012 WL 10516 (N.D.Ill.))**

Amendment that protects against political patronage in the workplace, *see Rutan v. Rep. Party of Ill.,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) ("promotion, transfer, recall, and hiring decisions"); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 372, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *accord Musabellie v. Gonzales,* 442 F.3d 991, 994 (7th Cir.2006) (opining that *Rutan* and *Elrod* limit the political "spoils system"), but have not done so in the equal protection context. *See Lundblad v. Celeste,* 924 F.2d 627, 628 (6th Cir.1991) ("[T]he Supreme Court has developed principles under the First Amendment prohibiting the hiring and firing of employees on a partisan political basis, but the Court has not developed such principles under the Equal Protection Clause [.]"). Thus, although the First Amendment stands as the primary source of constitutional protection against political patronage in the public workplace, whether it stands as the exclusive source appears to be an open question. *Cf. Pagan v. Calderon,* 448 F.3d 16, 36 (1st Cir.2006) (dismissing equal protection claim alleging political discrimination in employment, reasoning that the plaintiff's "allegations of political discrimination fit within the contours of the First Amendment").

## II. Count IV (Fraud)

In Count IV, Plaintiffs assert a claim of state law fraud against Defendant Towers and the Village.[FN4] Plaintiffs allege that Defendants fraudulently manipulated the promotional process, and "as a result of their reasonable reliance" on that conduct, Plaintiffs "were denied promotions, failed to seek promotions or challenge the promotions of Robert Fox and Curtis Rempson, denied salary increases, and denied job prospects within the department."

(Third Am. Compl. ¶ 121; *see also id.* ¶¶ 119, 128, 130.)

> FN5. The Third Amended Complaint additionally names the Trustees as Defendants in Count IV, but Plaintiffs explain that have abandoned any claim of fraud against the Trustees. (R. 90, Pls.' Resp. at 8.)

### A. Legal Standard

In pleading fraud in federal court, Rule 9(b) imposes a higher pleading standard than that required under Rule 8. Specifically, Rule 9(b) requires a pleading to state with particularity the circumstances constituting the alleged fraud. *See* Fed.R.Civ.P. 9(b). The Rule "requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc,* 20 F.3d 771, 777 (7th Cir.1994) (internal quotation marks omitted). This requirement "ordinarily requires describing the 'who, what, when, where, and how' of the fraud.' " *AnchorBank,* 649 F.3d at 615 (citing *Pirelli Armstrong Tire Corp. Retiree Md. Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 441–42 (7th Cir.2011)).

"To state a fraud claim under Illinois law, a plaintiff must allege that the defendant: (i) made a false statement of material fact; (ii) knew or believed the statement to be false; (iii) intended to and, in fact, did induce the plaintiff to reasonably rely and act on the statement; and (iv) caused injury to the plaintiff." *Bank of Am., N.A. v. Shelbourne Dev. Grp., Inc.,* 732 F.Supp.2d 809, 826 (N.D.Ill.2010) (quoting *Reger Dev., LLC v. Nat'l City Bank,* 592 F.3d 759, 766 (7th Cir.2010)). With regard to the fourth element, Illinois courts require that the injury amount to a "tangible pecuniary loss." *City of Chicago v. Mich. Beach Housing Co–Op,* 297 Ill.App.3d 317, 323, 696 N.E.2d 804, 231 Ill.Dec. 508 (Ill.App.Ct.1998)

Not Reported in F.Supp.2d, 2012 WL 10516 (N.D.Ill.)
**(Cite as: 2012 WL 10516 (N.D.Ill.))**

(reasoning that "common-law fraud primarily addresses the invasion of economic interests") (citation omitted).

**B. Analysis**

In this case, Defendants argue that Plaintiffs have failed to adequately plead a cognizable injury that resulted from Defendants' alleged fraud, and therefore have failed to state a claim for fraud under Illinois law. Specifically, Defendants argue that Plaintiffs' claim of fraud fails as a matter of law because "Plaintiffs have no property interest in a promotion." (Defs.' Mot. at 11 (citing *Bigby v. City of Chicago, 766 F.2d 1053, 1056 (7th Cir.1985).*) The Court agrees.

Plaintiffs premise their allegations of injury on their failure to attain a promotion to sergeant. Only one position was available, and for that reason, it would be nothing more than an "expression [of] opinion [about a] future probability" to conclude that the promotion would have gone to any particular Plaintiff, let alone any Plaintiff at all. *See Dloogatch v. Brincat, 396 Ill.App.3d 842, 851, 336 Ill.Dec. 571, 920 N.E.2d 1161 (Ill.App.Ct.2009)* ( "damages may not be predicated on mere speculation, hypothesis, conjecture or whim") (internal quotation marks and citations omitted); *see also City of Chicago v. Mich. Beach Housing Co-op., 297 Ill.App.3d 317, 323, 696 N.E.2d 804, 231 Ill.Dec. 508 (Ill.Ct.App.1998)*

**\*7** Indeed, public "employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Engquist, 553 U.S. at 604*. This is especially true in the context of a promotion. *See Moore v. Muncie Police & Fire Merit Comm'n, 312 F.3d 322, 327 (7th Cir.2002)* ("We have also previously held that an employee has no property interest in a *prospective* promotion, even when placed on an eligibility or ranking list.") (collecting cases); *Bigby, 766 F.2d at 1057* (holding that "the promotion of a patrolman to sergeant is one of

discretion," so that the plaintiff "had no vested right to promotion") (citing Illinois law).

As applied to this case, Plaintiffs make no plausible allegation that they had any legal property or otherwise economic interest in a promotion. *See Mich. Beach Housing Co–Op, 297 Ill.App.3d 317, 323, 696 N.E.2d 804, 231 Ill.Dec. 508 (Ill.App.Ct.1998)*. Nor does the Third Amended Complaint contain any plausible allegation that Plaintiffs' alleged injury in connection with the promotion process "is tangible enough ... to establish a pecuniary loss." *Mich. Beach Housing Co-op., 297 Ill.App.3d 317 at 323, 231 Ill.Dec. 508, 696 N.E.2d 804* (holding that fraudulent misrepresentations that caused a plaintiff to lose "an opportunity to convert low-income rental housing into cooperative housing" did not amount to "tangible enough evidence to establish a pecuniary loss"). Under these circumstances, Plaintiffs have failed to plausibly allege the element of injury. *See Twombly, 550 U.S. at 555* (stating that a complaint must include sufficient factual allegations "to raise a right to relief above the speculative level.").

Accordingly, the Court grants Defendants' motion to dismiss Count IV.

**III. Count V (Conspiracy)**

In Count V, Plaintiffs assert a state law claim of conspiracy to defraud. Under Illinois law, civil conspiracy is not an independent tort, and thus if a "plaintiff fails to state an independent cause of action underlying his conspiracy allegations, the claim for conspiracy also fails." *Thomas v. Fuerst, 345 Ill.App.3d 929, 936, 281 Ill.Dec. 215, 803 N.E.2d 619, 626 (Ill.App.Ct.2004)*. In moving to dismiss Count V, Defendants argue just that: "because the claim for common law fraud should be dismissed, the claim for conspiracy to commit [fraud] should also be dismissed." (Defs.' Mot. at 11.) Plaintiffs concede that their conspiracy claim has no independent viability and "would also fail" if the Court dismisses

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.   **Exhibit 1 – Page 7**

Not Reported in F.Supp.2d, 2012 WL 10516 (N.D.Ill.)
**(Cite as: 2012 WL 10516 (N.D.Ill.))**

the fraud claim.

Accordingly, because Plaintiffs have failed to state a claim for fraud, they have additionally failed to state a claim for conspiracy to defraud.

## CONCLUSION

For the reasons discussed above, the Court grants Defendants' motion as to Counts IV and V, and accordingly dismisses Counts IV and V, but denies Defendants' motion as to Count I, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

N.D.Ill.,2012.
Allbritton v. Village of Dolton
Not Reported in F.Supp.2d, 2012 WL 10516 (N.D.Ill.)

END OF DOCUMENT

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 8**



Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285
**(Cite as: 2012 WL 195528 (Bkrtcy.W.D.Tex.))**

H

United States Bankruptcy Court,
W.D. Texas,
Austin Division.
In re CRESCENT RESOURCES, LLC, et al.,
Debtors.
Crescent Resources Litigation Trust, by and Through
Dan Bensimon, Trustee, Plaintiff,
v.
Nexen Pruet, LLC f/k/a Nexsen Pruet Jacobs &
Pollard, LLC, Defendant.

Bankruptcy No. 09–11507–CAG.
Adversary No. 11–01082–CAG.
Jan. 23, 2012.

Eric J. Taube, Mark Curtis Taylor, Hohmann Taube
& Summers, L.L.P., Austin, TX, Marcia L.
Goldstein, New York, NY, Martin A. Sosland,
Michelle V. Larson, Rebecca A. Thomas, Weil
Gotshal & Manges L.L.P., Dallas, TX, for Debtors.

***MEMORANDUM OPINION AND ORDER
GRANTING NEXSEN PRUET'S MOTION TO
DISMISS***

CRAIG A. GARGOTTA, United States Bankruptcy
Judge.

**\*1** Came on to be considered the above-styled
and numbered adversary proceeding and, in
particular, the Motion to Dismiss filed September 14,
2011 (docket no. 7), on behalf of Defendant, Nexsen
Pruet, LLC f/k/a Nexsen Pruet Jacobs & Pollard,
LLC ("Nexsen Pruet"). The Court has jurisdiction
over this proceeding pursuant to 28 U.S.C. §§ 157
and 1334, and it is deemed a core proceeding under
28 U.S.C. § 157(b)(2)(A), (E), (F), (H), and (O). This
matter is referred to this Court under the District's
Standing Order of Reference. Venue is proper under

28 U.S.C. §§ 1408 and 1409.

On May 11, 2011, Plaintiff, Crescent Resources
Litigation Trust (the "Trust"), filed its Complaint for
Avoidance and Recovery of Avoidable Transfers
(docket no. 1), alleging that the Debtors, Crescent
Resources and their affiliated entities (the
"Debtors"),[FN1] made preferential transfers to Nexsen
Pruet in violation of 11 U.S.C. § 547 as well as
fraudulent transfers in violation of 11 U.S.C. § 548.
On September 14, 2011, Nexsen Pruet filed a Motion
to Dismiss (docket no. 7). On October 4, 2011, the
Trust filed its Response (docket no. 10). On
November 11, 2011, Nexsen Pruet filed its Reply in
Support of Motion to Dismiss (docket no. 14). On
November 18, 2011, after hearing the arguments of
counsel, the Court took the matter under advisement.
Having considered the arguments presented and the
applicable law, for the reasons stated below, the
Court finds that Nexsen Pruet's Motion to Dismiss
should be GRANTED.

> FN1. A list of Debtors is attached to the
> Trust's Complaint as Exhibit A. The Court
> ordered that the Debtors' cases be
> consolidated for procedural purposes and
> jointly administered pursuant to Rule
> 1015(b) of the Federal Rules of Bankruptcy
> Procedure (docket no. 1, at 3).

**BACKGROUND**

On June 10, 2009, the Debtors filed a voluntary
case under Chapter 11 of the Bankruptcy Code.
According to the Trust's Complaint, the Debtors
made one or more transfers from their Bank of
America bank account to Nexsen Pruet via check or
wire transfer on or within ninety days prior to the
Petition Date (docket no. 1, at 3, 4). The Trust
outlined the details of each of these alleged transfers
in a chart, which it attached as an exhibit to its

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.
**Exhibit 1 – Page 9**

Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285
**(Cite as: 2012 WL 195528 (Bkrtcy.W.D.Tex.))**

Complaint ("Exhibit B"). With respect to each alleged transfer, Exhibit B lists the invoice date, the invoice amount, and the invoice number (where available), [FN2] along with the corresponding payment date and/or bank clear date, the payment amount, and the check or wire number (*id.* at 3, Ex. B.)

> FN2. For slightly more than half of the alleged transfers, Exhibit B lists "MULTIPLE INVS" under the "Invoice number" column.

According to the Complaint, prior to and after the filing of the petition, the Debtors used a "Cash Management system, which is similar to systems used by other large business enterprises." [FN3] (*Id.* at 4.) Crescent Resources maintained the primary operating accounts that most of the Debtors and their subsidiaries used for deposits and disbursements; however, certain subsidiaries used their own stand-alone accounts (*id.*). The primary accounts and the stand-alone accounts were all held at Bank of America (*id.*). "From time to time, funds were transferred by Crescent Resources to these accounts, and excess capital was sent from these accounts to Crescent Resources as distributions." (*Id.*)

> FN3. In using the defined term "Cash Management system," the Trust includes a footnote citation to "Docket No. 15." Docket no. 15 in the main bankruptcy case (case no. 09–11507) consists of Debtors' Motion Pursuant to Sections 105(A), 345(B), 363(C) And 364(A) of the Bankruptcy Code for (I) Authority to Continue to Use Existing Cash Management System, (II) Authority To Maintain Existing Bank Accounts and Business Forms, and (III) Waiver of the Requirements of Section 345(B) of the Bankruptcy Code, filed June 10, 2009. This document is not attached to the Complaint.

**\*2** Expenses were generally paid from one of four primary accounts: (i) a Crescent Resources deposit account, (ii) a Crescent Resources disbursement account, (iii) a LandMar Group deposit account, or (iv) a LandMar Group disbursement account (*id.*). The "Cash Manager" at Crescent Resources oversaw the four primary accounts and determined the upcoming expenses to be paid from these accounts on a daily basis (*id.*). Payments were made either via wire transfer issued from the Crescent Resources deposit account or the LandMar Group deposit account or by paper check issued from the Crescent Resources disbursement account or the LandMar Group disbursement account (*id.*). Amounts paid from the Crescent Resources disbursement account and from the LandMar Group disbursement account were pre-funded prior to such checks being issued (*id.* at 5). Expenses not paid from one of the primary accounts were paid by check directly from the stand-alone accounts (*id.* at 4–5).

Under the section of the Complaint entitled "Facts Relating to Insolvency," the Trust alleges that the Debtors' Schedules, Statements of Financial Affairs, and Disclosure Statement, along with the declaration of the Debtors' chief financial officer,[FN4] reflect that the Debtors were "deeply insolvent at all times relevant to the complaint." (*Id.*) The Trust did not attach any of these documents to its Complaint. The Trust further alleges that the Debtors were insolvent "under a number of tests." (*Id.*) "First, they were left with unreasonably small capital to operate their business. Second, they were unable to pay their debts when they became due. Third, they were rendered insolvent because their post-transaction liabilities exceeded their post-transaction assets at a fair valuation." (*Id.* at 5–6.)

> FN4. In reference to "the declaration of Debtors' chief financial officer," the Trust provides a footnote citation to "Docket No. 22." (*See* docket no. 1, at 5, n. 5.) Docket no. 22 of the main bankruptcy case (case no.

Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285
**(Cite as: 2012 WL 195528 (Bkrtcy.W.D.Tex.))**

09–11507) consists of the Declaration of Kevin H. Lambert in Support of the Debtors' Chapter 11 Petitions and First Day Motions. The Trust did not attach this document to its Complaint. The Complaint does not reference any specific facts provided in the declaration or even a specific page number within the fifty-twopage document.

Under Count One of the Complaint, the Trust essentially recites verbatim the elements of a § 547 claim for preferential transfer (*id.* at 5). Under Count Two, the Trust brings a fraudulent transfer claim in the alternative, "[t]o the extent that the Transfer(s) were made by Crescent Resources, LLC to the Defendant and there was no antecedent debt." (*Id.* at 7.) The Trust does not specify whether the fraudulent transfer claim is brought under § 548(a)(1)(A) for actual fraud or under § 548(a)(1)(B) for constructive fraud; however, it essentially recites verbatim the elements of a § 548(a)(1)(B) constructive fraudulent transfer claim (*id.*). In particular, with regard to the element of reasonably equivalent value under the statute, the Trust alleges that "[t]he Debtor or Debtors identified on Exhibit B received less than the reasonably equivalent value in exchange for the Transfer(s)." (*Id.*) With regard to the element of insolvency under the statute, in addition to the general allegations contained in the "Facts Relating to Insolvency" section of the Complaint, the Trust alleges the following:

> The Debtor or Debtors identified on Exhibit B was insolvent on the date of the Transfer(s) or became insolvent as a result of the Transfer(s) or the relevant Debtor was engaged or about to engage in a business or transaction that would leave the relevant Debtor with unreasonably small capital or the relevant Debtor intended to incur or believed it would incur debts beyond its ability to pay as they matured.

**\*3** (*Id.*)

**PARTIES' CONTENTIONS**

In its Motion to Dismiss, Nexsen Pruet contends that neither Count One nor Count Two of the Trust's Complaint meets the plausibility standard required to withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See generally Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Nexsen Pruet argues that, (1) aside from the chart attached as Exhibit B to the Complaint listing all alleged payments made by the Debtors to Nexsen Pruet, the Complaint does not provide any other factual details to support the elements of either a preference claim or a fraudulent transfer claim; and (2) Exhbit B alone is insufficient to satisfy the Trust's pleading burden because it "leaves the Court and Defendant to speculate as to how the information contained therein is relevant to the claims." (Docket no. 7, at 3–4.) According to Nexsen Pruet, the Complaint's "Facts" section merely provides "a cursory background of the Debtors' cash management system and payment system, without referencing the Defendant or stating any specific facts supporting the Trust's case against the Defendant," and the "Causes of Action" section is "even less adequate, as it contains a simple recitation of the elements of the cause of action as legal conclusions without providing any facts or supporting details." (*Id.* at 4.) Over all, Nexsen Pruet asserts that the allegations are conclusory and based upon "naked assertions devoid of further factual enhancement." (*Id.* (citing *Iqbal,* 129 S.Ct. at 1950)). Accordingly, Nexsen Pruet requests that the Court dismiss both counts of the Complaint or, alternatively, require the Trust to replead (*id.* at 5).

In its Response, the Trust argues that, notwithstanding the Supreme Court's rulings in *Iqbal* and *Twombly,* the Federal Rules of Civil Procedure require only "notice" pleading and that "the pleading of specific facts is unnecessary." (Docket no. 10, at 2

Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285
**(Cite as: 2012 WL 195528 (Bkrtcy.W.D.Tex.))**

(citing *Erickson v. Pardus,* 551 U.S. 89, 93–94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)). In sum, the Trust argues that it provided a "detailed pleading of insolvency" and a "clear pleading of reasonably equivalent value" and that the Complaint is "more than sufficient to state a claim for relief that is plausible on its face." (*Id.* at 9.) In the alternative, should the Court find the Complaint to be insufficiently pleaded, the Trust requests the opportunity to replead in conformity with the Court's ruling (*id.* at 10).[FN5]

> **FN5.** The Trust states in its Response that "[t]he defense also moves to dismiss certain of the individual claims for alleged failure to plead those claims in accordance with FED.R.CIV.P. 9(b), as incorporated herein by FED. R. BANK. P. 7009." (Docket no. 10, at 2.) The Motion to Dismiss does not, however, contain any mention of Rule 9(b). As such, the Court sees no reason to consider the Trust's argument that a Trustee should not be held to the Rule 9(b) standard.

In its Reply, Nexsen Pruet argues that, since the Supreme Court's decisions in *Twombly* and *Iqbal,* "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." (Docket no. 14, at 1) (citing *Airport Blvd. Apartments Ltd. v. NE 40 Partners, LP (In re Partners, LP),* 440 B.R. 124, 127 (Bankr.S.D.Tex.2010)). Moreover, Nexsen Pruet argues that the information in Exhibit B "is insufficient for Defendant to reconcile its internal records or analyze the Trustee's allegations." (*Id.* at 4.) The Reply states:

> **\*4** Specifically, the Chart is so inadequate that the Defendant is unable to (a) isolate particular invoices that are applicable, (b) determine the debtor entity to which such invoices apply, (c) trace applicable invoices to specific wire

transactions between debtor entities and the Defendant, or (d) sort through its internal payment history for services rendered to specific debtor entities.

(*Id.*) In addition, Nexsen Pruet asserts that a 2009 case from the Eastern District of North Carolina sets forth "the appropriate application of *Twombly* and *Iqbal* " to a complaint by the trustee alleging preferential and fraudulent transfer actions (*id.* at 3) (citing *Angell v. BER Care, Inc. ( In re Caremerica, Inc.),* 409 B.R. 737, 750 (Bankr.E.D.N.C.2009)). Nexsen Pruet argues that "the factual allegations in the Complaint, and the exhibit attached thereto, are substantially less robust than those in *Caremerica.*" (*Id.* at 4.)

**MOTION TO DISMISS STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint "need only include 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Hershey v. Energy Transfer Partners, LP,* 610 F.3d 239, 245 (5th Cir.2010) (quoting Fed.R.Civ.P. 8(a)(2)). " '[D]etailed factual allegations' are not required." *Id.* (quoting *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555)). A court should not accept, however, "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Hershey,* 610 F.3d at 245–46 (quoting *Iqbal,* 129 S.Ct. at 1949–50). Moreover, the Court "will not strain to find inferences favorable to the plaintiff." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 361 (5th Cir.2004) (internal quotations omitted). Rather, the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.' " *Id.* Determining the existence of facial plausibility is a "context-specific task" that "requires the court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950. "A claim for relief is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285
**(Cite as: 2012 WL 195528 (Bkrtcy.W.D.Tex.))**

misconduct alleged.' " *Harold H. Huggins Realty, Inc. v. FNC, Inc.,* 634 F.3d 787, 796 (5th Cir.2011) (quoting *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 570)). An inference of liability must be at least as plausible as any "obvious alternative explanation." *Iqbal,* 129 S.Ct. at 1950–51 (citing *Twombly,* 550 U.S. at 567). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.' " *Harold H. Huggins Realty,* 634 F.3d at 796 (quoting *Iqbal,* 129 S.Ct. at 1949 (internal citation omitted)).

## ANALYSIS

**I. The Trust's preferential transfer claim under 11 U.S.C. § 547(b) should be dismissed without prejudice.**

**\*5** In order to state a claim for a preferential transfer under § 547(b), the Trust must plead that the transfer of an interest in the Debtors' property was:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such a transfer was made;

(3) made while the debtor was insolvent;

(4) made-

(A) within 90 days before the date of the filing of the petition; or

(B) [ ] within one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) [such that the] payment enables such creditor to receive more than such creditor would if—

(A) the case were a case under Chapter 7 of this

title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

*Hill v. Oria (In re Juliet Homes, LP),* No. 09–03429, 2011 WL 6817928, at \*8–9 (Bankr.S.D.Tex.2011) (citing 11 U.S.C. § 547(b)).

In the *Caremerica* case cited by Nexsen Pruet, the Chapter 7 trustee sought to avoid and recover certain alleged preferential and fraudulent transfers made by the debtors to BER Care, Inc. and subsequently transferred from BER Care, Inc. to the defendants. *In re Caremerica,* 409 B.R. at 744. The trustee's second amended complaint contained a list of the total amounts of the preferential and fraudulent transfers alleged to have been received by each defendant. *Id.* Attached to the complaint, the trustee included a bank statement belonging to BER Care, Inc. as well as a chart marked as Exhibit B, which contained "a list of each alleged transfer and included specific amounts, dates, check numbers, payee reference numbers, names of payees, account numbers and account names corresponding to each transfer." *Id.*

In support of their motion to dismiss, the defendants in *Caremerica* argued that the court should adopt the strict pleading standard set out in *In re Valley Media,* 288 B.R. 189 (Bankr.D.Del.2003). In that case, Judge Walsh of the Delaware Bankruptcy Court held that a complaint to avoid a preferential transfer must identify the nature and amount of each antecedent debt as well as, for each alleged transfer, the date, name of the transferor, name of the transferee, and dollar amount. *Id.* at 192. Three years later, Judge Walsh applied the same standard in *In re Oakwood Homes Corp.,* 340 B.R.

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 13**

Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285
**(Cite as: 2012 WL 195528 (Bkrtcy.W.D.Tex.))**

510 (Bankr.D.Del.2006), finding that a non-insider preference claim was sufficient to withstand a motion to dismiss where the complaint (a) detailed the relationship between the debtors and defendants and explained that many of the debts arose from a loan assumption program, (b) included "exact dates, precise dollar amounts, and in some cases check numbers for each of the transfers," and (c) identified the transferors as the debtors and their affiliates, which the court found operated as a unit with minimal distinctions between debtor and non-debtor entities. *In re Oakwood Homes,* 340 B.R. at 522. In accordance with *Valley Media,* Judge Walsh stopped short of requiring the plaintiff to plead "how factors" such as "how the transfers enabled Defendant to receive more than it would have in a Chapter 7 liquidation" or facts showing "that Plaintiff owed Defendant an antecedent debt," stating that "Rule 8(a) does not contemplate such specificity." *Id.* (citing *Valley Media,* 288 B.R. at 193).

**\*6** In reaching its decision on the motion to dismiss, the *Caremerica* court thoroughly analyzed the Rule 8(a) pleading standard set out by the Supreme Court in in *Iqbal* and *Twombly. In re Caremerica,* 409 B.R. at 745–48. The court then considered the pleading standard set out by *Valley Media* as well as that set out by subsequent conflicting cases, noting that most of the relevant case law was decided prior to *Iqbal* and *Twombly.*[FN6] The *Caremerica* court acknowledged that "*Valley Media* has been distinguished or ignored by the majority of bankruptcy courts both nationwide as well as in Delaware," but nevertheless determined that "the Supreme Court in *Twombly* and *Iqbal* breathe new life into the pleading requirements implemented in *Valley Media* for § 547 preference claims." *Id.* at 753, n. 2.

> FN6. *Id.* at 748–50 (citing *In re Allou Distribs., Inc.,* 387 B.R. 365, 405 (Bankr.E.D.N.Y.2008) (finding that a preference claim identifying transferor and

transferee, check number, date, and amount was sufficient); *In re NM Holdings Co., LLC,* 376 B.R. 194, 204 (Bankr.E.D.Mich.2007) (finding that a preference claim identifying transferor and transferee, form of transfer, and the total amount of transfers was sufficient to meet Rule 8(a)'s "liberal" pleading requirements); *In re The IT Group, Inc.,* 313 B.R. 370, 373–74 (Bankr.D.Del.2004) (finding the requirements of *Valley Media* "inappropriate and unnecessarily harsh" and holding that the complaint identifying the amount, date, and number of the transfer "clearly provided fair notice"); *In re Randall's Island Family Golf Ctrs., Inc.,* 290 B.R. 55, 65 (Bankr.S.D.N.Y.2003) (finding that "a preference complaint may provide a defendant with fair notice of the claim despite the lack of information required by *Valley Media* ")).

Based on this premise, the court then proceeded to address each element of a preferential transfer claim in turn. *Id.* at 750. With regard to Exhibit B, the court found that "the information provided in the Table of Transfers, including the names of transferees and the dates and amounts of each transfer, [was] sufficient to plausibly assert that funds were transferred to the Movants" and that, with regard to transfers made within 90 days of the petition date, insolvency was to be presumed. *Id.* at 751 (citing 11 U.S.C. § 547(f)). With regard to the other elements, however, the court applied a standard even more demanding than that of *Valley Media* and *Oakwood Homes,* finding that "in light of the heightened pleading standard expressed in *Iqbal,* the trustee is obligated to support his allegation with facts showing that it is plausible that creditors would receive less than a 100% payout in a liquidation." *Id.* at 754. The court also determined that the trustee is obligated to allege facts surrounding the nature and amount of the antecedent debt. *Id.* In so ruling, the

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 14**

Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285
**(Cite as: 2012 WL 195528 (Bkrtcy.W.D.Tex.))**

court rejected the trustee's argument that the new pleading requirements impose an undue burden on the trustee.[FN7]

> FN7. "[T]he court admits that claims for relief are more difficult to plead sufficiently following *Twombly* and *Iqbal.* However, the trustee is certainly more likely to have access to this information than the antitrust plaintiffs in *Twombly* or the Pakistani detainee in *Iqbal.* If these claimants were held to a heightened pleading standard, so too can a trustee in bankruptcy." *Id.* at 754. "After all, the trustee has theoretically had all of the books and records of the debtors for up to two years prior to bringing these causes of action, with the full discovery powers of the court through 2004 exams and other means available during that time." *Id.*

At the time when *Caremerica* was decided, "bankruptcy courts were in the early stages of applying *Twombly* [and] *Iqbal* to preference claims, and there were, and continue to be, conflicting rulings." *Tousa Homes, Inc. v. Palm Beach Newspapers (In re Tousa, Inc.),* 442 B.R. 852, at 853 (Bankr.S.D.Fla.2010).[FN8] To date, no court in this circuit has expressly adopted the *Caremerica* standard. This Court will not do so either in this case. That is not to say, however, that the trustee has met his pleading burden simply by including allegations that mirror the language of the fraudulent transfer statute along with a chart such as Exhibit B. In the majority of cases, even in those in which courts rejected the *Valley Media* and *Caremerica* standards as too demanding, the plaintiffs, at a minimum, alleged facts surrounding the nature of the relationship between the debtor and the defendant in order to support the inference of an antecedent debt. For example, in *In re NM Holdings,* 407 B.R. at 243, the ninety-one page complaint contained a "General Allegations" section that included "an extensive recitation of transactions that occurred" between the

debtor and the defendants. In *In re C.R. Stone Concrete Contractors,* 434 B.R. at 211–15, the complaint detailed the relationships between the debtor corporation and the defendants as contractors and hired parties in the business of concrete design and installation.

> FN8. *See, e.g., In re C.R. Stone Concrete Contractors, Inc.,* 434 B.R. 208 (Bankr.D.Mass.2010) (holding that the new standards of *Twombly* and *Iqbal* did not require the court to "apply *In re Valley Media's* heightened pleading standards"); *Gold v. Winget ( In re NM Holdings Co., LLC),* 407 B.R. 232, 256–57 (Bankr.E.D.Mich.2009) (determining the "heightened pleading requirements imposed by the *Valley Media* case [are] inconsistent with the liberal notice pleading principles underlying the civil rules" and finding a more liberal standard consistent with *Twombly* ) (internal citations omitted). See also the conflicting cases listed in note 6, *supra,* that were decided pre-*Iqbal.*

*\*7* In this case, according to the Trust's Complaint, the Debtors made one or more transfers from their Bank of America bank account to Nexsen Pruet via check or wire transfer on or within ninety days prior to the petition date, June 10, 2009 (docket no. at 3, 4). Thus, the Court will presume Debtors were insolvent at the time the alleged transfers were made. With respect to each transfer, Exhibit B lists the invoice date, the invoice amount, and the invoice number (where available), along with the corresponding payment date and/or bank clear date, the payment amount, and the check or wire number (*id.* at 3, Ex. B). Exhibit B also identifies the transferor as either "Crescent Resources, LLC" or "LandMar Group, LLC" and identifies the transferee as Nexsen Pruet. In accordance with *Valley Media, Oakwood Homes,* and in particular *Caremerica,* the content of Exhibit B is sufficient to support the

Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285
**(Cite as: 2012 WL 195528 (Bkrtcy.W.D.Tex.))**

inference that the transfers were made.

Notwithstanding the Court's finding that the Trust has sufficiently pleaded the majority of the elements of a preferential transfer action, the Court finds that the Trust has not sufficiently pleaded the existence of an antecedent debt. By contrast to the cases cited above, including those which espouse even the most lenient of pleading standards, the Trust's Complaint contains no description whatsoever of the Defendant, Nexen Pruet, much less a description of the nature of the relationship between Nexsen Pruet and the Debtors. The Complaint merely contains the conclusory allegation that "[t]he Transfers were made ... for or on account of an antecedent debt owed by the particular Debtor to the Defendant before such Transfers were made," with no factual allegations to support this contention (*id.* at 6). Without more, the Court is unable to infer the existence of an antecedent debt based on the conclusory allegations presented under Count I of the Complaint.

In sum, while the Trust has alleged adequate factual matter to support the majority of the elements of a § 547 claim, the Complaint as presently pleaded cannot survive a motion to dismiss. Accordingly, with regard to the Trust's claim of preferential transfer under Count One of the Complaint, the Court finds that Nexsen Pruet's Motion to Dismiss should be GRANTED, and the preferential transfer claim should be DISMISSED without prejudice.

**II. The Trust's fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(B) should be dismissed without prejudice.**

"Section 548 covers two classes of [fraudulent] transactions: ones in which the debtor intended the transfer to harm or hinder creditors; and ones in which the unfairness stems from a disparity of exchange coupled with the debtor's lack of other assets." 5 Collier on Bankruptcy ¶ 548.01 (16th ed.2011)). "If the fraudulent transfer statute the

[plaintiff] want[s] the Court to apply requires intent to defraud, the enhanced pleading requirements of Rule 9(b) apply; if the statute allows for fraudulent transfer without intent to defraud, however, only the general pleading rules of Rule 8(a) must be satisfied." *In re Juliet Homes,* 2011 WL 6817928, at *12 (quoting *E. Poultry Distribs., Inc. v. Yarto Puez,* 2001 WL 34664163, at *2 (N.D.Tex.2001)). "Rule 9(b) does not apply to claims for avoidance of constructively fraudulent transfers because such claims are not based on actual fraud but instead rely on the debtor's financial condition and the sufficiency of consideration provided by the transferee." *In re Caremerica,* 409 B.R. at 755–56 (citing *In re Derivium Capital, LLC,* 380 B.R. 429, 439 (Bankr.D.S.C.2006); *In re Verestar, Inc.,* 343 B.R. 444, 459 (Bankr.S.D.N.Y.2006)). "Rather, § 548(a)(1)(B) claims must satisfy Rule 8(a) and contain a short and plain statement showing entitlement to relief. Under *Iqbal,* it follows that claims to avoid constructively fraudulent transfers must assert factual allegations which show that relief is plausible." *Id.* at 756.

**\*8** In *Caremerica,* with regard to the trustee's fraudulent transfer claim, the amended complaint alleged that the transferors "received less than reasonably equivalent value in exchange from the defendant for such fraudulent transfer" and that the transferors were "insolvent on the date of each fraudulent transfer or became insolvent as a result of the fraudulent transfer." *Id.* at 756. The court found that the trustee's allegations merely "mirror the elements of § 548(a)(1)(B)" and that the trustee "fails to support such allegations with factual assertions other than dates, amounts, and names of transferees included in Exhibit B." *Id.* The court specifically pointed out that the amended complaint was missing "an identification of the consideration received by each transferor, information as to why the value of such consideration was less than the amount transferred, and facts supporting the debtors' insolvency at the time of the transfer." *Id.*

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 16**

Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285
**(Cite as: 2012 WL 195528 (Bkrtcy.W.D.Tex.))**

Accordingly, "the trustee's claims based on constructive fraud fail[ed] to meet the Rule 8 pleading standard." *Id.*

In this case, like in *Caremerica,* the Trust's allegations with respect to the fraudulent transfer claim contained in Count Two of the Complaint do no more than mirror the elements of § 548(a)(1)(B) (*see* docket no. 1, at 7). The Trust argues that the Complaint, read in its entirety, contains a "detailed pleading of insolvency" and a "clear pleading of reasonably equivalent value." (Docket no 1 at 9.) Like in *Caremerica,* however, "other than dates, amounts, and names of transferees included in Exhibit B," along with general conclusory allegations of insolvency and reasonably equivalent value, the Trust fails to support its allegations with factual assertions. *In re Caremerica,* 409 B.R. at 756.[FN9]

> FN9. Unlike in the "Bonus" adversaries for which the Court issued an oral ruling on January 20, 2012, the facts in this case, or lack thereof, do not establish a context from which the Court may infer the nature of the alleged payments. Moreover, in the "Bonus" adversary complaints, the Trust pleaded specific facts relating to the Debtors' liabilities and assets at the time the alleged payments were made.

First, with regard to insolvency, the Trust alleges that the Debtors' Schedules, Statements of Financial Affairs, and Disclosure Statement, along with the declaration of the Debtors' chief financial officer, reflect that the Debtors were "deeply insolvent at all times relevant to the complaint." (Docket no. 1 at 5.) The Trust did not attach any of these documents to its Complaint nor did it refer the Court to any specific facts provided in these documents that would allow the Court to draw a reasonable inference of insolvency. The Trust further alleges that the Debtors were insolvent "under a number of tests" and then proceeds to describe each test, without providing the

applicable facts to support a finding of insolvency under any of them (*id.*). Second, with regard to reasonably equivalent value, the Complaint contains only one sentence, which states, "The Debtor or Debtors identified on Exhibit B received less than the reasonably equivalent value in exchange for the Transfer(s)." (Docket no. 1, at 7.) In light of *Iqbal* and *Twombly,* this Court will not accept such "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *See Hershey,* 610 F.3d at 245–46 (quoting *Iqbal,* 129 S.Ct. at 1949–50).

**\*9** In sum, the Trust has failed to plead sufficient factual matter to support a plausible claim for relief under either § 547 or § 548. Accordingly, the Court finds that Nexsen Pruet's Motion to Dismiss should be GRANTED, and the Trust's Complaint should be DISMISSED without prejudice as to refiling.

**CONCLUSION**

In accordance with the foregoing, it is, therefore,

ORDERED that Nexsen Pruet's Motion to Dismiss the Trust's claim for preferential transfers under 11 U.S.C. § 547(b), contained in Count I of the Complaint, is hereby GRANTED; and it is further

ORDERED that Nexsen Pruet's Motion to Dismiss the Trust's claim for fraudulent transfers under 11 U.S.C. § 548(a)(1), contained in Count II of the Complaint, is hereby GRANTED; and it is further

ORDERED that the Court grants permission for the Trust to replead its claims against Nexsen Pruet under the pleading standards expressed in this order.

Bkrtcy.W.D.Tex.,2012.
In re Crescent Resources, LLC
Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 17**

Not Reported in B.R., 2012 WL 195528 (Bkrtcy.W.D.Tex.), 55 Bankr.Ct.Dec. 285
**(Cite as: 2012 WL 195528 (Bkrtcy.W.D.Tex.))**

END OF DOCUMENT



Not Reported in F.Supp.2d, 2012 WL 1802450 (N.D.Ill.)
**(Cite as: 2012 WL 1802450 (N.D.Ill.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Innocent OBI, Plaintiff,
v.
CHASE HOME FINANCE, LLC; and JPMorgan
Chase, N.A., Defendants.

No. 11–cv–3993.
May 15, 2012.

Innocent Obi, Chicago, IL, pro se.

Stephen Ryan Meinertzhagen, Andrew Douglas
Lemar, Burke, Warren, MacKay & Serritella,
Chicago, IL, for Defendants.

***MEMORANDUM OPINION AND ORDER***

JOHN W. DARRAH, District Judge.

**\*1** Defendants Chase Home Finance, LLC
("CHF") and JPMorgan Chase, N.A. ("Chase") move
to dismiss Plaintiff Innocent Obi's Amended
Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6) for failure to state a claim upon
which relief may be granted and pursuant to Federal
Rule of Civil Procedure 9(b) for failure to plead fraud
with particularity. For the reasons presented below,
Defendants' Motion to Dismiss is granted.[FN1]

> **FN1.** Defendants simultaneously move for
> sanctions in favor of Defendants and against
> Plaintiff. This request for sanctions is
> denied. "A motion for sanctions must be
> made separately from any other motion and
> must describe the specific conduct that
> allegedly violates Rule 11(b)." Fed.R.Civ.P.

11(c)(2).

**BACKGROUND**

Plaintiff, proceeding *pro se,* filed his initial
complaint on behalf of himself and his five children
in the Circuit Court of Cook County, Illinois; this
action was removed to the Northern District of
Illinois on June 13, 2011. (Notice of Removal at 1.)
This initial Complaint alleged that Defendants Chase,
CHF, and formerly named defendant Safeguard
Properties, LLC entered Plaintiff's home and
removed his property; this Complaint brought claims
of fraud, conspiracy, indemnification, defamation,
punitive damages, and conversion. (Compl.¶¶ 52–
191.) The initial Complaint further alleged all
Defendants committed defamation by failing to
redact the names of Plaintiff s children in a motion to
dismiss filed in a previous action, involving Plaintiff
Obi and these Defendants. (*Id.* ¶¶ 50–51, 151–191.)
On July 20, 2011, Defendants filed a joint motion to
dismiss the initial Complaint. Plaintiff, instead of
filing a response to the motion to dismiss, moved for
leave to file an amended complaint, which was
granted. Plaintiff filed his Amended Complaint on
December 27, 2011, dropping his children from the
litigation and dropping some claims. (Am. Compl. at
2.) Plaintiff also eliminated multiple defendants from
his Amended Complaint, leaving only Defendants
CHF and Chase as parties to the litigation. (*Id.*)
Defendant CHF was a subsidiary of Defendant Chase
and merged into Chase on May 1, 2011. (Def. Mot. to
Dismiss at 7.) In Plaintiff's Amended Complaint,
Plaintiff alleges: (I) a claim under the Fair Debt
Collection Practices Act ("FDCPA") and the Illinois
Collection Agency Act ("ICAA")[FN2]; (II) a claim of
fraud on the part of the defendants and so-called
"inappropriate conduct"; (III) a claim of conspiracy;
(IV) a claim of intentional infliction of emotional
distress ("IIED"); (V) a so-called claim of "state law
indemnification"; (VI) a so-called claim of

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 19**

Not Reported in F.Supp.2d, 2012 WL 1802450 (N.D.Ill.)
**(Cite as: 2012 WL 1802450 (N.D.Ill.))**

"emergency temporary and permanent injunctive relief"; (VII) a claim of "declaratory relief"; and (VIII) a claim of "punitive damages." Defendants seek to have Plaintiff's Complaint dismissed in its entirety. Defendants further seek to have Plaintiff recommended to the Court's list of restricted filers, arguing that Plaintiff has been a plaintiff in ten frivolous lawsuits in the Northern District of Illinois since May 2010 and that all of these suits have been dismissed. (Mem. at 5.)

> FN2. Plaintiff erroneously refers to this Act as the "Illinois FDCPA" in his Amended Complaint. (Am.Compl.¶¶ 42–66.)

### LEGAL STANDARD

To properly assert a claim in a complaint, the plaintiff must present: "(1) a short and plain statement of the grounds for the court's jurisdiction, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for the relief sought." Fed.R.Civ.P. 8. Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (Twombly )). While a court is to accept all allegations contained in a complaint as true, this principle does not extend to legal conclusions. Iqbal, 129 S.Ct. at 1949. The Federal Rules further provide that a defendant may assert a defense that the plaintiff failed "to state a claim upon which relief can be granted ." Fed.R.Civ.P. 12(b)(6). To defeat a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual matter to state a claim for relief that is "plausible on its face." Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 570.) "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations." Iqbal, 129 S.Ct. at 1939. A threadbare statement of a claim supported by a conclusory

statement is insufficient. Iqbal, 129 S.Ct. at 1939 (citing Twombly, 550 U.S. at 555).

**\*2** Federal Rule of Civil Procedure 9(b) governs pleading a claim of fraud: this is a heightened pleading standard. Hefferman v. Bass, 467 F.3d 596, 601 (2006). Rule 9(b) "requires that facts such as the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff be alleged in detail." Id. at 601 (internal quotations omitted). A plaintiff who fails to meet this heightened pleading standard for fraud will have the claim dismissed.

### ANALYSIS
*Count I: FDCPA and ICAA Claims*

Defendants move to dismiss Plaintiff's claims in Count I, which allege violations of the FDCPA and the ICAA. First, Plaintiff's claim of Defendants' violation of the ICAA must fail because the ICAA does not apply to banks, such as Defendant Chase, or its subsidiaries, such as Defendant CHF. As the ICAA provides: "[t]his Act does not apply to persons whose collection activities are confined to and are directly related to the operation of a business other than that of a collection agency, and specifically does not include the following: banks, including trust departments, affiliates, and subsidiaries." 225 ILCS 425/2.03(1).

Defendants move to dismiss Plaintiff's FDCPA claim on similar grounds: the FDCPA applies to debt collectors, and the Defendants cannot be considered debt collectors. The FDCPA prevents debt collectors from using "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The FDCPA defines a debt collector as someone who "uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly,

Not Reported in F.Supp.2d, 2012 WL 1802450 (N.D.Ill.)
**(Cite as: 2012 WL 1802450 (N.D.Ill.))**

debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). In the Amended Complaint, Plaintiff identifies Chase as a creditor; however, creditors such as Chase are not subject to the FDCPA. *See Aubert v. American Gen. Fin., Inc.,* 137 F.3d 976, 978 (7th Cir.1998) (providing: "[c]reditors who collect in their own name and whose principal business is not debt collection ... are not subject to the [FDCPA].")*.* Defendant CHF is also not subject to the FDCPA. As Plaintiff alleges in the Amended Complaint, CHF was the servicer of his loan. (Am.Compl.¶ 15.) The FDCPA excludes loan servicers from the definition of a debt collector, stating that a debt collector, for purposes of the FDCPA, would not include "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity ... concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. § 1692(6)(F)(iii). Because Plaintiff's loan was not in default when CHF began servicing it, CHF could not be considered a debt collector under FDCPA.

**\*3** Accordingly, Plaintiff's Count I of his Amended Complaint, alleging violations of the FDCPA and the ICAA, is dismissed with prejudice.

### *Count II: Fraud and Inappropriate Conduct*

Plaintiff also alleges fraud on the part of the Defendants for their alleged "failure ... to validate the debt." (Am.Compl.¶¶ 67–68.) Defendants argue Plaintiff failed to meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b), which requires a pleading of particularity. Fed.R.Civ.P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *Anchorbank, FSB v. Hofer,* 649 F.3d 610, 615 (7th Cir.2011). Plaintiff's Amended Complaint fails to reach the answers of even these basic questions and, as a result, fails to meet the pleading standard required by Rule 9(b). Plaintiff

fails to identify any individuals who allegedly made false statements or the substance of the allegedly false statements. Plaintiff does not allege when or where the so-called false statements were made, nor does Plaintiff attempt to explain how any statement could be false. Hence, Plaintiffs Count II, claiming fraud, is dismissed with prejudice for failure to meet the heightened pleading standard under Rule 9(b).

### *Count III: Conspiracy*

Plaintiff next alleges conspiracy on the part of the Defendants, in Count III of his Amended Complaint. (Am.Compl.¶¶ 75–86.) Under Illinois law, to properly allege a claim of civil conspiracy, the plaintiff must allege facts which show: (1) a combination of two or more people; (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means; (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act. *Fritz v. Johnston,* 209 Ill.2d 302, 282 (Ill.2004) (citing *Adcock v. Brakegate, LTD.,* 164 Ill.2d 54, 62–63, 206 Ill.Dec. 636, 645 N.E.2d 888 (Ill.1994))*.* Plaintiff alleges in his Amended Complaint the Defendants "conspired with one another in a concerted effort to violate state and Federal laws, prohibiting illegal and fraudulent means of collection of debt." (Am.Compl.¶ 76.) Civil conspiracy requires an independent cause of action underlying the conspiracy; it is not an independent tort. *See Thomas v. Fuerst,* 345 Ill.App.3d 929, 936, 281 Ill.Dec. 215, 803 N.E.2d 619 (Ill.App.Ct.2004) (holding that if a "plaintiff fails to state an independent cause of action underlying his conspiracy allegations, the claim for conspiracy also fails"). Because Plaintiff fails to properly plead any of the elements of civil conspiracy under Illinois law, and because he fails to identify a proper independent cause of action upon which the conspiracy sought to further, his claim of conspiracy is dismissed with prejudice.

### *Count IV: Intentional Infliction of Emotional Distress*

Not Reported in F.Supp.2d, 2012 WL 1802450 (N.D.Ill.)
**(Cite as: 2012 WL 1802450 (N.D.Ill.))**

Plaintiff further alleges Defendants intentionally inflicted emotional distress on him by not verifying or validating his debt. (Am.Compl.¶¶ 87–89.) In Illinois, the elements of an IIED claim include: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen–El v. Cook County Sheriff's Dept.,* 602 F.3d 852, 864 (7th Cir.2010). To show that the action was extreme and outrageous the plaintiff must allege the conduct is "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Id.* (quoting *Kolegas v. Heftel Broad. Corp.,* 154 I11.2d 1 (1992)). Plaintiff fails to allege any facts that would support allegations of Defendants' conduct as extreme and outrageous, nor does Plaintiff allege facts that Defendants knew their conduct was likely to cause emotional distress. Plaintiff's allegations are merely conclusory and fail to demonstrate any intent or knowledge on the part of the Defendants to cause Plaintiff distress. Consequently, Plaintiff's IIED claim is also dismissed with prejudice.

*Count V: Indemnification*

**\*4** Plaintiff also seeks to recover from the Defendants on a claim of indemnification. In support of this claim, Plaintiff states the following:

State and Federal law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

The individuals identified in the foregoing paragraphs are or were employees of the defendant entitled, who acted within the scope of their employment in committing the misconduct described herein.

State and Federal law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

(Am.Compl.¶¶ 97–99.) This claim fails for several reasons. First, Defendants Chase and CHF are not public entities. Second, Plaintiff fails to identify any employees by name or otherwise anywhere in his Amended Complaint. Third, and most significantly, Plaintiff appears to misunderstand the basic meaning of indemnification. "Indemnification shifts the entire loss from one person who has been compelled to pay it to another who on the basis of equitable principles should bear the loss." *Threshermen's Mut. Ins. Co. v. Wallingford Mut. Ins. Co.,* 26 F.3d 776, 781 n. 6 (7th Cir.1994) (internal citation omitted). If indemnification *were* to exist in this case, it would exist between the Defendants and the Defendants' employees; Plaintiff can make no showing for a claim of indemnification to him. Plaintiff's claim of indemnification is dismissed with prejudice.

*Counts VI, VII, and VIII: Injunctive Relief, Declaratory Relief, and Punitive Damages*

The last three counts of Plaintiff s Amended Complaint fail to state any causes of action whatsoever but, rather, name remedies. In Counts VI through VIII of the Amended Complaint, Plaintiff seeks emergency, temporary, and permanent injunctive relief; declaratory relief; and punitive damages. (Am.Compl.¶¶ 100–125.)[FN3] Count VI of the Amended Complaint, seeking injunctive relief, must fail as it does not state a cause of action. "By its very name, it is apparent that injunctive relief is a remedy. Where a party has a legal right threatened by irreparable harm and there is no adequate remedy at law, a party may seek an injunction. [Plaintiff], however, fails to state a claim merely by stating that he is entitled to injunctive relief. An injunction is a remedy, not a cause of action." *Noah v. Enesco*

Not Reported in F.Supp.2d, 2012 WL 1802450 (N.D.Ill.)
**(Cite as: 2012 WL 1802450 (N.D.Ill.))**

*Corp.*, 911 F.Supp. 305, 307 (N.D.Ill.1995).

FN3. Defendants erroneously refer to these Counts as Counts 6, 7, 9 and 11 in their Motion to Dismiss, at 13.

Similarly, Count VII, which names "declaratory relief" as a claim, is also dismissed as it does not state a cause of action. Declaratory relief is a form of remedy a plaintiff may request in his prayer for relief. Declaratory relief is not an independent cause of action. *See Chicago Police Sergeants Ass'n v. City of Chicago*, No. 08–CV–4214, 2011 WL 2637203, at *9 (N.D.Ill. July 6, 2011). Likewise, Count VIII of the Amended Complaint names "punitive damages" as a claim; punitive damages are also a remedy, not an independent cause of action. *See Indemnified Capital Invs., SA. v. R.J. O'Brien & Assoc., Inc.*, 12 F.3d 1406, 1413 (7th Cir.1993) (holding that a claim of punitive damages must be dismissed where the other claims were dismissed, as it is not an independent cause of action).

**\*5** Consequently, because Plaintiff's claims in Counts VI through VIII of his Amended Complaint fail to allege claims of action under the law, these claims are dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, the Defendants' Motion to Dismiss is granted; all of Plaintiff's claims are dismissed with prejudice. The Clerk of the Court is directed to formally recommend Plaintiff Innocent Obi to the Executive Committee of the Northern District of Illinois to be considered for its list of restricted filers.

N.D.Ill.,2012.
Obi v. Chase Home Finance, LLC
Not Reported in F.Supp.2d, 2012 WL 1802450 (N.D.Ill.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.
**Exhibit 1 – Page 23**



Slip Copy, 2013 WL 1795940 (Bkrtcy.D.Virgin Islands)
**(Cite as: 2013 WL 1795940 (Bkrtcy.D.Virgin Islands))**

**H**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. Virgin Islands,
D. St. Thomas and St. John.
In re INNOVATIVE COMMUNICATION
CORPORATION, Debtor.
Stan Springel, Trustee, Plaintiff,
v.
Robert F. Craig P.C., Defendant.

Bankruptcy No. 07–30012 (MFW).
Adversary No. 09–3070 (MFW).
April 29, 2013.

Joseph L. Steinfeld, Jr., Ask LLP, St. Paul, MN, for
Plaintiff.

Robert F. Craig, Robert F. Craig, P.C., Omaha, NE,
Jeffrey B. C. Moorhead, Jeffrey B. C. Moorhead,
P.C., St. Croix, VI, for Defendant.

### *MEMORANDUM OPINION* [FN1]

> FN1. The Court is not required to state
> findings of fact or conclusions of law
> pursuant to Rule 7052(a)(3) of the Federal
> Rules of Bankruptcy Procedure.
> Accordingly, the facts recited herein are as
> averred in the Complaint, which must be
> presumed as true for the purposes of this
> Motion to Dismiss. *See Ashcroft v. Iqbal,*
> *556 U.S. 662, 678, 129 S.Ct. 1937, 173*
> *L.Ed.2d 868 (2009).*

MARY F. WALRATH, Bankruptcy Judge.

*1 Before the Court is the Motion of Robert F.
Craig P.C. (the "Defendant") to Dismiss the

Complaint filed by Stan Springel (the "Trustee"), the
chapter 11 trustee of the bankruptcy estate of
Innovative Communication Corporation ("New
ICC"). For the reasons set forth below, the Court will
grant the Motion.

I. *BACKGROUND*

On February 10, 2006, involuntary chapter 11
cases were filed against Innovative Communication
Company, LLC ("ICC–LLC"), Emerging
Communications, Inc. ("Emerging"), and Jeffrey J.
Prosser.[FN2] Thereafter, ICC–LLC, Emerging and
Prosser filed voluntary petitions for relief under
chapter 11 of the Bankruptcy Code. ICC–LLC is a
holding company that owns approximately 51% of
Emerging, which owns 100% of New ICC. On March
15, 2007, Stan Springel was appointed the Trustee of
ICC–LLC and Emerging.

> FN2. Prosser was the chairman of the board,
> CEO and president of ICC–LLC.

On July 5, 2007, an involuntary chapter 11 case
was filed against New ICC. Thereafter, New ICC
filed a voluntary petition for relief under chapter 11.
New ICC is a holding company which has various
operating subsidiaries that provide telephone,
newspaper, and other services to the citizens of the
United States Virgin Islands, British Virgin Islands,
surrounding Caribbean locations and portions of
France. Stan Springel was later appointed the Trustee
of New ICC.

On September 19, 2009, the Trustee commenced
the above adversary proceeding by filing a complaint
against the Defendant (the "Complaint"), which seeks
to recover certain pre-petition transfers (the
"Transfers") as fraudulent pursuant to section
548(a)(1)(A) ("Count I"), section 548(a)(1)(B)
("Count II"), section 544 and New York law ("Count

Slip Copy, 2013 WL 1795940 (Bkrtcy.D.Virgin Islands)
**(Cite as: 2013 WL 1795940 (Bkrtcy.D.Virgin Islands))**

III"), section 544 and Florida law ("Count IV"), and section 544 and United States Virgin Islands law ("Count V"). In the alternative, the Trustee seeks to recover the Transfers as preferential under section 547 ("Count VI").

The Defendant filed a Motion to Dismiss on November 10, 2009, alleging that (i) the Trustee failed to meet the pleading requirements under Rule 9(b), (ii) the action is time-barred by V.I.Code Ann. tit. 5, § 31(5)(A) and 11 U.S.C. § 548, (iii) the action is barred by the doctrine of judicial estoppel, and (iv) New York and Florida law do not apply to the action. On February 1, 2010, the Trustee filed a response to the Motion. Briefing is complete and the matter is ripe for decision.

II. *JURISDICTION*

The Court has subject matter jurisdiction over this adversary proceeding. 28 U.S.C. §§ 1334(b) & 157(b)(1). Many of the counts are core matters. 28 U.S.C. § 157(b)(2)(F). The Court has the power to enter an order on a motion to dismiss even if the matter is non-core or the Court lacks the authority to enter a final order on the merits. *See, e.g., In re Trinsum Grp., Inc.,* 467 B.R. 734, 739 (Bankr.S.D.N.Y.2012) ("After *Stern v. Marshall,* the ability of bankruptcy judges to enter interlocutory orders in proceedings ... has been reaffirmed...."); *Boyd v. King Par, LLC,* Case No. 11–CV–1106, 2011 WL 5509873, at *5 (W.D.Mich. Nov.10, 2011) ("[U]ncertainty regarding the bankruptcy court's ability to enter a final judgment ... does not deprive the bankruptcy court of the power to entertain all pretrial proceedings, including summary judgment motions.").

III. *DISCUSSION*

A. *12(b)(6) Failure to State a Claim for Relief*

**\*2** The Defendant argues that the Complaint

should be dismissed for failure to state a claim because the causes of actions regarding the Transfers are barred by: (1) the two-year reach-back provision under section 548, (2) judicial estoppel, (3) the laws of the United State Virgin Islands, and (4) the 90–day preference period under section 547.

1. *Standard of Review*

For the Trustee to survive a Rule 12(b)(6) motion, his claims must meet the standards of pleading. The Supreme Court's decisions in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) have shifted federal pleading standards from notice pleading to a heightened standard of pleading. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir.2009). This heightened pleading requirement applies to all civil suits in federal courts. *Id.*

To survive a motion to dismiss under the new pleading standard, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[A]pleading offering only labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Fowler,* 578 F.3d at 210. "Courts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable." *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 184 (3d Cir.2000). A court must "draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner." *Id.*

Determining whether a complaint is "facially plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 25**

Slip Copy, 2013 WL 1795940 (Bkrtcy.D.Virgin Islands)
**(Cite as: 2013 WL 1795940 (Bkrtcy.D.Virgin Islands))**

common sense." *Iqbal,* 556 U.S. at 679. However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown— that the pleader is entitled to relief." *Id.*

Courts must conduct a two-part analysis. *Fowler,* 578 F.3d at 210. "First the factual and legal elements of a claim should be separated," with the reviewing court accepting "all of the complaint's well-pleaded facts as true, but ... disregard[ing] any legal conclusions." *Id.* at 210–11. Next, the reviewing court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Id.*

2. *Two–Year Limitation Statute*

The Defendant argues that the Trustee's recovery is barred by the Virgin Islands' two-year statute of limitations for fraudulent conveyances and by section 548's two-year look back period. The Virgin Islands' limitation statute states:

**\*3** Two years—(A) An action for libel, slander, assault, battery, seduction, false imprisonment, or for any injury to the person or rights of another not arising on contract and not herein especially enumerated, or to set aside a sale of real property for non-payment of real property taxes pursuant to Title 33, chapter 89, subchapter III of this Code.

V.I.Code Ann. tit. 5, § 31(5) (2012). *See Montgomery v. Estate of Griffith,* 49 V.I. 255 (2008) (holding that the two-year limitations period applied to actions for common law fraud). Alternatively, the Defendant argues that section 548(a)(1) provides that "[t]he trustee may avoid any transfer ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition...." 11 U.S.C. § 548(a)(1).

The Defendant asserts that the Trustee is seeking the recovery of payments in the sum of $913,351.25 made by New ICC to the Defendant between December 31, 2001, and January 11, 2005. The involuntary petition against New ICC was filed on July 5, 2007. Therefore, the Defendant argues that the claims are beyond the two-year statute of limitations and reach-back period.

The Trustee responds that the Transfers are not time-barred because, in fact, four of the five transfers to the Defendant were made within the two-year period prior to the petition date. The Trustee notes that the Complaint seeks to recover five transfers from the Defendant in the aggregate amount of $209,087.71. (Adv. D.I. 1 at ¶ 9.) The Complaint identified the five transfers as those listed on Exhibit A dated May 27, 2004, February 15, 2006, May 26, 2006, July 21, 2006, and August 28, 2006.[FN3] Therefore, according to Exhibit A, the only transfer outside the two-year reach-back period was the first transfer dated May 27, 2004.

FN3. It is appropriate at the motion to dismiss stage to consider documents specifically referenced in the Complaint. *See, United States ex. rel. Lee v. Corinthian Colls.,* 655 F.3d 984, 993 n. 4 (9th Cir.2011); *Angstandt v. Mid–West Sch. Dist.,* 377 F.3d 338, 342 (3d Cir.2004).

The Court finds that because it is clear from the face of the Complaint that some of the transfers to the Defendant are not time-barred, the Court will deny the Defendant's Motion to Dismiss Counts I, II and V on this basis.

3. *Judicial Estoppel*

The Defendant also argues that the Complaint is barred by the doctrine of judicial estoppel because the Trustee's position in the instant adversary proceeding is inconsistent with his position in Adversary Proceeding No. 07–3010 (the "Turnover

Slip Copy, 2013 WL 1795940 (Bkrtcy.D.Virgin Islands)
**(Cite as: 2013 WL 1795940 (Bkrtcy.D.Virgin Islands))**

Proceeding") [FN4]

> [FN4.] The Turnover Proceeding was filed against Jeffrey J. Prosser, Dawn Prosser, Justin Prosser, Michael J. Prosser, Sybil G. Prosser, Michelle LaBennett, and Lyndon A. Prosser.

The standard for the application of judicial estoppel is: "first, the party in question must have adopted irreconcilably inconsistent positions; second, the party must have adopted these positions in bad faith; and third, there must be a showing that judicial estoppel is tailored to address the harm and that no lesser sanction would be sufficient." *Chao v. Roy's Constr., Inc.,* 517 F.3d 180, 186 n. 5 (3d Cir.2008). "[J]udicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position." *G–I Holdings, Inc. v. Reliance Ins. Co.,* 586 F.3d 247, 262 (3d Cir.2009). "Judicial estoppel is only appropriate when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court." *Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,* 337 F.3d 314, 324 (3d Cir.2003) (internal citations omitted).

*4 The Defendant asserts that in the Turnover Proceeding Jeffrey Prosser was being sued for payments listed on Exhibit TT–60, which included the Transfers at issue in this adversary proceeding. The Defendant argues that the Trustee unequivocally asserted on numerous occasions in the Turnover Proceeding that the action was one for turnover of property of the estate to avoid the applicable statute of limitations for fraudulent transfers. As a result, the Trustee obtained relief in the form of a Temporary Restraining Order and Preliminary Injunction relating to that property.

The Trustee responds that although the Transfers were listed on Exhibit TT–60 at the trial in the

Turnover Proceeding, the Trustee was not seeking recovery of those Transfers in the Turnover Proceeding. The Trustee argues that it merely made reference to the Transfers in the Turnover Proceeding to explain the nature and broad extent of Jeffrey Prosser's wrongdoing. In the Turnover Proceeding, the Trustee was seeking to recover real and personal property identified on Exhibits TT–47 and TT–48, not the Transfers included on Exhibit TT–60.

The Court agrees with the Trustee and finds that the Transfers at issue in the current adversary proceeding were not related to the property which was the subject of the Turnover Proceeding. Thus, the Court will deny the Defendant's Motion to Dismiss on the basis of judicial estoppel.

*4. Florida and New York Law*

The Defendant seeks to dismiss Counts III and IV because it contends that the Complaint improperly uses Florida and New York law as the controlling law. Counts III and IV contain the same allegations but each count applies the law of a different jurisdiction.

The Complaint does not state that a specific state law should govern as the controlling law. The Trustee responds that the Restatement (Second) of Conflicts of Law could determine that either New York, the United States Virgin Islands, or Florida is the law that should govern with respect to the section 544 cause of action. Therefore, the Trustee pleads in the alternative a section 544 cause of action under the laws of New York, Florida, and the United States Virgin Islands.

Rule 8(d)(2) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7008 of the Federal Rules of Bankruptcy Procedure, allows parties to plead in the alternative. *See* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1282 (3d

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 27**

Slip Copy, 2013 WL 1795940 (Bkrtcy.D.Virgin Islands)
**(Cite as: 2013 WL 1795940 (Bkrtcy.D.Virgin Islands))**

ed. rev.2008) ("[I]n a complex legal environment flexible pleading [is] essential to a full presentation of all relevant facts and legal theories at trial and the final settlement of disputes on their merits. Consequently, under Rule 8 [ (d)(2) ], a party may plead alternatively or hypothetically within a single count or defense, or assert separate claims or defenses in an alternative or multiple manner."). Therefore, the Complaint's assertions of a section 544 claim under Virgin Islands law does not bar the other section 544 claims under the laws of New York and Florida. *See, e.g., Rodriguez–Suris v. Montesinos,* 123 F.3d 10, 20 (1st Cir.1997) (Rule 8(d)(2) allows inconsistent positions in the pleadings, and "[e]specially at the early stages of litigation, a party's pleading will not be treated as an admission precluding another, inconsistent pleading."); *Molsbergen v. United States,* 757 F.2d 1016, 1019 (9th Cir.1985) ("[A] policy which permits one claim to be invoked as an admission against an alternative or inconsistent claim would significantly restrict, if not eliminate, the freedom to plead inconsistent claims provided by Rule 8(e)(2).").

**\*5** Thus, the Court will deny the Defendant's Motion to Dismiss the Complaint on this basis.

### 5. *Preferential Transfer*

The Defendant also seeks to dismiss Count VI of the Complaint asserting that the Trustee fails to state a claim upon which relief can be granted under section 547. The purpose of the preference pleading requirements is "to ensure that the defendant receives sufficient notice of what transfer is sought to be avoided." *Geller v. The Lenick Co. (In re Crucible Materials, Corp.),* Adv. No. 10–55178, 2011 WL 2669113, at \*3 (Bankr.D.Del. July 6, 2011).

To provide sufficient notice to the defendant, courts have determined that a preference complaint must include: "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by

(i) date [of the transfer], (ii) name of debtor/transferor, (iii) name of transferee, and (iv) the amount of the transfer." *OHC Liquidation Trust v. Credit Suisse First Bost. ( In re Oakwood Homes Corp.),* 340 B.R. 510, 522 (Bankr.D.Del.2006). *See also Valley Media, Inc. v. Borders, Inc. (In re Valley Media Inc.),* 288 B.R. 189, 192 (Bankr.D.Del.2003).

In this case, the Defendant argues that the Complaint fails to allege which transfers were made within 90 days of the Petition Date.

The involuntary petition was filed on July 5, 2007. As noted above, according to Exhibit A to the Complaint, the last transfer to the Defendant was received on August 28, 2006, well before the 90–day preference period. The Complaint does not allege that the Defendant was an insider of New ICC.[FN5] Therefore, the Court finds that Count VI fails to state a claim for relief. The Court will grant the Defendant's Motion to Dismiss Count VI.

> FN5. Transfers to insiders are avoidable as preferences if they were made within one year before the petition date. 11 U.S.C. § 547(b)(4)(B).

### B. *Pleading Fraud with Particularity*

The Defendant also argues that the Trustee failed to plead with particularity that the Transfers constituted actual fraud under sections 548(a)(1)(A) and 544 or constructive fraud under sections 548(a)(1)(B) and 544.

### 1. *Actual Fraud*

Under Counts I and III through V, the Trustee asserts that the Transfers were actually fraudulent pursuant to section 548(a)(1)(A) and 544, under the applicable laws of New York, Florida, and the United States Virgin Islands. The Defendant argues that the Trustee did not plead fraud with the particularity required by Rule 9(b).

Slip Copy, 2013 WL 1795940 (Bkrtcy.D.Virgin Islands)
**(Cite as: 2013 WL 1795940 (Bkrtcy.D.Virgin Islands))**

Section 548(a)(1)(A) provides that a trustee may avoid transfers of interests in the debtor's property occurring within two years prior to the petition date if the debtor "made such transfer ... with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made ..., indebted." 11 U.S.C. § 548(a)(1)(A).

Section 544, in turn, authorizes the avoidance of transfers of interests in a debtor's property that are avoidable by unsecured creditors under applicable state law. 11 U.S.C. § 544(b)(1). Here, the Trustee asserts that the Transfers are avoidable under the applicable state law, including the New York Fraudulent Conveyance Act, the Virgin Island Fraudulent Conveyance Act, and the Florida Uniform Fraudulent Transfer Act. The elements of an avoidable actually fraudulent transfer under the Uniform Fraudulent Transfer Act ("UFTA") and the Uniform Fraudulent Conveyance Act ("UFCA") do not substantially vary from the elements set forth in section 548(a)(1)(A). *See Charys Liquidating Trust v. Growth Mgmt., LLC (In re Charys Holding Co., Inc.),* Bankr.No. 08–10289, 2010 WL 2774852, at *5 (Bankr.D.Del. July 14, 2010).

**\*6** Where a party asserts a fraudulent conveyance claim for actual fraud, the complaint must set forth facts with sufficient particularity to apprise the defendant of the charges against him so that he may prepare an adequate answer. *Global Link Liquidating Trust v. Avantel, S.A. (In re Global Link Telecom Corp.),* 327 B.R. 711, 718 (Bankr.D.Del.2005). To provide fair notice, the complaint must go beyond merely parroting the statutory language. *Id. See also Burch v. Dent and Co., Inc. ( In re Circle Y of Yoakum, Tex.),* 354 B.R. 349, 356 (Bankr.D.Del.2006).

Rule 9(b) requires a plaintiff asserting an actual

fraud to plead:

(1) a specific false representation of material fact;

(2) knowledge by the person who made it of its falsity;

(3) ignorance of its falsity by the person to whom it was made;

(4) the intention that it be acted upon; and

(5) the plaintiff acted upon it to his damage

*Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 284 (3d Cir.1992). *See also Charal Inv. Co., Inc. v. Rockefeller (In re Rockefeller Ctr. Props., Inc. Sec. Litig.);* 311 F.3d 198, 216 (3d Cir.2002); *Fin. Trust Co., Inc. v. Citibank, N.A.,* 351 F.Supp.2d 329, 330 (D.Vi.2004). Although stating the "date, place, and time" clearly fulfills this requirement, plaintiffs may use any alternative method of "injecting precision and some measure of substantiation" into the allegations of fraud. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984).

The Defendant contends that the Trustee's Complaint merely recites the elements of a statutory fraudulent conveyance claim without pleading any alleged predicate acts. The Defendant states that other than conclusory allegations that parrot the statutory language, the adversary complaints filed by the Trustee against numerous defendants in the New ICC case differ only by the names of the defendants, the amount at issue, and the date of the payments.

The Court agrees with the Defendant and finds that the Trustee has failed to state adequately a claim for actual fraud in the Complaint. The Complaint fails to reveal any factual information about the alleged fraudulent activities. Simply stating that

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.   **Exhibit 1 – Page 29**

Slip Copy, 2013 WL 1795940 (Bkrtcy.D.Virgin Islands)
**(Cite as: 2013 WL 1795940 (Bkrtcy.D.Virgin Islands))**

Jeffrey Prosser disguised the true nature of the Transfers and caused New ICC to enter into transactions with no legitimate business purpose is insufficient. The Complaint provides no explanation as to the nature of any specific wrongful act supposedly committed by the Defendants or Jeffrey Prosser, such as identifying when the misrepresentations occurred, who made them, what they entailed, whether they were intentional, whether they were repeated, or what assets were fraudulently converted. *See e.g., Unsecured Creditors' Comm. v. Banque Paribas (In re Heartland Chems.),* 103 B.R. 1012, 1015 (Bankr.C.D.Ill.1989) (holding that Rule 9 requires allegations in the complaint that plead how, when, and where the fraud occurred). The Trustee's allegations are simply recitations of the statutory language and fail to establish a plausible claim for actual fraud. *See e.g., Circle Y,* 354 B.R. at 356 (holding that to plead fraud, the Trustee cannot merely recite the statutory elements). Thus, the Court will grant the Defendant's Motion to Dismiss the actual fraud claims of Counts I and III through V of the Complaint.

### 2. *Constructive Fraud*

**\*7** In Counts II and III through V, the Trustee also asserts that the Transfers were constructively fraudulent pursuant to sections 548(a)(1)(B) and 544, under the applicable laws of New York, Florida, and the United States Virgin Islands.

The Defendant again asserts that the Trustee has failed to meet the heightened pleading standard required by Rule 9(b). *See* Fed.R.Civ.P. 9(b); Fed. R. Bankr.P. 7009.

Section 548(a)(1)(B) authorizes the avoidance of transfers of interests in the debtor's property occurring within two years prior to the petition date if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred...." 11 U.S.C. §

548(a)(1)(B)(i) and (ii)(I).

As explained above, section 544 authorizes avoidance of transfers under applicable state law. 11 U.S.C. § 544(b)(1). Plaintiffs here have alternatively pled claims under the constructively fraudulent conveyance laws of New York, Florida, and the United States Virgin Islands. These laws do not meaningfully vary from the requirements of section 548(a)(1)(B) for present purposes. *See Charys,* 2010 WL 2774852, at \*6.

A claim of constructive fraud "need not allege the common variety of deceit, misrepresentation, or fraud in the inducement ... because the transaction is presumptively fraudulent and all that need be alleged is that the conveyance was made without fair consideration while Debtor was functionally insolvent." *Global Link,* 327 B.R. at 718. *See also, Astropower Liquidating Trust v. Xantrex Tech., Inc. ( In re Astropower Liquidating Trust),* 335 B.R. 309, 333 (Bankr.D.Del.2005).

Nonetheless, the Defendant argues that Counts II through V are not sufficiently pled because the Trustee merely parrots the language of section 548(a)(1)(B). Specifically, the Defendant asserts that the Trustee failed to plead that New ICC was insolvent or that New ICC received less than reasonably equivalent value in exchange for the transfers. *See* 11 U.S.C. § 548(a)(1)(B)(i)-(ii). The Trustee must do more than simply allege the statutory elements of a constructive fraud action. *Global Link,* 327 B.R. at 718. A party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave. *Walker v. Sonafi Pasteur ( In re Aphton Corp.),* 423 B.R. 76, 89 (Bankr.D.Del.2010) (internal citations omitted). To plead lack of reasonably equivalent value exchanged sufficiently, therefore, the Trustee must present some information of the value of what New ICC received in exchange for the Transfers. The Complaint fails to do so.

Slip Copy, 2013 WL 1795940 (Bkrtcy.D.Virgin Islands)
**(Cite as: 2013 WL 1795940 (Bkrtcy.D.Virgin Islands))**

Similarly, to adequately plead insolvency, the Trustee must present some information of New ICC's financial status at the time of the Transfers. *See, e.g., Global Link,* 327 B.R. at 717 (holding that a claim under section 548 is insufficient when it "simply alleges the statutory elements of a constructive fraud action under section 548(a)(1)(B)"). *But see Zazzali v. Mott ( In re DBSI, Inc.),* 447 B.R. 243, 247–48 (Bankr.D.Del.2011) (holding that insolvency was sufficiently pled when plaintiff alleged debtors never realized a profit, its liabilities exceeded its assets, the debtors relied solely on investment money, and the debtors failed to properly account for assets and liabilities); *Charys,* 443 B.R. at 636 (holding that insolvency was sufficiently pled when complaint detailed working capital deficit, balance sheet numbers, and overvalued assets).

**\*8** Here, the Complaint merely provides a near-verbatim recitation of the statutory elements of section 548 without providing any facts to support the Trustee's assertion that New ICC was insolvent or became insolvent as a result of the Transfers or that New ICC received less than reasonably equivalent value in exchange for the Transfers. Therefore, the Court concludes that the Trustee has failed to state a cause of action for constructive fraud as required by Rule 9(b) and the laws of New York, Florida, and the United States Virgin Islands. Thus, the Court will grant the Defendant's Motion to Dismiss Counts II through V of the Complaint as to the constructively fraudulent claims as well.

C. *Leave to Amend*
Normally, when granting a motion to dismiss, leave will be freely granted to amend the complaint. *See, e.g., Shane v. Fauver,* 213 F.3d 113, 115–16 (3d Cir.2000) (holding that the court should generally grant leave to amend a complaint dismissed for failure to state a claim); *Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 938 (3d Cir.1984) (noting that a presumption exists in favor of granting the moving party leave to amend); *Burtch v. Henry Prod., Inc. (In re AE Liquidation, Inc.),* Adv. No. 10–55478, 2012 WL 32589, at \*2 (Bankr.D.Del. Jan.6, 2012) (holding that leave to amend should be freely given in the absence of undue delay, bad faith, undue prejudice, or futility).

In this case, the Court does not find bad faith, undue delay prejudice, or futility. The Court will, therefore, grant the Trustee 30 days to amend the Complaint.

IV. *CONCLUSION*
For the reasons set forth above, the Court will grant the Defendant's Motion to Dismiss Counts I through VI of the Complaint.[FN6] The Trustee, however, may amend the Complaint within 30 days.

> FN6. Because the Trustee's avoidance claims all fail to state a claim for relief, his related claims to recover the value of the Transfers, under section 550(a) and to disallow Defendant's claims under section 502(d) and (j) also must fail.

An appropriate order is attached.

Bkrtcy.D.Virgin Islands,2013.
In re Innovative Communication Corp.
Slip Copy, 2013 WL 1795940 (Bkrtcy.D.Virgin Islands)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2007 WL 2893638 (N.D.Ill.)
**(Cite as: 2007 WL 2893638 (N.D.Ill.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
POLYAD COMPANY, an Illinois company,
Plaintiff,
v.
INDOPCO INC., a Delaware corporation doing
business as National Starch and Chemical Company
and TSE Industries, Inc., a Florida corporation,
Defendants.

No. 06 C 5732.
Sept. 25, 2007.

J. Timothy Cerney, Carol Sharpe McMahan, Philip E. Old, Carroll, Hartigan, Farmer, Cerney & McGillen, Ltd., Patrick Thomas Stanton, John Lawrence Conlon, Schwartz, Cooper, Greenberg & Krauss, Chicago, IL, for Plaintiff.

Richard B. Polony, Clifford E. Yuknis, Daniel William McGrath, Evan D. Brown, Hinshaw & Culbertson LLP, James K. Genden, Bradley J. Axel, Robert James Slobig, Zoran Dragutinovich, Torshen, Slobig, Genden, Dragutinovich & Axel, Ltd., Chicago, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

DAVID H. COAR, United States District Judge.

**\*1** Polyad Company ("Polyad"), an Illinois company, has brought suit in this Court under diversity jurisdiction against TSE Industries, Inc. ("TSE"), a Florida corporation, and Indopco Inc. ("Indopco"), a Delaware corporation doing business as National Starch and Chemical Company. On January 23, 2007, Polyad filed an amended complaint

alleging three counts; two counts against Indopco for tortious interference with contract and intentional interference with a business relationship and one count against TSE for breach of contract. Before the Court now are TSE's Motion to Dismiss Count III (breach of contract claim) and Indopco's Motion to Dismiss Count I (tortious interference with a contract claim) pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendants' motions are **GRANTED.**

### I. BACKGROUND

Polyad is an Illinois corporation with its principal place of business in Cook County, Illinois. It sells specialty polyurethane reactive hot melt adhesives to manufacturers of recreational vehicles ("RV manufacturers"). Indopco is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. It is the dominant seller of polyurethane hot melt adhesives in the United States, including sales to RV manufacturers. Indopco does business in Illinois and sells its products in Cook County, Illinois. TSE is a Florida corporation with its principal place of business in Clearwater, Florida. It is a toll (contract) manufacturer of chemical products, including polyurethane hot melt adhesives, which had a contract to manufacture adhesives for Indopco. TSE does business in Illinois through its representative, Desco, Inc., located in Elk Grove Village, Illinois. TSE manufactured and sold products to Polyad in Illinois.

Between 1990 and 2000, Gerald W. Bornhofen ("Bornhofen") was an employee of Indopco who marketed reactive hot melt adhesives to RV manufacturers. Bornhofen was very successful for Indopco, being responsible for sales of approximately $30 million per year to RV manufacturers. In March 2000, Bornhofen resigned from Indopco. In January 2003, he became an employee of Polyad, selling

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 32**

Not Reported in F.Supp.2d, 2007 WL 2893638 (N.D.Ill.)
**(Cite as: 2007 WL 2893638 (N.D.Ill.))**

polyurethane reactive hot melt adhesives. In 2003, Indopco began a campaign to drive Polyad out of the recreational vehicles adhesives business by using their representatives to disparage Polyad's product to RV manufacturers.

In late 2003, Polyad contracted with a toll manufacturer to produce new Polyad reactive hot melt adhesive products to Polyad's specifications. Toll manufacturing is a version of contract manufacturing sometimes used in the specialty chemical industries in which production of specific batches are outsourced to third parties (i.e. toll manufacturers). Using a toll manufacturer to produce Polyad's new adhesives made Polyad more competitive than re-selling private label adhesive because the cost of the toll-manufactured adhesives to Polyad was much lower. In or about May 2004, Polyad entered into negotiations with TSE to toll manufacture Polyad's new adhesives, which resulted in Polyad and TSE entering into an oral requirements contract pursuant to which TSE agreed to manufacture Polyad's requirements for its new adhesives in accordance with Polyad's formulae and specifications and Polyad agreed to exclusively utilize TSE to manufacture the adhesives and pay TSE for the adhesives at the rate of $0.70 per pound plus the cost of raw materials. TSE began performance and manufactured Polyad's new adhesives in accordance with Polyad's specifications and delivered the adhesives to Polyad.

**\*2** Indopco's campaign to disparage Polyad's products and to interfere with Polyad's relationship with its customers and suppliers consisted of the following incidents:

(a) October, 2003-Andy Blood and Jason Queen, both Indopco employees, told a representative of Amerimax Building Products that Polyad's product includes urine as a secret ingredient;

(b) November, 2003-National Starch representatives distributed a tee shirt to Amerimax employees depicting a "Calvin and Hobbs" cartoon character urinating onto a drum of Polyad's product;

(c) April, 2004-Roger Lumm, an Indopco employee, falsely claimed to a production supervisor at Starcraft RV that Polyad's adhesives infringe upon Indopco's patents;

(d) September, 2004-John Orloff of Indopco called Tony Rindone of TSE to falsely warn TSE that Polyad's adhesives infringe Indopco's patents and that TSE could potentially be made a defendant in a patent and intellectual property lawsuit; and

(e) October, 2004-Roger Lumm of National Starch approached Duane VanderWerf of Atwood Mobil Products and falsely claimed that Polyad's adhesives infringe upon Indopo's patents and requested that VanderWerf purchase a five gallon pail of Polyad's product for Indopco for which Indopco would reimburse VanderWerf.

In October, 2004, an Indopco manager called Tony Rindone of TSE and demanded that TSE immediately stop producing product for Polyad. On or about November 1, 2004, TSE informed Polyad that, despite recent threats from Indopco regarding TSE's contractual relationship with Polyad, TSE would continue to produce Polyad's products and that TSE would give Polyad six to eight months' prior notice of any intention to attempt to terminate TSE's business relationship with Polyad. At or about the same time, TSE requested that Polyad provide a forecast of the quantities of a certain raw material used in Polyad's formulae for the next six months in order for TSE to purchase a large enough supply before an expected price increase would take effect.

In early November, 2004, TSE provided pricing

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 33**

Not Reported in F.Supp.2d, 2007 WL 2893638 (N.D.Ill.)
**(Cite as: 2007 WL 2893638 (N.D.Ill.))**

information to Polyad to meet Polyad's manufacturing requirements for the following year and beyond. In reliance on TSE's pricing information and assurances that TSE could and would supply all of Polyad's needs for product, Polyad made commitments to and contracts with its customers at fixed prices including entering into a 3 year contract with Coachmen Recreational Vehicles, LLC ("Coachmen"), dated as of November 1, 2004, for Polyad to be the sole supplier of Coachmen's annual requirements of polyurethane hot melt adhesives.

In December, 2004, George Gunia of Indopco visited Coachmen and warned that Polyad would not be able to supply product to Coachmen. In that same month, Indopco contacted Coachmen via e-mail and suggested that in the very near future Polyad would not be able to meet Coachmen's requirements. Indopco was aware of the contract between Polyad and Coachmen prior to sending the e-mail to Coachmen suggesting that Polyad would not be able to meet Coachmen's requirements.

**\*3** On or about December 3, 2004, TSE orally assured Polyad that TSE would be able to produce Polyad's adhesive products and meet Polyad's volume requirements for 2005. During the same conversation, however, TSE requested that Polyad not compete for any more of Indopco's customers until Indopco renewed its contract with TSE that was due to expire on February 1, 2005. On December 13, 2004, TSE had assured Polyad via e-mail that it would meet Polyad's volume requirements for the coming years. On or about December 20, 2004, Tony Rindone of TSE informed Polyad that TSE would no longer manufacture adhesives for Polyad, thus breaching its contract with Polyad.

Polyad has been unable to secure another toll manufacturer for its products. Indeed, there are no other toll manufacturers other than TSE who have sufficient ability and capacity to manufacture Polyad's adhesive products. Polyad alleges that

Indopco intentionally, tortiously and without any justification interfered with the contract between Polyad and TSE and the contract between Polyad and Coachmen by causing TSE to cease manufacturing adhesive products for Polyad. Indopco knew that Polyad's sales of adhesives to RV manufacturers, such as Coachmen, would be adversely affected if TSE ceased producing Polyad's adhesive products.

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, the Court accepts all well-pleaded allegations in the plaintiff's complaint as true. *Fed.R.Civ.P. 12(b)(6)*. The purpose of a 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case. *Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir.1990)* (citation omitted). A complaint should not be dismissed pursuant to *Rule 12(b)(6)* unless it fails it provide fair notice of what the claim is and the grounds upon which it rests or it is apparent from the face of the complaint that under no plausible facts may relief be granted. *St. John's United Church of Christ v. City of Chicago, 2007 WL 2669403 at \*7 (7th Cir. September 13, 2007)* (citing *Bell Atlantic Corporation v. Twombly, ---U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (May 21, 2007)*). All reasonable inferences are to be drawn in favor of the plaintiff. *Gastineau v. Fleet Mortg. Corp., 137 F.3d 490, 493 (7th Cir.1998)* (citation omitted).

## III. DISCUSSION

### A. Breach of Contract Claim

TSE alleges that Polyad's Amended Complaint (the "complaint") is so legally deficient that it must be dismissed for failure to state a claim upon which relief can be granted. The first alleged deficiency is that the complaint states the contract between TSE and Polyad was oral. Therefore, the contract is unenforceable due to the well known statute of frauds

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.
**Exhibit 1 – Page 34**

Not Reported in F.Supp.2d, 2007 WL 2893638 (N.D.Ill.)
**(Cite as: 2007 WL 2893638 (N.D.Ill.))**

contained within the Uniform Commercial Code. *See* 810 Ill. Comp. Stat 5/2-201.[FN1] This statute renders unenforceable any contract for goods where there is a) no writing sufficient to indicate that such a contract has been established, and b) such writing is present, but it is not signed by the party against whom the contract is to be enforced. The second ground for dismissal asserted by TSE is that the purported oral contract, as described in the complaint, does not contain any material terms, especially quantity and duration of term. Thus, TSE contends that Polyad cannot possibly secure relief based upon a claim of breach of contract. Polyad responds that its breach of contract claim as described in the complaint complies with the requirements of Illinois' statute of fraud concerning contracts for goods and that it contains enough information to satisfy Federal Rule of Civil Procedure 8, which governs what is to be pleaded in federal court.

> FN1. The parties agree that Illinois UCC law applies.

**\*4** Rule 8(c) lists statute of frauds as an affirmative defense. The earliest time to consider an affirmative defense is normally in a Rule 12(c) motion for judgment on the pleadings. *Mosely v. Bd. of Educ. of the City of Chicago,* 434 F.3d 527, 533 (7th Cir.2006). This court will not dismiss a complaint in instances where such dismissal would be tantamount to forcing a plaintiff to plead allegations to deny an affirmative defense. However, a plaintiff may just as well plead himself out of court by pleading facts that undermine the allegations set forth in his complaint. *Kolupa v. Roselle Park Dist.,* 438 F.3d 713, 715 (7th Cir.2006). Here, TSE argues that Polyad has pleaded itself out of court by virtue of its concession that the contract was oral. This Court concludes that Polyad has pleaded sufficiently and the complaint cannot be dismissed due to application of the statute of frauds. However, as will be discussed, Polyad has pleaded facts that demonstrate it is not entitled to relief.

*Statute of Frauds*

Polyad concedes that it does not have a written contract with TSE. However, it argues that its allegation that an email confirming the existence of the oral contract suffices to bar application of the Statute of Frauds to its oral requirements contract under Section 2-201(1). TSE argues that Polyad's defense against application of the Statute of Frauds cannot succeed as a matter of law because it does not satisfy Section 2-201(2) or (3). But Polyad need not satisfy section 2-201(2) (or section 2-201(3) for that matter) because it can satisfy section 2-201(1) on the pleadings. Section 2-201(1) states in relevant part that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense *unless there is some writing sufficient to indicate* that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker" (emphasis added). By alleging that the email is a writing sufficient to indicate a contract was made, Polyad satisfies the 2-201(1) on the pleadings. Subsection 2-201(1) is separate and distinct from subsections (2) and (3). *See e.g. Forms World of Illinois, Inc. v. Magna Bank, N.A.,* 334 Ill.App.3d 1107, 269 Ill.Dec. 63, 779 N.E.2d 917 (Ill.App.Ct.2002). Furthermore, Polyad is *not* alleging that the email is the contract as TSE asserts in its Reply memorandum.

The Seventh Circuit has recognized that "the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001, provides that in all transactions in or affecting interstate commerce, a contract or other record relating to the transaction shall not be denied legal effect merely because it is in electronic format." *Cloud Corp. v. Hasbro, Inc.,* 314 F.3d 289, 295 (7th Cir.2002). That Court held further that "neither the common law nor the UCC requires a handwritten signature and the sender's name on an e-mail satisfies the signature requirement of the statute of frauds." *Id. at 296.* Therefore, an email with the

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 35**

Not Reported in F.Supp.2d, 2007 WL 2893638 (N.D.Ill.)
**(Cite as: 2007 WL 2893638 (N.D.Ill.))**

sender's name in it can suffice to take a written confirmation outside of the Statute of Frauds.

   **\*5** TSE argues that this Court should scrutinize the actual email, even though it is not attached to the complaint. TSE offers *Tierney v. Vahle,* as authority for the proposition that the Seventh Circuit allows a defendant filing a Rule 12(b)(6) motion to provide the court with the document referenced by the plaintiff in the complaint but not attached. 304 F.3d 734, 738 (7th Cir.2002). That Court's discussion of reviewing documents at the pleading stage not attached to the complaint was dicta because in that case, the document at issue was attached to the complaint. 304 F.3d at 738. Nonetheless, even if courts are permitted to view documents merely referenced in the complaint but not attached, this Court declines to review the email here because its contents are not material to determining the sufficiency of the complaint. All that matters is that Polyad has alleged there is an email that serves as a writing sufficient to indicate a contract did exists between the parties under 2-201(1), signed by TSE (a fact conceded by TSE). Whether the email is sufficient is not for this Court to decide on a motion to dismiss.

### *Lack of Material Terms*
#### *Quantity*
   Polyad alleges that there was an oral requirements contract between it and TSE in which TSE agreed to supply adhesives to Polyad made according to Polyad's formulae and specifications in exchange for TSE's exclusive right to manufacture the adhesives and at a cost of 70 cents per pound of product and TSE's expenses on raw material inputs. In Illinois, courts have recognized that requirements contracts generally leave terms such as quantity open as a matter of course. *Crossroads Ford Truck Sales, Inc. v. Sterling Truck Corp.,* 92 N.E.2d 488, 497 (Ill.App.Ct.2003). However, the Seventh Circuit Court of Appeals has explained that under Illinois law "a requirements contract exists only when the

contract (1) obligates the buyer to buy goods, (2) obligates the buyer to buy goods exclusively from the seller, and (3) obligates the buyer to buy all of its requirements for goods of a particular kind from the seller." *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.,* 186 F.3d 815, 817 (7th Cir.1999) (citation omitted). This does not mean that for an oral requirements contract to exist and be enforceable, the writing offered to satisfy 2-201(1) (here the email) must state that all of the buyer's requirements is the quantity to be bought, instead it means that the contract will be found to exist only where there is evidence of an obligation to supply the buyer with all of its requirements. *Zayre Corp. v. S.M. & R. Co., Inc.,* 882 F.2d 1145, 1154 (7th Cir.1989) (citing *Ray Dancer, Inc. v. DMC Corp.,* 175 Ill.App.3d 997, 125 Ill.Dec. 447, 530 N.E.2d 605, 610 (Ill.1989)). Thus again, this Court need not scrutinize the email as it was not attached to the complaint. Polyad offers paragraph 12 of the Amended Complaint as a sufficiently pleaded allegation of the quantity element of a requirements contract. That paragraph states that pursuant to the contract "TSE agreed to manufacture Polyad's requirements." This pleading suffices to provide the necessary quantity term. At trial or in summary judgment proceedings, Polyad will need to show evidence that TSE was to supply all of Polyad's requirements, not here where the simple general allegation will suffice.

#### *Lack of Exclusivity*
   **\*6** TSE also contends that Polyad's amended complaint should be dismissed for failure to state a claim upon which relief can be granted on the grounds that Polyad pleads facts undermining its assertion that it contracted exclusively with TSE. An obligation that the buyer is to purchase goods exclusively from the seller is necessary element for a requirements contract to exist and to be enforceable. *Zemco Mfg., Inc.,* 186 F.3d at 817. In the complaint, Polyad pleads it contracted with some third party toll manufacturer in late 2003 to produce its products to Polyad's specifications. (Complaint, ¶

Not Reported in F.Supp.2d, 2007 WL 2893638 (N.D.Ill.)
**(Cite as: 2007 WL 2893638 (N.D.Ill.))**

10.) Later in the complaint, Polyad pleads that in May, 2004, it began negotiations with TSE to produce its product and settled on a contract with TSE as the exclusive manufacturer. (Complaint, ¶ 12.) TSE argues that such pleading undermines Polyad's assertion that it was exclusively dealing with TSE as a manufacturer of Polyad's products.

The problem here for TSE is that its argument requires this Court to infer that the contractual relationship with the other toll manufacturer was still in existence at the time Polyad entered into the purported oral contract with TSE. On a 12(b)(6) motion, all reasonable inferences are to be drawn in favor of the plaintiff. *Gastineau,* 137 F.3d at 493 (citation omitted). It is entirely reasonable to assume from the allegations pleaded that any contractual relationship between Polyad and other manufacturers terminated before Polyad contracted with TSE to meet its requirements. Polyad's allegations are not inconsistent. They merely leave gaps and this Court may not seize on them and make inferences that run against Polyad as the party defending the 12(b) (6) motion.

*Duration*

Lastly, TSE contends that the oral requirements contract lacked a duration term, the absence of which makes the contract terminable at will and prevents a finding of a breach. In Illinois, the UCC provides that where a contract provides for successive performances but is indefinite in duration, it is valid for a reasonable time *but unless otherwise agreed may be terminated at any time by either party.* 810 Ill.Comp.Stat. 5/2-309(2) (emphasis added). It is beyond dispute that Polyad has not alleged anywhere in the Amended Complaint that the oral requirements contract had a definite duration term. Instead, Polyad offers a series of allegations that lead to the conclusion that there was no definite duration term in the original oral contract.

For instance, in paragraph 21 of the Amended

Complaint, Polyad alleges that TSE provided pricing information to Polyad *in November, 2004* "for the following year and beyond." In paragraph 26, Polyad alleges that TSE assured Polyad in December, 2004 (almost six months after the contract was executed) that it would meet Polyad's volume requirements for 2005. Lastly, in paragraph 27, Polyad alleges TSE assured it in a *December 13, 2004* email, that TSE would met Polyad's requirements "for the coming years." Polyad offered these allegations as demonstarting that there was a definite term of duration in the contract. However, in this Court's view the only reasonable inference one can draw from Polyad's allegations is that the TSE contract lacked a definite term of duration.

**\*7** Polyad contends that the absence of a term of duration does not matter because in Illinois, when a contract is without definite duration, the law will imply a reasonable time. Polyad is only partially correct. The Illinois Supreme Court has held that generally, contracts lacking duration terms are terminable at will by either party. *Jespersen v. Minnesota Min. and Mfg. Co.,* 183 Ill.2d 290, 233 Ill.Dec. 306, 700 N.E.2d 1014, 1016 (Ill.1998). The Court noted that there are exceptions to that rule but did not list them. *Id.* In *Carrico v. Delp,* an Illinois appellate court recognized that "when a period of duration can fairly be implied from the nature of the contract," the law will supply a reasonable time. 141 Ill.App.3d 684, 95 Ill.Dec. 880, 490 N.E.2d 972, 976 (Ill.App.Ct.1986). In *First Nat. Bank of Cicero v. Sylvester,* another Illinois appellate court interpreted *Carrico* to mean that the exception to the general rule is appropriate "when consideration for a promise requiring continuing performance has been partly executed." 196 Ill.App.3d 902, 144 Ill.Dec. 24, 554 N.E.2d 1063, 1069 (Ill.App.Ct.1990).[FN2]

> FN2. For purposes of this motion, the Court will assume that the common law Carrico exception is applicable to Illinois UCC statutory provision.

Not Reported in F.Supp.2d, 2007 WL 2893638 (N.D.Ill.)
**(Cite as: 2007 WL 2893638 (N.D.Ill.))**

There is nothing implicit in the nature of this alleged requirements contract to discern a definite term of duration. Nor is there any indication of an obligation that Polyad partially performed. Nor is there any mention of consideration for any promise. In *Carrico,* the contract at issue was a line-of-credit agreement. 95 Ill.Dec. 880, 490 N.E.2d at 973. There, the plaintiffs pledged collateral to secure future draws on the credit line as part of their performance under the contract. *Id. at 976.* The Court held that "construing the contract to be terminable at will would" not be compatible with the nature of the contract because the plaintiffs would have "obtain[ed] no benefit from pledging additional security." *Id.* Here, Polyad does not allege (or argue in its briefs) any comparable circumstances exist to indicate that the nature of their requirements contract with TSE would last for a definite time or conversely, not terminate before a certain period of time.[FN3] Polyad has not alleged that it has given TSE anything in consideration for a promise requiring continuing performance has been partly executed.

> FN3. Although Polyad contends it has pleaded allegations sufficient to show the contract was to last until at least 2005, those allegations merely demonstrate that at best, TSE assured Polyad at some date well after the time of contract formation that it would supply goods "for the coming year and beyond." (Complaint, ¶ 21 .) Such pleading is far from definite and would require this Court to find that the parties informally modified an already informal oral contract without any discussion of consideration.

Polyad argues that it had no obligation to include specific facts regarding a term of duration in the TSE contract. It quotes a Seventh Circuit case where the court stated "a plaintiff is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle him to judgment." *Early v. Bankers Life and Cas. Co.,* 959 F.2d 75, 79 (citation omitted). Polyad is correct that generally there is no requirement under the federal notice pleading standards that a plaintiff must provide specific facts or even include every possible factual allegation germane to establishing a particular claim. That is why a court will not dismiss a claim pursuant to Rule 12(b)(6) unless the complaint fails it provide fair notice of what the claim is and the grounds upon which it rests or it is apparent from the face of the complaint that under no plausible facts may relief be granted. *St. John's United Church of Christ,* 2007 WL 2669403 at *7.

**\*8** However, a plaintiff may just as well plead himself out of court by pleading facts that undermine the allegations set forth in his complaint. *Kolupa,* 438 F.3d at 715; *Early,* 959 F.2d at 79 ("If he alleges facts that show he isn't entitled to a judgment, he's out of luck."). That is what Polyad has done in its Amended Complaint. By including allegations that demonstrate a lack of a definite term of duration for the TSE contract, Polyad forced itself into providing factual allegations sufficient to demonstrate that the contract falls under the exception to the Illinois rule that contracts without specific terms of duration are terminable at the will of the parties. Polyad has failed to do so and therefore, TSE cannot be liable for breach of contract. *Jespersen,* 233 Ill.Dec. 306, 700 N.E.2d at 1017.

In sum, Polyad has not pleaded sufficiently to withstand a 12(b) (6) motion to dismiss which only attacks the legal sufficiency of the complaint. TSE's Motion to Dismiss on the grounds of violation of the Statute of Frauds is DENIED but is GRANTED on the grounds that the complaint fails to include material terms of the alleged contract.

**B. Tortious Interference with Contract Claim**

Not Reported in F.Supp.2d, 2007 WL 2893638 (N.D.Ill.)
**(Cite as: 2007 WL 2893638 (N.D.Ill.))**

Indopco contends that should the Court conclude that the Amended Complaint fails to state a breach of contract claim, it must also dismiss the tortious interference with contract claim. In Illinois, the necessary elements of a tortious interference with contract claim are: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages. *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc., 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (Ill.1989)* (citation omitted).

*Coachmen Contract*

Polyad alleges that Indopco tortiously interfered with Polyad's contract with Coachmen as well as its contract with TSE. Polyad cannot satisfy the elements of the tort based upon its allegations. The fourth element of the claim requires the plaintiff to plead a subsequent breach by the "other." *HPI Health Care Services, Inc. ., 137 Ill.Dec. 19, 545 N.E.2d at 676.* The "other" is the other party to the alleged contract *not* the plaintiff. *Israel v. Nat. Canada Corp., 276 Ill.App.3d 454, 213 Ill.Dec. 163, 658 N.E.2d 1184, 1192-1193 (Ill.App.Ct.1995)* ("Inducement to breach a contract involves acts aimed at parties other than a plaintiff and cause those parties to breach a contract held by that plaintiff.").

Polyad alleges nothing in its Amended Complaint that would allow the Court to infer that Coachmen has breached its contract with Polyad. It merely asserts factual allegations that allow the Court to infer that Indopco's action have caused Polyad to breach the Coachmen contract. For instance, in paragraph 30 through 33, Polyad alleges that TSE stopped providing product to Polyad because of Indopco's influence and that Polyad's sales to Coachmen have been adversely affected. The only reasonable inference is that Polyad has breached with

Coachmen, not the other way around. This was not a very high hurdle for Polyad to overcome; the complaint only needed to contain an allegation that Coachmen breached its contract with Polyad. This claim does not satisfy Rule 8 because it does not provide a necessary element of the claim.

**\*9** Indopco's motion to dismiss is GRANTED as to the tortious interference with contract claim based on the Coachmen contract.

*TSE Contract*

Since this Court has concluded that the complaint fails to state a breach of contract claim because it provides factual allegations demonstrating the contract did not contain a definite term of duration, it is wholly appropriate to dismiss the tortious interference claim based on that alleged breach. It is undisputed that a breach of contract is an essential element of a tortious interference with contract claim in Illinois. *HPI Health Care Services, Inc., 137 Ill.Dec. 19, 545 N.E.2d at 676.* Polyad anticipated this result as it included a claim of tortious interference with a business expectancy claim in its Amended Complaint that Indopco cannot successfully challenge with a 12(b)(6) motion.

**IV. CONCLUSION**

For the foregoing reasons, Defendant TSE's Motion to Dismiss is **GRANTED.** Indopco's Motion to Dismiss Count I of the Amended Complaint is also **GRANTED.**

N.D.Ill.,2007.
Polyad Company v. Indopco Inc.
Not Reported in F.Supp.2d, 2007 WL 2893638 (N.D.Ill.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2013 WL 5753783 (N.D.Ill.)
**(Cite as: 2013 WL 5753783 (N.D.Ill.))**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
RBS Citizens, National Association, as successor by
merger to Charter One Bank, N.A., Plaintiff,
v.
Richard S. Gammonley; Richard T. Gammonley;
Charles Di Giovanni, as trustee for the 573 North
Washington Land Trust; 573 North Washington Land
Trust; Charles Di Giovanni, as trustee for the 1111 S.
Wabash Unit 2602 Land Trust; 1111 S. Wabash Unit
2602 Land Trust; 14326 Bluff Road Land Trust; and
Samson Properties, LLC—Series B, Defendants.

Case No. 12 C 8659
1:12–cv–08659October 23, 2013

Anthony M. Sciara, Robinson Shapiro & Schwartz,
LLC, Matthew E. McClintock, Goldstein &
McClintock, Chicago, IL, for Plaintiff.

Jon D. Cohen, Stahl Cowen Crowley LLC, Chicago,
IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*
JOHN Z. LEE, United States District Judge

**\*1** Plaintiff RBS Citizens National Association
("RBS"), as successor by merger to Charter One
Bank, N.A. ("the Bank"), has sued Defendants
Richard S. Gammonley ("RSG"); Richard T.
Gammonley ("RTG" and together with RSG, the
"Gammonleys"); Charles Di Giovanni, as Trustee for
both the 673 North Washington Land Trust and the
1111 S. Wabash Unit 2602 Land Trust; 573 North
Washington Land Trust; 14326 Bluff Road Land
Trust; and Samson Properties, LLC—Series B
("Samson") (collectively, "the Defendants") to void
what Plaintiff contends were fraudulent transfers of

assets and interests pursuant to the Illinois Uniform
Fraudulent Transfer Act ("IUFTA"), 740 Ill. Comp.
Stat. 160 (2003). Defendants move to dismiss
Plaintiff's First Amended Complaint (the "Amended
Complaint") pursuant to Federal Rule of Civil
Procedure ("Rule") 12(b)(6). For the reasons set forth
herein, Defendants' motion is denied.

### *Facts* [FN1]

> **FN1.** The following facts are taken from
> Plaintiff's Amended Complaint and are
> assumed to be true for purposes of this
> motion to dismiss. *See Murphy v. Walker*, 51
> F.3d 714, 717 (7th Cir. 1995).

In 2005, Defendants RTG and RSG were both
officers of a company, R.T.G. Land Development
Corporation, which effectively controlled RTG–
Bloomingdale, LLC. (Am. Compl. ¶ 21.) On
December 16, 2005, RTG–Bloomingdale, LLC,
executed two agreements with the Bank: (1) a
construction loan agreement, and (2) a construction
completion guaranty agreement. The construction
loan agreement was executed in connection with
RTG–Bloomingdale's development of real property
located in Bloomingdale, Illinois. (*Id.* ¶¶ 20, 21.)

Also on that date, RTG–Bloomingdale executed
a revolving credit promissory note in favor of the
Bank in the amount of twenty seven million dollars.
(*Id.* ¶ 22.) In addition, RTG–Bloomingdale executed
an open-end construction mortgage (together with the
construction agreement and promissory note, the
"Bloomingdale loan"). (*Id.* ¶ 23.) That same day,
Defendants RTG and RSG also executed an
individual guaranty agreement in favor of the Bank,
which required the Gammonleys to personally pay
the Bank any outstanding payments due under the
Bloomingdale loan in the event that RTG–

Not Reported in F.Supp.2d, 2013 WL 5753783 (N.D.Ill.)
**(Cite as: 2013 WL 5753783 (N.D.Ill.))**

Bloomingdale were to default. (*Id.* ¶¶ 25, 26.)

In October and November of 2007, RTG–Bloomingdale defaulted on the Bloomingdale loan on at least three occasions, each of which permitted the Bank, under the terms of the construction loan agreement, to declare the promissory note due and payable by the Gammonleys without presentment, demand, protest or notice. (*Id.* ¶¶ 27–32.) At the time of the three defaults, the Bloomindale Loan had an outstanding balance in excess of $20,000,000.00. (*Id.* ¶ 33.) The Gammonleys and the Bank executed a forbearance and loan modification agreement on January 15, 2008, in which the Gammonleys made various promises to the Bank in exchange for the Bank's promise not to exercise its rights against RTG–Bloomingdale and the Gammonleys for defaulting on the Bloomingdale loan. (*Id.* ¶¶ 33–37.) The Bank and the Gammonleys amended the forbearance agreement on March 27, 2008. (*Id.* ¶ 38.) In the amended forbearance agreement, the Gammonleys expressly acknowledged defaulting on the Bloomingdale loan on two additional occasions, on February 29, 2008 and March 31, 2008. (*Id.* ¶ 40.)

**\*2** On June 15, 2008, RTG–Bloomingdale and the Gammonleys defaulted on the amended forbearance agreement, and the Bank and the Gammonleys executed a second forbearance agreement. (*Id.* ¶ 42.) The Gammonleys, however, defaulted on the second forbearance agreement as well, at which time the Bloomindale loan still had an outstanding balance in excess of $20,000,000.00. (*Id.* ¶ 44.)

Subsequently, on February 9, 2009, the Bank filed a complaint (the "Bloomingdale Complaint") against the Gammonleys and others for foreclosure and other relief in the Circuit Court of DuPage County, Illinois. (*Id.* ¶ 46.) On May 18, 2012, the Circuit Court of DuPage County entered a joint and several judgment in favor of the Bank and against the Gammonleys in the amount of $20,366,634.16. (*Id.* ¶

48.)

Separately, on July 24, 2006, Defendant RTG's company, RTG–Oak Lawn LLC, executed a term note (the "Oak Lawn loan") in favor of the Bank in the amount of $3,376,000.00. (*Id.* ¶ 49.) As with the Bloomingdale loan, Defendant RTG executed an unlimited guaranty in favor of the Bank, which provided that Defendant RTG would be personally, directly, unconditionally, and immediately liable to the Bank in the event that RTG–Oak Lawn defaulted on the Oak Lawn loan. (*Id.* ¶¶ 50–51.)

RTG–Oak Lawn defaulted on the Oak Lawn loan on April 8, 2009. (*Id.* ¶ 52.) After serving notice of demand upon RTG–Oak Lawn and the Gammonleys, the Bank filed a complaint against the Gammonleys in the Circuit Court of DuPage County, Illinois on September 7, 2010. (*Id.* ¶¶ 54–55.) On May 17, 2012, the Circuit Court entered a final judgment order in favor of the Bank and against the Gammonleys in the amount of $3,619,745.58. (*Id.* ¶ 57.)

On November 16, 2007, only a few weeks after Defendant RSG became personally liable to the Bank for more than $20,000,000.00, Defendant RSG conveyed property located at 573 North Washington, Hinsdale, Illinois (the "North Washington property"), then-valued at more than $1,400,000.00, to himself and his wife, Lisa Gammonley, as tenants by the entirety. (*Id.* ¶¶ 60–61.) According to Plaintiff, RSG effectuated the transfer with the sole and actual intent to hinder, delay, or defraud the Bank. (*Id.* ¶ 62.) On May 13, 2010, RSG once again transferred the North Washington property allegedly for the purpose of defrauding the Bank; this time to Defendant Di Giovanni as the North Washington Trustee in exchange for $10.00. (*Id.* ¶¶ 67, 68.) Defendant Di Giovanni was allegedly either the initial transferee of the North Washington property, a person who directly benefitted from the second North Washington property transfer, or merely a subsequent transferee of the North Washington Property. (*Id.* ¶

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.
**Exhibit 1 – Page 41**

Not Reported in F.Supp.2d, 2013 WL 5753783 (N.D.Ill.)
**(Cite as: 2013 WL 5753783 (N.D.Ill.))**

69.)

On February 29, 2012, at a time when Defendant RSG knew that he was personally liable to the Bank for over $23,000,000.00, RSG conveyed his interest in timeshare units (the "Timeshare Units") located in the U.S. Virgin Islands to five different trusts in exchange for $10.00. (*Id.* ¶¶ 85, 86.) The beneficiaries of the trusts were RSG's five minor children. (*Id.* ¶ 86.) As such, Defendant RSG retained effective control over the property by virtue of his status as a parent. (*Id.* ¶ 89.) According to Plaintiff, RSG effectuated the transfer with the sole and actual intent to hinder, delay, or defraud the Bank. (*Id.* ¶ 88.)

In or around September 2009, Defendant RSG and his wife transferred various personal property ("RSG personal property") located at their North Washington property to either a trust or entity for the alleged purpose of hindering, delaying, or defrauding the bank. (*Id.* ¶¶ 104, 106.) Defendant RSG retained effective control over the personal property through his continued residence at the North Washington property. (*Id.* ¶ 108.)

**\*3** On June 24, 2010, Defendant RTG conveyed property located at 1111 S. Wabash, Unit 2602, Chicago, Illinois (the "Wabash property"), then-valued at more than $875,000.00, to Defendant Di Giovanni, as the Wabash Trustee, in exchange for zero consideration. (*Id.* ¶¶ 120, 122.) RTG effectuated the transfer with the actual intent to hinder, delay, or defraud the Bank. (*Id.* ¶ 123.) At the time of the transfer, Defendant RTG knew that he was personally liable to the Bank for more than $23,000,000.00. (*Id.* ¶ 121.) Again, Defendant Di Giovanni was allegedly either the initial transferee of the Wabash property, a person who directly benefitted from the Wabash property transfer, or merely a subsequent transferee of the Wabash Property. (*Id.* ¶ 125.)

Four days later, on June 28, 2010, Defendant RTG conveyed his property located at 14326 Bluff Road, Lakeside, Michigan (the "Bluff Road property") to the Bluff Road Trust in exchange for $10.00. (*Id.* ¶ 141.) The Bluff Road property was valued at $4,990,000.00 at the time of the transfer, which was again consummated allegedly for the purpose of hindering, delaying, or defrauding the Bank. (*Id.* ¶ 142.)

Finally, on March 12, 2010, Defendant RTG transferred his interest in various items of personal property located at the Bluff Road property, including paintings, silver, boats, and cars (collectively, "RTG personal property") to Defendant Samson for little or no consideration. (*Id.* ¶¶ 159, 167.) At the time of the transfer, RTG knew that he was personally liable to the bank for more than $20,000,000.00. (*Id.* ¶ 161.) RTG allegedly carried out the transfer with the actual intent to hinder, delay, or defraud the Bank. (*Id.* ¶ 160.)

Defendants move to dismiss the Amended Complaint pursuant to Rule 12(b)(6) on two grounds. They contend that: (1) Plaintiff has failed to adequately plead claims for fraud in fact under 740 Ill. Comp. Stat. 160/5(a)(1) ("§ 5(a)(1) of the IUFTA"); and (2) Plaintiff has failed to adequately plead claims for fraud in law under 740 Ill. Comp. Stat. 160/5(a)(2) ("§ 5(a)(2) of the IUFTA") and/or 740 Ill. Comp. Stat. 160/6(a) ("§ 6(a) of the IUFTA"). The Court will address each issue in turn.

### Discussion

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

Not Reported in F.Supp.2d, 2013 WL 5753783 (N.D.Ill.)
**(Cite as: 2013 WL 5753783 (N.D.Ill.))**

alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).*

Actions based on fraud, however, must meet a heightened pleading standard to survive a Rule 12(b)(6) motion to dismiss. *See Gen. Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1078 (7th Cir. 1997); see Fed. R. Civ. P. 9(b).* Specifically, Rule 9(b) requires that a complaint involving fraud include "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 923 (7th Cir. 1992)* (quoting *Bankers Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992)*) (internal quotations omitted). Courts require this heightened pleading standard to "assure that the claim is responsible and supported, rather than defamatory and extortionate." *Borsellino v. Goldman Sachs Grp., Inc., 477 F.3d 502, 507 (7th Cir. 2007)* (quoting *Payton v. Rush–Presbyterian–St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999)*) (internal quotations omitted).

The IUFTA specifically protects against two types of fraud: actual fraud (otherwise referred to as fraud in fact), (§ 5(a)(1)), and constructive fraud (otherwise referred to as fraud in law), (§§ 5(a)(2) and 6(a)). *See* 740 Ill. Comp. Stat. 160; *Gen. Elec. Capital Corp., 128 F.3d at 1078.* A complaint alleging a violation of §§ 5(a)(1), 5(a)(2), or 6(a) of the IUFTA must therefore meet Rule 9(b)'s heightened pleading standard to survive a motion to dismiss under Rule 12(b)(6). *See id.* It follows that, here, because each of the Amended Complaint's twelve counts alleges either fraud in fact or fraud in law, each count must meet Rule 9(b)'s heightened, "who, what, when, where, and how" pleading standard to survive Defendants' motion to dismiss under Rule 12(b)(6). *See Borsellino, 477 F.3d at 507*

**A. Fraud in Fact**

**\*4** Defendants first argue that the Court should

dismiss Counts I, III, V, VII, IX and XI of the Complaint under Rule 12(b)(6) because the counts fail to sufficiently plead claims of fraud in fact pursuant to § 5(a)(1) of the IUFTA. For the reasons set forth below, however, the Court finds that the Amended Complaint's allegations of fraud in fact satisfy Rule 9(b)'s heightened pleading standard. Therefore, the Court denies Defendants' motion to dismiss Counts I, III, V, VI, IX, and XI of the Amended Complaint.

First, Defendants contend that Plaintiff fails because it has not sufficiently alleged that Defendants' six property transfers were made with the "actual intent to hinder, delay, or defraud the creditors." 740 Ill. Comp. Stat. 160/5(a)(1). Section 5(b) of the IUFTA outlines eleven factors, known as the "badges of fraud," that courts should consider in determining whether there is "actual intent." *See In re Spatz, 222 B.R. 157, 168 (Bkrtcy. N.D. Ill. 1998).* Defendants appear to argue that the Court should dismiss Counts I, III, V, VI, IX, and XI because Plaintiff has failed to allege all of the "badges of fraud" enumerated in § 5(b). But it is well-established that no one enumerated factor is dispositive. *See id.; see also In re Equip. Acquisition Res., Inc., 481 B.R. 422, 431 (Bankr. N.D. Ill. 2012)* ("A single badge of fraud is insufficient to establish intent, but the presence of several may create a presumption that the debtor acted with the requisite intent to defraud."). Nor is the list intended to be an exhaustive one. *See* 740 Ill. Comp. Stat. 160/5(b) (noting that the court can consider the badges of fraud "among other factors"); *Frank IX & Sons, Inc. v. Phillipp Indus., Inc., 1997 WL 534509, at \*8 (N.D. Ill. Aug. 25, 1997)* (holding that "section 5(b)'s list of 'badges of fraud' is not all-inclusive, and the court may also consider other evidence"). Rather, at this early stage in the litigation, it is sufficient for Plaintiff to allege the "who, what, when, where, and how" of Defendants' fraud, along with facts from which the Court can reasonably infer that Defendants acted with actual intent.

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 43**

Not Reported in F.Supp.2d, 2013 WL 5753783 (N.D.Ill.)
**(Cite as: 2013 WL 5753783 (N.D.Ill.))**

Here, Plaintiff's twelve counts meet these requirements by describing: the specific parties involved in each of the property transfers ("who"); the description of each property involved in the transfers ("what"); the exact dates of each transfer and the dates' relation to Defendants' outstanding obligations ("when"); the location of each transfer ("where"); and the means by which the Defendants effectuated each transfer ("how"). (Am. Compl. ¶¶ 2–9, 61, 67, 82–89, 104–08, 120–26, 139–44, 159–62.) Furthermore, each of Plaintiff's six fraud in fact counts alleges at least three badges of fraud under § 5(b) of the IUFTA to indicate how Defendants acted with the requisite intent.

For example, in Count I, Plaintiff alleges that: (1) the first North Washington transfer was to an insider, RSG and his wife; (2) RSG retained control of the North Washington property after its transfer; and (3) RSG consummated the transfer just days after he became aware that he was personally liable to the bank for more than $20,000,000. (*Id.* ¶¶ 61, 63.) Plaintiff further alleges in Count I that, with respect to the second North Washington transfer: (1) RSG had already been engaged in litigation prior to the transfer; (2) RSG transferred the North Washington property to Defendant Di Giovanni for only $10.00; and (3) RSG knew that he would soon be ordered to pay substantial judgment to RBS. (*Id.* ¶¶ 66, 67.)

**\*5** In Count III, Plaintiff alleges that: (1) RSG transferred timeshare units to his children's trust (*id.* ¶ 86); (2) RSG retained effective control over the timeshare units because his children were under the age of 18 (*id.* ¶ 89); (3) RSG was in the middle of litigation with RBS at the time of the transfer (*id.* ¶¶ 27–33, 85, 89); (4) RSG transferred the property for $10.00 (*id.* ¶ 86); and (5) according to Plaintiff, RSG knew that the court was about to render a substantial personal judgment against him at the time of the transfer (*id.* ¶¶ 27–33, 85, 89).

In Counts V and XI, Plaintiff alleges that: (1) RSG and RTG retained effective control over the North Washington property and RTG personal property, respectively, as they continued to reside at the North Washington and Bluff Road properties following the two transfers (*id.* ¶¶ 108, 159); (2) RSG and RTG were in the middle of litigation with RBS at the time of the transfers (*id.* ¶¶ 27–33, 103, 158); and (3) RSG and RTG both knew that the court was about to render a substantial personal judgment against them at the time of the two transfers (*id.* ¶¶ 27–33, 103, 158).

Similarly, in Counts VII and IX, Plaintiff alleges that: (1) RSG and RTG were in the middle of litigation with RBS at the time of the two transfers (*id.* ¶¶ 27–33, 121, 140); (2) RSG and RTG each received either zero consideration, or a mere $10.00, in return for the two transfers (*id.* ¶¶ 122, 141); and (3) RSG and RTG both knew that the court was about to render a substantial personal judgment against them at the time of the two transfers (*id.* ¶¶ 27–33, 121, 140).

As a result, the Court finds that Counts I, III, V, VII, IX, and XI satisfy Rule 9(b)'s "who, what, when, where, and how" pleading standard and allege sufficient facts from which actual intent can be reasonably inferred.

In their motion, Defendants also argue that Counts I, III, V, VII, IX, and XI of the Complaint should be dismissed due to Plaintiff's failure to allege that Defendant received inadequate consideration in exchange for the six property transfers. This argument is similarly unpersuasive. "[F]ull consideration is *not,* as a matter of law, an absolute defense to fraud in fact." *Spatz,* 222 B.R., at 169 (emphasis added); *see Equip. Acquisition Res., Inc.,* 481 B.R. at 428 ("[u]nlike transfers that are only constructively fraudulent, the equivalence of value

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.
**Exhibit 1 – Page 44**

Not Reported in F.Supp.2d, 2013 WL 5753783 (N.D.Ill.)
**(Cite as: 2013 WL 5753783 (N.D.Ill.))**

given in exchange for the actual intent fraudulent transfer is immaterial to the question whether the transfer is actually fraudulent.") As such, the Court denies Defendants' motion to dismiss the six Counts for failure to adequately plead lack of consideration.

**B. Constructive Fraud**

Defendants also move to dismiss Counts II, IV, VI, VIII, X, and XII of the Complaint for failure to state a claim against Defendants for constructive fraud pursuant to §§ 5(a)(2) or 6(a) of the IUFTA. In addition to satisfying 9(b)'s "who, what, when, where, and how" standard, in order to plead a sufficient cause of action under §§ 5(a)(2) or 6(a) of the IUFTA, a complaint must also allege that: "(1) the debtor made a voluntary transfer; (2) at the time of the transfer, the debtor had incurred obligations elsewhere; (3) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer; and (4) after the transfer the debtor failed to retain sufficient property to pay the indebtedness." *Zimmerman v. Paulsen*, 524 F. Supp.2d 1077, 1080 (citing *Gen. Elec. Capital Corp.*, 128 F.3d at 1079) (internal citation omitted).

Here, Defendants argue that Plaintiff failed to allege that Defendants had not receive reasonably equivalent value in exchange for the six transfers. The Seventh Circuit has held that "a transfer lacks reasonably equivalent value if there is no or inadequate consideration." *Creditor's Comm. of Jumer's Castle Lodge v. Jumer*, 472 F.3d 943, 947 (7th Cir. 2007). Furthermore, the appropriate test is "to determine the value of what was transferred and to compare it to what was received." *Id.* "[T]he standard for [r]easonable equivalence should depend on all the facts of each case, an important element of which is fair market value." *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997).

**\*6** Applying this standard to the facts alleged, the Court finds that Counts II, IV, VI, VIII, X, and XII sufficiently allege that Defendants failed to

receive reasonably equivalent value in exchange for the six transfers. Specifically, each Count alleges that Defendants transferred property, ranging in fair market value from thousands of dollars to over four million dollars, in return for either zero consideration or a mere $10.00.

For example, Count II alleges that Defendant RSG transferred the North Washington property, then valued at more than $1,400,000.00, to Defendant Di Giovanni in exchange for $10.00. (Am. Compl. ¶¶ 59, 67.) Count IV alleges that RSG and his wife transferred timeshare units valued at over $60,000.00 to various trusts in exchange for $10.00 (*Id.* ¶¶ 83, 86.) Count VI alleges that Defendant RSG transferred five televisions, two stereo systems, a refrigerator, a Viking range, and exercise equipment to a trust or entity in exchange for zero consideration. (*Id.* ¶¶ 111, 114, 115.) Count VIII alleges that Defendant RTG transferred the Wabash Property, then possessing a fair market value in excess of $875,000.00, to Defendant Di Giovanni in exchange for zero consideration. (*Id.* ¶¶ 120, 122, 131.) Count X alleges that Defendant RTG transferred the Bluff Road Property, possessing a fair market value in excess of $4,990,000.00, to the Bluff Road Trust in exchange for $10.00. (*Id.* ¶¶ 139, 141.) Finally, Count XII alleges that Defendant RTG transferred any and all of his rights, title and interest in his household effects, paintings, collectibles, jewelry, chinaware, silver, works of art, boats, cars, and other tangible property, along with the insurance policies thereon, to Defendant Samson, all in exchange for zero consideration. (*Id.* ¶¶ 159, 167.)

Therefore, all six Counts sufficiently allege that Defendants failed to receive reasonably equivalent value in exchange for the six property transfers, and Defendants' motion to dismiss Counts II, IV, VI, VIII, X, and XII for failure to adequately plead fraud in law is denied.

***Conclusion***

Not Reported in F.Supp.2d, 2013 WL 5753783 (N.D.Ill.)
**(Cite as: 2013 WL 5753783 (N.D.Ill.))**

    For the reasons provided in this Memorandum Opinion and Order, the Court denies Defendants' motion to dismiss Plaintiff's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

       **SO ORDERED**

N.D.Ill., 2013
RBS Citizens v. Gammonley
Not Reported in F.Supp.2d, 2013 WL 5753783 (N.D.Ill.)

END OF DOCUMENT



Slip Copy, 2013 WL 4498700 (S.D.Ala.)
**(Cite as: 2013 WL 4498700 (S.D.Ala.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Alabama,
Southern Division.
SE PROPERTY HOLDINGS, LLC, Plaintiff,
v.
George S. BRASWELL, et al., Defendants.

Civil Action No. 13–0267–WS–N.
Aug. 21, 2013.

P. Russel Myles, McDowell Knight Roedder & Sledge, L.L.C., Mobile, AL, J. Blair Newman, Jr., Mobile, AL, for Plaintiff.

James G. Curenton, Jr., Fairhope, AL, for Defendants.

**ORDER**

WILLIAM H. STEELE, Chief Judge.

**\*1** This matter comes before the Court on defendants' Motion to Dismiss (doc. 12). The Motion has been briefed and is now ripe for disposition.

**I. Background.**

This action is brought under the Alabama Uniform Fraudulent Transfer Act, Ala.Code §§ 8–9A–1 et seq. ("AUFTA," or the "Act"). According to the well-pleaded allegations of the Complaint (doc. 1), defendant George Braswell is indebted to plaintiff SE Property Holdings, LLC ("SEPH"), pursuant to his status as guarantor on various unpaid loans that SEPH now owns and holds, including pre–2009 loans made by Vision Bank to nonparties Bama Bayou, LLC, Marine Park, LLC, and Sundance, LLC. SEPH filed suit to challenge a pair of conveyances of real property made by George Braswell to defendant Vennie Braswell on or about May 19, 2009, alleging that said transfers were violative of AUFTA.[FN1]

> FN1. As discussed *infra,* the Act imposes liability for several different kinds of transfers. The Complaint does not specify the particular sections of AUFTA that SEPH invokes, nor does it identify with clarity which category or categories of fraudulent transfer plaintiff contends are in issue. While this is not a *per se* pleading defect mandating dismissal, the resulting ambiguity in the Complaint has needlessly cluttered and complicated the Rule 12(b)(6) analysis. It would have been a relatively simple matter for SEPH to designate in its pleading which sections of the Act it claims the Braswells violated, rather than trading in generalities and citing AUFTA as a generic whole. Certainly, doing so would have streamlined the briefing and review process on the Braswells' Motion to Dismiss, with no countervailing detriment to SEPH.

Count One of the Complaint alleges that the conveyances "constitute fraudulent transfers" under AUFTA because of, *inter alia,* the following facts and circumstances: (1) "George Braswell was insolvent at the time of the transfer or became insolvent as a result of such transfer," (2) "the transfer was made to an insider or related party," (3) "the transferor did not receive reasonably equivalent value in exchange for the transfer," (4) "the transfer was made for an antecedent debt," and (5) "the transfer was made with the actual intent to hinder, delay and/or defraud ... SEPH and/or other creditors." (Doc. 1, ¶ 8.) The Complaint does not set forth supporting facts to bolster any of these statements, nor does it cite any specific section(s) of AUFTA. Nonetheless, on the basis of these allegations, plaintiff demands in Count One that the purportedly

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 47**

Slip Copy, 2013 WL 4498700 (S.D.Ala.)
**(Cite as: 2013 WL 4498700 (S.D.Ala.))**

fraudulent transfers be set aside and that a monetary judgment be entered against the Braswells, jointly and severally, for compensatory and punitive damages,[FN2] Count Two of the Complaint adds little of substance, except to set forth an additional allegation that Vennie Braswell conspired with George Braswell to effectuate the purportedly fraudulent transfers.

> **FN2.** AUFTA provides that avoidance of a transfer is an authorized remedy for violation of the Act. *See* Ala.Code § 8–9A–7(a)(1) (remedies available to creditors include "[a]voidance of the transfer to the extent necessary to satisfy the creditor's claim"). Also, the Alabama Supreme Court has confirmed that "the law permits damages awards in cases involving fraudulent transfers" under the catch-all remedies clause of Ala.Code § 8–9A–7(a)(3)(c). *Johns v. A.T. Stephens Enterprises, Inc.,* 815 So.2d 511, 516 (Ala.2001).

Defendants now seek dismissal of the Complaint on two distinct grounds. First, to the extent that SEPH brings claims of insider transactions or constructive fraud under the Act, the Braswells maintain that they are time-barred and must be dismissed. Second, to the extent that SEPH brings claims of actual fraud under AUFTA, the Braswells contend that the Complaint flunks a *Twombly / Iqbal* analysis because it pleads insufficient factual content.

**II. Analysis.**

*A. Legal Standard for Rule 12(b)(6) Motions.*

To withstand Rule 12(b)(6) scrutiny and satisfy Rule 8(a), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," so as to "nudge[ ][his] claims across the line from

conceivable to plausible." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). "This necessarily requires that a plaintiff include factual allegations for each essential element of his or her claim." *GeorgiaCarry.Org, Inc. v. Georgia,* 687 F.3d 1244, 1254 (11th Cir.2012). These minimum pleading standards "require [ ] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. As the Eleventh Circuit has explained, *Twombly / Iqbal* principles require that a complaint's allegations be "enough to raise a right to relief above the speculative level." *Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention,* 623 F.3d 1371, 1380 (11th Cir.2010) (citations omitted).

**\*2** For purposes of a Rule 12(b)(6), the Court accepts as true the well-pleaded factual allegations of the Complaint and draws all reasonable inferences in the plaintiff's favor. *See, e.g., Keating v. City of Miami,* 598 F.3d 753, 762 (11th Cir.2010) (on a motion to dismiss under Rule 12(b)(6), court must "accept[ ] the facts alleged in the complaint as true" and "draw [ ] all reasonable inferences in the plaintiff's favor"). That said, "if allegations are indeed more conclusory than factual, then the court does not have to assume their truth." *Chaparro v. Carnival Corp.,* 693 F.3d 1333, 1337 (11th Cir.2012); *see also Mamani v. Berzain,* 654 F.3d 1148, 1153 (11th Cir.2011) ("Legal conclusions without adequate factual support are entitled to no assumption of truth."). The Court's review of the Braswells' Motion to Dismiss is informed by these principles.

*B. Salient Features of Alabama Uniform*

Slip Copy, 2013 WL 4498700 (S.D.Ala.)
**(Cite as: 2013 WL 4498700 (S.D.Ala.))**

*Fraudulent Transfer Act.*

"The purpose of the AUFTA is to prohibit the fraudulent transfer of property by a debtor who intends to defraud creditors by placing assets beyond their reach." *American National Red Cross v. ASD Specialty Healthcare, Inc., 888 So.2d 464, 465 (Ala.2003)* (citation and internal quotation marks omitted). "The AUFTA statutory scheme includes four different types of 'fraudulent transfers' upon which liability may be predicated." *American National Red Cross v. ASD Specialty Health Care, Inc., 325 F. Supp .2d 1322, 1336 (S.D.Ala.2002).* First, a debtor's transfer is fraudulent as to a creditor whose claim arose before or after the transfer "if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor." *Ala.Code § 8–9A–4(a).* Second, a debtor's transfer is fraudulent as to a creditor whose claim arose before or after the transfer "if the debtor made the transfer without receiving a reasonably equivalent value ... and the debtor [either] [w]as engaged or about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small ... or ... [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." *Id. at § 8–9A–4(c).* Third, a debtor's transfer is fraudulent as to a creditor whose claim arose before the transfer "if the debtor made the transfer without receiving a reasonably equivalent value ... and the debtor was insolvent." *Id.* at § 8–9A–5(a). Fourth, a debtor's transfer is fraudulent as to a creditor whose claim arose before the transfer "if the transfer was made to an insider for an antecedent debt and the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent." *Id.* at § 8–9A–5(b). These types of claims may be broadly classified as claims for actual fraudulent transfer (violation of *§ 8–9A–4(a)*), claims for constructive fraudulent transfer (violation of *§§ 8–9A–4(c)* or *8–9A–5(a)*), and what the Court will refer to as claims for "insider" constructive fraudulent transfer (violation of *§ 8–9A–5(b)*).

**\*3** The distinctions among these kinds of claims are not purely academic; rather, there are important differences for limitations purposes. Under the Act, a claim for actual fraudulent transfer involving real property must be brought within 10 years after the transfer. *See* Ala.Code § 8–9A–9(1). Claims for constructive fraudulent transfer by creditors whose claims arose prior to the transfer must be brought within four years. *Id.* at § 8–9A–9(3). And claims for insider constructive fraudulent transfer must be brought within one year. *Id.* at § 8–9A–9(5).

As framed by defendants' Rule 12(b)(6) Motion and the associated briefing, the task at hand is to determine (i) which types of AUFTA claims SEPH is pursuing, (ii) whether those claims are adequately pleaded, and (iii) whether they are timely under the applicable limitations provisions. The undersigned will examine each category of claim (actual fraudulent transfer, constructive fraudulent transfer, insider constructive fraudulent transfer) separately.

*C. Insider Constructive Fraudulent Transfer.*

SEPH's Complaint invokes the language of insider constructive fraud by alleging that "the transfer was made to an insider or related party" and "the transfer was made for an antecedent debt." (Doc. 1, ¶ 8.) Again, § 8–9A–5(b) provides that a transfer is fraudulent if "made to an insider for an antecedent debt" and if certain other circumstances exist. In their Motion to Dismiss, the Braswells correctly point out that the statute of limitations for insider constructive fraud claims brought under § 8–9A–5(b) is one year. *See* Ala.Code § 8–9A–9(5). Here, of course, the allegedly fraudulent transfers occurred on May 19, 2009, but the Complaint was not filed until May 17, 2013, nearly four years later. On that basis, defendants argue that any claim by SEPH for insider constructive fraud pursuant to § 8–9A–5(b) should be dismissed as time-barred.

Slip Copy, 2013 WL 4498700 (S.D.Ala.)
**(Cite as: 2013 WL 4498700 (S.D.Ala.))**

In response, plaintiff does not interpose a tolling argument or defend the timeliness of this cause of action. Instead, SEPH states in a footnote that it "is not pursuing a claim pursuant to Ala.Code § 8–9A–5(b)" (doc. 17, at 3 n. 1), even though the plain language of its pleading suggests otherwise. Thus, the § 8–9A–5(b) claim pleaded in the Complaint appears to be untimely and has been disavowed by SEPH. For both of these reasons, defendants' Motion to Dismiss is **granted** as to the insider constructive fraudulent transfer claim embedded in Count I, and that claim is **dismissed without prejudice.**

### D. Constructive Fraudulent Transfer.

With regard to constructive fraudulent transfer, defendants first argue that the Complaint contains no such claim. (Doc. 13, at 12 ("SEPH alleged an 'actual intent' to defraud claim and an 'insider' claim, but did not allege a constructive fraud claim.").) Not so, says SEPH. Plaintiff has the better argument. The Complaint's allegations that George Braswell "did not receive reasonably equivalent value for the transfer" and that he "was insolvent at the time of the transfer or became insolvent as a result of such transfer" (doc. 1, ¶ 8) are couched in the vernacular of constructive fraudulent transfer, and invoke buzzwords from § 8–9A–4(c) and § 8–9A–5(a). *See, e.g., Baggett v. Baggett,* 870 So.2d 735, 739 (Ala.Civ.App.2003) ("A constructive fraudulent transfer occurs when a debtor transfers assets to another without consideration, and the debtor was, or became, insolvent at the time of the transfer.") (citations omitted). Whatever else may be said, the plain language of the pleading demonstrates that SEPH is pursuing a constructive fraudulent claim against the Braswells.

**\*4** Alternatively, defendants maintain that the constructive fraudulent transfer claim should be dismissed because it has not been adequately pleaded to satisfy minimum standards under Rule 8, as articulated by the Supreme Court in *Twombly* and *Iqbal.* To recapitulate, a complaint filed in federal

court cannot survive Rule 12(b)(6) review unless it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Chaparro,* 693 F.3d at 1337 (citation omitted). Thus, "[p]laintiffs must plead all facts establishing an entitlement to relief with more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *Resnick v. AvMed, Inc.,* 693 F.3d 1317, 1324 (11th Cir.2012) (citation and internal quotation marks omitted); *Chaparro,* 693 F .3d at 1337 ("A complaint that provides 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' is not adequate to survive a Rule 12(b)(6) motion to dismiss.") (citation omitted). "The plausibility standard calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the defendant's liability." *Miyahira v. Vitacost.com, Inc.,* 715 F.3d 1257, 1265 (11 th Cir.2013) (citation and internal quotation marks omitted). Binding precedents have endorsed a two-step approach under which courts first identify "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then "turn to the well-pleaded factual allegations and, assuming their veracity, determine whether they plausibly give rise to an entitlement to relief." *Resnick,* 693 F.3d at 1325 (citations and internal quotation marks omitted).

For a transfer to be constructively fraudulent under § 8–9A–4(c), the debtor must have "made the transfer without receiving a reasonably equivalent value" and the debtor must either (i) have been engaged in a business or transaction for which his remaining assets were "unreasonably small in relation to the business or transaction;" or (ii) have intended to incur, or believed that he would incur, debts beyond his ability to pay. With respect to these elements, the Complaint states only a conclusory allegation that "the transferor did not receive reasonably equivalent value in exchange for the transfer." (Doc. 1, ¶ 8.) Significantly, the pleading is devoid of factual allegations that might lend shape

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.
**Exhibit 1 – Page 50**

Slip Copy, 2013 WL 4498700 (S.D.Ala.)
**(Cite as: 2013 WL 4498700 (S.D.Ala.))**

and substance to this formulaic recitation of an element. There are no well-pleaded facts plausibly suggesting that George Braswell did not receive reasonably equivalent value for the subject real property. All we have is plaintiff's conclusory say-so, which is not entitled to the assumption of truth under *Iqbal/Twombly*.[FN3] Exacerbating the problem, the Complaint says nothing whatsoever (conclusory or otherwise) with regard to the element set forth in § 8–9A–4(c)(1)–(2), to-wit: that the debtor's remaining assets were "unreasonably small" for the business or transaction in which he was engaged, or that he intended to incur, or believed he would incur, debts beyond his ability to pay. The Complaint, as pleaded, sidesteps that element altogether. This omission is fatal to the claim on Rule 12(b)(6) review. *See GeorgiaCarry.Org, 687 F.3d at 1254* (pleading standards require that "a plaintiff include factual allegations for each essential element of his or her claim"). Accordingly, in its present form, SEPH's claim for constructive fraudulent transfer under § 8–9A–4(c) fails to state a claim upon which relief can be granted.

> FN3. In response, SEPH relies on "[t]he attachments to the Complaint, property deeds reflecting George Braswell's transfers of two pieces of real property for $10.00 each." (Doc. 17, at 8.) But the Complaint itself does not allege that George Braswell received just $10 for each parcel. Although the warranty deeds are attached to the Complaint (and are properly considered in the Rule 12(b)(6) analysis), those deeds state that George Braswell transferred each piece of real property to Vennie Braswell "for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) cash and other good and valuable considerations." (Doc. 1, Exhs. A & B.) What are the "other good and valuable considerations"? They must be considered in a "reasonably equivalent value" analysis, yet SEPH waves them aside

without explanation and asks that its § 8–9A–4(c) claim be deemed plausible based on a selective reading of the deeds that omits language harmful to plaintiff's position. Accepting the well-pleaded factual allegations of the Complaint as true, the Court has no idea whether George Braswell received reasonably equivalent value for the subject transfers because the Complaint does not allege what he received or how it was inadequate. On these factual allegations, SEPH's ability to show a transfer for less than reasonably equivalent value does not rise above the speculative level. Nor does SEPH strengthen its position by protesting that it "cannot be expected to already know all of the facts regarding the circumstances and intent of George Braswell's decision to transfer real property to his wife for $10.00." (Doc. 17, at 5.) Leaving aside the facts that the Complaint neither alleges a familial relationship between George Braswell and Vennie Braswell nor alleges that the consideration for each transfer was just $10.00, this argument fails because applicable procedural rules (as interpreted by the Supreme Court) require that a plaintiff only bring claims for which it has a plausible basis in fact. If SEPH is simply guessing—with no factual predicate—that George Braswell is insolvent or that he did not receive reasonably equivalent value, then plaintiff falls well short of relevant pleading standards.

**\*5** The same determination attaches to plaintiff's attempt to state a constructive fraudulent transfer claim under § 8–9A–5(a). That section provides that a transfer is fraudulent if the debtor did not receive "reasonably equivalent value" and if the debtor was "insolvent." As already stated, the Complaint recites no factual allegations plausibly supporting the conclusory statement that George Braswell did not

Slip Copy, 2013 WL 4498700 (S.D.Ala.)
**(Cite as: 2013 WL 4498700 (S.D.Ala.))**

receive reasonably equivalent value for the subject property transfers. Moreover, the Complaint articulates no facts that might support a conclusion that George Braswell is "insolvent" as that term is defined in Alabama Code § 8–9A–2. All plaintiff has done is cut and paste the statutory element as a conclusory label that "George Braswell was insolvent at the time of the transfer or became insolvent as a result of such transfer," with no supporting facts. That omission also violates *Twombly* principles and is not entitled to the assumption of truth, thereby rendering SEPH's § 8–9A–5(a) claim inadequately pleaded.[FN4]

> **FN4.** As an important clarification, the Court is dismissing plaintiff's constructive fraudulent transfer claims under § 8–9A–4(c) and § 8–9A–5(a) only because they were inadequately pleaded under *Twombly / Iqbal* tenets. The Court does not adopt or endorse defendants' arguments that such claims should be dismissed as untimely; to the contrary, because a fair reading of the Complaint is that it does assert constructive fraudulent transfer claims against the Braswells, those claims were timely filed within the four-year limitations period established by § 8–9A–9(3). That plaintiff must supplement the factual allegations of these claims in order for them to pass *Twombly* muster does not render them untimely, and any amendment by plaintiff to bolster those previously asserted claims would "relate back" to the original, timely Complaint by operation of Rule 15(c), Fed.R.Civ.P.

**E. Actual Fraudulent Transfer.**

Plaintiff also proceeds against the Braswells on an actual fraudulent transfer theory. Once again, however, defendants balk that the Complaint as presently constituted lacks sufficient factual heft to nudge SEPH's claim from the conceivable to the

plausible. Pursuant to AUFTA, a transfer is fraudulent "if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor." Ala.Code § 8–9A–4(a). To guide courts in determining actual intent, the Act delineates a nonexhaustive list of 11 factors that may be considered, such as whether the transfer was to an insider, whether the debtor retained possession or control of the property, whether the transfer was of substantially all the debtor's assets, whether the value of consideration received was reasonably equivalent to that of the asset, whether the debtor was insolvent, and so on. *See id.* at § 8–9A–4(b).[FN5]

> **FN5.** Alabama courts have summarized this statutory scheme as follows: "An actual fraudulent transfer is one made by a debtor who transfers assets with actual intent to hinder, delay, or defraud any creditor of the debtor.... The trial court considers several factors in determining whether the debtor possessed the requisite intent, including to whom the transfer was made, the amount of assets transferred, and the financial condition of the debtor before and after the transfer." *Baggett,* 870 So.2d at 739 (citations and internal quotation marks omitted); *see also Cox v. Hughes,* 781 So.2d 197, 201 (Ala.2000) ("Actual fraud denotes the actual mental operation of intending to defeat or delay the rights of the creditor.") (citation omitted).

In response to the Rule 12(b)(6) Motion, SEPH argues that the Complaint presents substantial facts as to these statutory factors demonstrating George Braswell's actual intent to defraud. Review of the pleading shows otherwise. Rather than specific facts, the Complaint sets forth nothing more than conclusory labels concerning various factors, such as "George Braswell was insolvent at the time of the transfer or became insolvent as a result of such transfer," "the transfer was made to an insider or

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 52**

Slip Copy, 2013 WL 4498700 (S.D.Ala.)
**(Cite as: 2013 WL 4498700 (S.D.Ala.))**

related party," "the transferor did not receive reasonably equivalent value," and "the transfer was made with the actual intent to hinder, delay, and/or defraud ... SEPH." (Doc. 1, ¶ 8.) No facts are recited as to any of these factors, leaving the Court and the Braswells in the dark as to the factual basis (if any) for these contentions. For the reasons stated *supra,* this kind of showing falls well short of the basic pleading requirements of Rule 8(a), as prescribed in the *Twombly / Iqbal* line of authorities.[FN6]

> [FN6.] Notably, in opposing the Motion to Dismiss and attempting to bolster its pleading, SEPH relies on unpleaded facts. For example, plaintiff argues that "it is difficult to imagine facts more 'suggestive of proscribed conduct' than a debtor's transfer of two pieces of real property to his wife for $20.00." (Doc. 17, at 6–7.) But the Complaint does not allege that the Braswells are husband and wife, or that their shared last name is anything other than happenstance. Nor does the Complaint allege that George Braswell transferred those parcels to Vennie Braswell for $20.00; instead, it merely attaches deeds which specify the consideration for each transfer as being $10.00 plus "other good and valuable considerations," which SEPH does not acknowledge. Similarly, although plaintiff argues in its brief that George Braswell retained control or possession of the real property after transferring it to Vennie Braswell, and that the transfer consumed substantially all of his assets, those facts are not pleaded or supported in the Complaint. The sufficiency of plaintiff's Complaint must be evaluated based on its contents, not those of a subsequent memorandum of law.

**III. Conclusion.**

*6 For all of the foregoing reasons, it is **ordered** as follows:

1. Defendants' Motion to Dismiss (doc. 12) is **granted;**

2. Plaintiff's claim for insider constructive fraudulent transfer pursuant to Alabama Code § 8–9A–5(b) is **dismissed without prejudice** as untimely and abandoned;

3. Plaintiffs' claims for constructive fraudulent transfer and actual fraudulent transfer pursuant to Alabama Code §§ 8–9A–4(a), 8–9A–4(c) and 8–9A–5(a) are **dismissed without prejudice** for failure to comport with minimum pleading standards under the Federal Rules of Civil Procedure; and

4. Notwithstanding the foregoing, plaintiff may file an Amended Complaint that corrects the pleading deficiencies as to the Section 4(a), 4(c) and 5(a) claims on or before **September 3, 2013,** failing which this file will be closed and judgment will be entered dismissing the Complaint without prejudice.

DONE and ORDERED.

S.D.Ala.,2013.
SE Property Holdings, LLC v. Braswell
Slip Copy, 2013 WL 4498700 (S.D.Ala.)

END OF DOCUMENT



Not Reported in F.Supp.2d, 2009 WL 2192791 (N.D.Ill.)
**(Cite as: 2009 WL 2192791 (N.D.Ill.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
SOURCE ONE GLOBAL PARTNERS, LLC,
Plaintiff,
v.
KGK SYNERGIZE, INC., Defendant.
KGK Synergize, Inc., Counterclaim–Plaintiff and
Third–Party Plaintiff,
v.
Source One Global Partners, LLC, d/b/a Sourceone
Global Partners, d/b/a SOurce One Global Partners,
LLP, and f/k/a Source One Global, LLC,
Counterclaim–Defendant,
and
Jesse Lopez, Third–Party Defendant.

No. 08 C 7403.
July 21, 2009.

Keith J. Grady, Graham L.W. Day, Polsinelli
Shughart PC, St. Louis, MO, John J. Curry, Jr.,
Polsinelli Shalton Flanigan Suelthaus PC, Chicago,
IL, for Plaintiff/Counterclaim–Defendant.

Annette Michele McGarry, Marianne C. Holzhall,
McGarry & McGarry, LLC, Chicago, IL, Kevin N.
Ainsworth, Marvin S. Gittes, Mintz Levin Cohn
Ferris Glovsky and Popeo PC, New York, NY, for
Defendant/Counterclaim–Plaintiff and Third–Party
Plaintiff.

Carina Maria Catherine Segalini, Polsinelli Shughart,
PC, Chicago, IL, for Third–Party
Defendant/Plaintiff/Counterclaim–Defendant.

***MEMORANDUM OPINION AND ORDER***

SIDNEY I. SCHENKIER, United States Magistrate
Judge.

**\*1** SourceOne Global Partners, LLC
("SourceOne") has filed a 13–count complaint
against KGK Synergize, Inc. ("KGK"). SourceOne
asserts claims for: (1) declaratory and injunctive
relief in connection with three patents—U.S. Patent
Nos. 6,239,114 ("the '114 Patent"), 6,251,400 ("the
'400 Patent"), and 6,987,125 ("the '125 Patent") and
various trademarks (Counts I–VII); (2) unfair
competition under common law and under the
Lanham Act, 15 U.S .C. § 1125 (Counts XII–XIII);
and (3) common law claims for tortious interference
with contract, prospective economic advantage,
injurious falsehood and product disparagement, and
defamation *per se* (Counts VIII–XI). KGK has
answered the complaint, and in addition, has asserted
an 11–count counterclaim against SourceOne and an
eight-count amended third-party complaint against
Jesse Lopez, who is alleged to be the "founder,
president and CEO of SourceOne" (Am. Third–Party
Comp. ¶ 17).

In its counterclaim, KGK alleges claims against
SourceOne for: (1) infringement of the '114, '400 and
'125 Patents (Counts I–II and XI); (2) infringement of
KGK's trademarks (Count HI); (3) unfair competition
under the Lan h am Act (Counts IV and VII); (4)
declaratory judgment and constructive trust (Counts
V–VT); (5) breach of contract (Counts VIII–IX); and
(6) violation of the Illinois Deceptive Trade Practices
Act, 815 ILCS 510/2(Count X). The third-party
complaint against Mr. Lopez asserts many of the
same claims: (1) infringement of the '114, '400 and
'125 Patents (Counts I–II and VIII); (2) trademark
infringement (Count III); (3) unfair competition
under the Lan h am Act (Count IV); (4) breach of
contract (Counts V–VI); and (5) violation of the
Illinois Deceptive Trade Practices Act (Count VII).

Not Reported in F.Supp.2d, 2009 WL 2192791 (N.D.Ill.)
**(Cite as: 2009 WL 2192791 (N.D.Ill.))**

Presently before the Court is Mr. Lopez's motion to dismiss KGK's third-party complaint, pursuant to Fed.R.Civ.P. 12(b)(6) (doc. # 42). For the reasons set forth below, we grant Mr. Lopez's motion to dismiss in its entirety.

## II.

In deciding Mr. Lopez's motion to dismiss, we consider whether KGK's third-party complaint meets the standard set forth in Fed.R.Civ.P. 8(a): the complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." To satisfy Rule 8(a), a complaint (or, as here, a third-party complaint) must pass the thresholds of both notice and plausibility.

The notice requirement is met if the complaint describes the claim with sufficient detail to provide "fair notice of what the ... claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The complaint "does not need detailed factual allegations, [but] a plaintiffs obligation to provide the grounds of Ms entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. (citations and quotations omitted). Thus, while a court must accept as true on a motion to dismiss all well-pled allegations, e.g., Jackson v. E.J. Branch Corp., 176 F.3d 971, 977–78 (7th Cir.1999), mere "labels and conclusions" will not do. Twombly, 550 U.S. at 555. As the Supreme Court has recently explained, "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but its does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Ashcroft v. Iqbal, 556 U.S. – ––, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

**\*2** The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id. at 1949. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief".' " Id . (quoting Twombly, 550 U.S. at 557); see also EEOC v. Concentra Health Servs., 496 F.3d 773, 776 (7th Cir.2007) (quotations omitted) ("allegations must plausibly suggest th at the defendant has a right to relief raising that possibility above a 'speculative level' "). Assessing whether a complaint meets the plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S.Ct. at 1950.

Finally, we note that Iqbal has laid to rest any argument that these pleading standards under Rule 8 apply only to antitrust claims, which were the focus of the pleading at issue in Twombly. "Our decision in Twombly expounded the pleading standard for 'all civil actions,' ... and it applies to antitrust and discrimination suits alike." Iqbal, 129 S.Ct. at 1953 (citations and quotations omitted). These pleading standards apply with equal force to the claims alleged in KGK's third-party complaint here, and it is therefore with those standards in mind that we assess those claims.

The lead argument in Mr. Lopez's motion to dismiss is that all of KGK's claims rely "on the unsupportable theory that SourceOne is merely Jesse Lopez's alter ego and that, accordingly, the corporate veil of SourceOne should be pierced in order to hold Jesse Lopez accountable for SourceOne's alleged acts and omissions" (Lopez Mem. at 3). Mr. Lopez asserts that KGK's allegations do not " 'plausibly suggest' that [KGK] ha[s] a right to relief based on an alter ego theory," and that all of the third-party claims should be dismissed (Id. at 7) (quoting Steel v. GE Money Bank, 2009 WL 393860 at *7 (N.D.Ill. Feb.17, 2009).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 55**

Not Reported in F.Supp.2d, 2009 WL 2192791 (N.D.Ill.)
**(Cite as: 2009 WL 2192791 (N.D.Ill.))**

For its part, KGK asserts that its allegations plausibly suggest an entitlement to relief on an alter ego theory (KGK Mem. 9–11; KGK Suppl. Mem. at 1–5). In addition, KGK asserts that even if it has not sufficiently pled an alter ego claim, KGK has adequately pled direct claims against Mr. Lopez for patent infringement (Counts I–II and VIII) and breach of contract (Counts V–VI) (KGK Mem. at 8–9; KGK Suppl. Mem. at 5).

We conclude that KGK has failed to state a claim under Rule 8(a) for liability under an alter ego theory, We further conclude that all of KGK's claims depend on an alter ego theory, and that as a result all of them must be dismissed.[FN1]

> **FN1.** The parties also debate whether the claims under the Lanham Act (Counts III–IV) sound in fraud, and thus are subject to the particularity standard under Fed.R.Civ.P. 9(b) rather than the more liberal notice/plausibility pleading standard in Rule 8 (compare Lopez Mem. at 7–9 and KGK Mem. at 12). While KGK may have the better of that argument, see Segal v. Geisha NYC LLC, 517 F.3d 501, 505 (7th Cir.2008) (applying Rule 8(a) pleading standards in considering dismissal of claim under the Lanham Act for trademark infringement), we do not reach this question in light of our holding that KGK's alter ego allegations do not satisfy Rule 8.

### III.

We first address KGK's alter ego allegations. Since those allegations must be assessed against the backdrop of the elements required to prove an alter ego claim, see Iqbal, 129 S.Ct. at 1950, we begin with a discussion of the relevant principles under Illinois law, which the parties agree supplies the substantive principles that govern the alter ego question.

**\*3** Under Illinois law, "a corporation is presumed to be 'separate and distinct from its officers, shareholders, and directors, and those parties will not be held personally liable for the corporation's debts and obligations.' " Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec, 529 F.3d 371, 378 (7th Cir.2007) (quoting Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc., 371 Ill.App.3d 1019, 309 Ill.Dec. 686, 864 N.E.2d 927, 941 (Ill.App.2007)). Piercing the corporate veil is not favored and, in general, courts are reluctant to do so. See In re KZK Livestock, Inc., 221 B.R. 471, 478 (Bankr.C.D.Ill.1998) (citing CM Corp. v. Oberer Dev. Co., 631 F.2d 536 (7th Cir.1980); In re Kevin W. Emerick Farms, Inc., 201 B.R. 790 (Bankr.C.D.Ill.1996)). Accordingly, a party bringing a veil-piercing claim bears the burden of showing that the corporation is in fact a "dummy or sham" for another person or entity. Jacobson v. Buffalo Rock Shooters Supply, Inc., 278 Ill.App.3d 1084, 215 Ill.Dec. 931, 664 N.E.2d 328, 331 (Ill.App.3d 1996). A corporation's veil of limited liability will be pierced only when (1) there is "such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist [,]" and (2) "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." Van Dorn Co. v. Future Chem. & Oil Corp., 753 F.2d 565, 569–70 (7th Cir.1985) (quoting Macaluso v. Jenkins, 95 Ill.App.3d 461, 50 Ill.Dec. 934, 420 N.E.2d 251, 255 (Ill.App .3d 1981) (alteration in original)). Here, we conclude that KGK has not satisfied either requisite to pleading a claim to pierce the corporate veil.

### A.

Illinois courts consider the following factors when determining whether there is sufficient "unity of interest" to justify disregarding the corporate form: "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4)

Not Reported in F.Supp.2d, 2009 WL 2192791 (N.D.Ill.)
**(Cite as: 2009 WL 2192791 (N.D.Ill.))**

nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders." *Fontana v. TLD Builders, Inc.*, 362 Ill.App.3d 491, 298 Ill.Dec. 654, 840 N.E.2d 767, 778 (Ill.App.3d 2005). "The court will not rest its decision on a single factor," but will look to and weigh all of these factors. *McCracken v. Olson Companies, Inc.*, 500 N.E.2d 487, 491 Ill.App.3d 1986).

**1.**

We first consider whether KGK's allegations suggest plausibly, and not merely speculatively, that there is "such unity of interest and ownership that the separate personalities of the corporation [SourceOne] and the individual [Mr. Lopez] ... no longer exist." *Van Dorn*, 753 F.2d at 569–70. At the outset, we note that KGK offers no allegations of: (1) inadequate capitalization; (2) failure to issue stock; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; or (11) the corporation existing as a mere facade for the operation of the dominant stockholders. At most, KGK seeks to suggest that the following factors plausibly suggest that the corporate veil should be pierced: (3) failure to observe corporate formalities, and (7) absence of corporate records; (6) nonfunctioning of the other officers or directors; (8) commingling of funds; and (10) failure to maintain arm's-length relationships among related entities. We address KGK's allegations on those matters in turn.

**\*4** To plead a failure to observe corporate formalities or to keep corporate records, KGK

primarily alleges facts having to do with a Price Waterhouse Coopers audit of SourceOne (Am. Third–Party Compl. ¶¶ 22–23, 26–28). During that audit, a binder of information allegedly disappeared, sales orders and shipping documents were difficult to locate or could not be found, and Mr. Lopez was unable or unwilling to give Price Waterhouse access to SourceOne's inventory balances and purchasing/shipping records located at its manufacturer's facility. However, those allegations do not plausibly suggest an endemic failure to observe corporate formalities or keep records. In *McCracken*, 102 Ill.Dec. 581, 500 N.E.2d at 491–82, which KGK cites as a case where the corporate veil was pierced, th e stock and minute book of the defendant's company did not have any entries for the ten years preceding the claim, and the defendant had executed a lease and option agreement without obtaining corporate authorization, The alleged conduct of SourceOne in connection with the Price Waterhouse audit simply does not rise to that level. The Price Waterhouse allegations are consistent with an episodic lapse in record keeping or with a disinclination to cooperate in that particular audit. If episodes of subpar record keeping were sufficient to establish an alter ego theory, then piercing the corporate veil would become common place and would not be the extraordinary act that it is under Illinois law.

KGK's additional allegations on this score fare no better. KGK alleges that in 2006, Mr. Lopez caused SourceOne to switch from a four-digit invoice number to a five-digit invoice number (Am. Third–Party Compl. ¶ 29). While KGK surely included this allegation to suggest that Mr. Lopez was trying to conceal sales, the mere fact of the switch, without more, does not plausibly suggest that corporate formalities were abandoned. KGK also alleges that Mr. Lopez's wife prepared certain accounting information for SourceOne at their home (*Id.* at ¶¶ 24–25). This allegation does not suggest that SourceOne failed to maintain records; the allegation

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 57**

Not Reported in F.Supp.2d, 2009 WL 2192791 (N.D.Ill.)
(Cite as: 2009 WL 2192791 (N.D.Ill.))

states that in fact accounting records were being prepared. The fact that in some instances this was done by Mr. Lopez's wife rather than someone whom SourceOne would have to pay does not plausibly suggest an abandonment of corporate formalities; it is equally—if not more—plausible that Mr. Lopez enlisted his wife's assistance to economize.

In an attempt to show the non-functioning of other officers or directors, KGK alleges that Mr. Lopez alone makes the business decisions of SourceOne: "even when SourceOne's employees interacted with KGK, *they apparently* were not empowered to make decisions. Tin's held true for, among other things, issues of accounting, marketing, sales, and customer relations" (Am. Third–Party Compl. ¶ 19) (emphasis added). This allegation of an "apparent" lack of empowerment is conclusory, and is entitled to no weight in our analysis. Even were it otherwise, this allegation would not advance KGK's alter ego claim. The fact that officers of a company get final clearance on business decisions from the president does not strike us as unusual, and more importantly, under Illinois law control of the corporation alone is not enough to warrant piercing the corporate veil. *Melko v. Dionisio,* 219 Ill.App.3d 1048, 162 Ill.Dec. 623, 580 N.E.2d 586, 595 (Ill.App.3d 1991) (being the sole shareholder of a corporation is not sufficient to warrant veil-piercing). KGK's allegation of non-functioning officers and directors fails to cross the line from speculation to plausibility.

**\*5** In an effort to show commingling of funds, KGK alleges that SourceOne and Mr. Lopez's wife borrowed a home equity loan and gave, as collateral, a mortgage on the Lopez residence (Am. Third–Party Compl. ¶ 30). That allegation is insufficient to plausibly suggest that SourceOne was a mere "dummy or sham." *See Bankers Trust Co. v. Chicago Title & Trust Company,* 89 Ill.App.3d 1014, 45 Ill.Dec. 309, 412 N.E.2d 660, 664 (Ill.App.3d 1980) (holding that a personal guarantee undertaken by a business owner and his wife, who was not part of the company, is not an unusual situation for a small business and does not demonstrate the unity of interest required to pierce the corporate veil).

Finally, to show a failure to maintain arm's-length relationships among related entities, KGK alleges that Mr. Lopez exerted considerable control over SourceOne and stated that "SourceOne is Jesse Lopez," that Mr. Lopez's wife took out a loan on behalf of SourceOne, and that Mr. Lopez signed a Settlement Agreement with KGK on both a line designated for the president of SourceOne and on a separate line for Mr. Lopez in his individual capacity (Am. Third–Party Compl. ¶¶ 20, 30 and 14–15). We already have explained that taking a loan on the Lopez residence to inject money into SourceOne does not support piercing the corporate veil. Moreover, the fact that Mr. Lopez stated that "SourceOne is Jesse Lopez" is of no moment. Many corporations—small and large—are often identified with a prominent person. In the 1970s, one might have said "Chrysler is Lee Iacocca"; today, one might say that "Microsoft is Bill Gates." In neither event could anyone plausibly suggest that the corporate veils of those corporations should be pierced. And, the fact that Mr. Lopez signed the Settlement Agreement both as SourceOne's president and in his individual capacity, and made himself personally liable for only part and not all of the terms of that agreement, points to a demarcation between SourceOne and Mr. Lopez as an individual, and not a blurring of their separate existences.

In sum, when we consider collectively KGK's allegations concerning Mr. Lopez's position as founder, president, CEO, and managing member of SourceOne, his relationship to his officers, the Price Waterhouse audit, and the interaction of his wife with the company, we fail to see a plausible statement of " 'such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist [.]' "

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 58**

Not Reported in F.Supp.2d, 2009 WL 2192791 (N.D.Ill.)
**(Cite as: 2009 WL 2192791 (N.D.Ill.))**

*Van Dorn,* 753 F,2d at 569–70 (*quoting Macaluso, 50 Ill.Dec. 934, 420 N.E.2d at 255).* KGK's allegations do not state a claim for piercing the corporate veil.

**2.**

KGK's allegations also fail to plausibly suggest that "adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Van Dorn,* 753 F.2d at 569–70. In *Sea–Land Services, Inc. v. Pepper Source,* 941 F.2d 519, 522–23 (7th Cir.1991), the Seventh Circuit found that the "promote injustice" test requires something less than an affirmative showing of fraud, but something more than the mere prospect of an unsatisfied judgment. That is, "some element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest must be present in order to disregard the corporate fiction." *Pederson v. Paragon Pool Enterprises,* 214 Ill.App.3d 815, 158 Ill.Dec. 371, 574 N.E.2d 165, 169 (Ill.App.3d 1991). Illinois courts have pierced the corporate veil to avoid injustice when failure to do so would: unfairly enrich one of the parties, *B. Kreisman & Co. v. First Arlington Nat'l Bank,* 91 Ill.App.3d 847, 47 Ill.Dec. 757, 415 N.E.2d 1070, 1073 (Ill.App.3d 1980); allow a parent corporation, that created a subsidiary's liabilities and caused the subsidiary's inability to meet those liabilities, to escape responsibility, *In re ContiCommodity Servs., Inc., Sec. Litig.,* 733 F.Supp. 1555, 1565 (N.D.Ill.1990); allow former partners to ignore obligations, *Gromer, Wittenstrom & Meyer, P.C. v. Strom,* 140 Ill.App.3d 349, 95 Ill.Dec. 149, 489 N.E.2d 370, 374 (Ill.App.3d 1986); or uphold a corporate arrangement to keep assets in a liability-free corporation while placing liabilities on an asset-free corporation, *Van Dorn,* 753 F.2d at 569; *Tome Engenharia E. Transposes, Ltd. v. Malki,* 1996 WL 172286 at *5 (N.D.Ill. Apr.11, 1996), citing *Sea–Land Svcs. Inc. v. Pepper Source,* 993 F.2d 1309, 1312 (7th Cir.1993).

**\*6** Here, KGK's allegations do not meet any of those standards. KGK alleges that "injustice would

be promoted if Mr. Lopez were to escape personal liability because (a) Mr. Lopez has used his control over Source One to wrongfully injure KGK; (b) Mr. Lopez has been and will continue to be unjustly enriched; (c) Mr. Lopez's actions have injured KGK by undermining its market share and goodwill; (d) unless Mr. Lopez is enjoined from further infringing activities KGK will be irreparably injured" (Am. Third–Party Compl. ¶ 34; KGK Mem. at 11 (*citing* Third–Party Complaint)). KGK's first three points are mere conclusions; and, none of those conclusions are advanced by the more specific conduct that KGK has alleged and that we already have concluded does not plausibly show that SourceOne is a mere dummy or sham for Mr. Lopez.

KGK's final point, that "unless Mr. Lopez is enjoined from further infringing activities KGK will be irreparably injured," is premised on the view that "if Lopez were not personally enjoined from further infringements, he would be able to start yet another new company to continue to offer the same line of infringing products" (Am. Third–Party Compl. ¶ 34). That argument ignores that if KGK obtains an injunction against SourceOne, that injunction will bind SourceOne's "officers, agents, servants, employees and attorneys." Fed.R.Civ.P. 65(d)(2)(B). The Seventh Circuit applied this rule in *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.,* 91 F.3d 914, 919 (7th Cir.1996), holding that an injunction issued against DEV also bound Yamagata, DEV's president and one of its directors. KGK's claims against SourceOne subsume its claims against Mr. Lopez, and thus any injunctive relief against SourceOne will protect KGK from the post-judgment actions by Mr. Lopez that KGK claims to fear.[FN2]

> FN2. We have considered *Babak Sausage Co. v. A & J Seven Bridges, Inc.,* No. 07 C 4718, 2008 WL 4181744, *10 (N.D. Ill. Sept 5, 2008),* which KGK cites in support of its argument that piercing the corporate veil is necessary to protect KGK from post-

Not Reported in F.Supp.2d, 2009 WL 2192791 (N.D.Ill.)
(Cite as: 2009 WL 2192791 (N.D.Ill.))

judgment conduct by Mr. Lopez (KGK Mem. at 11). We disagree that *Bobak* stands for that proposition, as it contains no discussion or analysis on that point and finds that the complaint otherwise "clearly alleges claims and seeks remedies against the Individual Defendants based on their past and current use of the Mark." *Babak, 2008 WL 4181744, *10*.

**B.**

KGK argues that even if its alter ego allegations fail, it has sufficiently pled individual claims against Mr. Lopez for patent infringement (Counts I–II and VIII) and breach of contract (Counts V–VI), which do not depend on an alter ego theory. For the reasons set forth below, we reject that argument.

**1.**

KGK argues that it need not pierce the corporate veil to pursue the patent infringement claims against Mr. Lopez, because those claims constitute direct claims against Mr. Lopez in his individual capacity for contributory or inducing infringement (KGK Mem. at 1, 8–9; KGK Suppl. Mem. at 1, 5–6). To be sure, "it is well settled th at corporate officers who actively aid and abet their corporation's infringement may be personally liable for inducing infringement under § 271(b), regardless of whether the corporation is the alter ego of the corporate officer," *Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1578–79 (Fed.Cir.1986)* (*citing Power Lift, Inc. v. Lang Tools, Inc., 774 F.2d 478, 481 (Fed.Cir.1985)*). However, we disagree that KGK has pled direct claims of patent infringement against Mr. Lopez.

**\*7** To begin with, KGK's allegations of infringement by Mr. Lopez are inextricably linked to the alter ego claims. Each of the patent claims incorporate the section of the third-party complaint entitled "Facts" which is devoted principally to allegations designed to show that the corporate veil

should be pierced (Am. Third–Party Compl. ¶¶ 35, 43, and 101). Then, in each of the patent infringement counts, KGK alleges that Mr. "Lopez, using Source One as his alter ego, has engaged in the infringing activities with actual knowledge of the [patent]" (*Id.* at ¶¶ 39,47, and 105), and that those activities were "willful and deliberate" (*Id.* at ¶¶ 40, 48, and 106). There are no allegations of infringing conduct by Mr. Lopez that are untethered from alleged action by SourceOne.

That said, even if we construe the allegations against Mr. Lopez as asserting direct claims of infringement, they fail to pass muster under *Twombly*. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Twombly, 550 U.S. at 555* (quotations omitted). Here, KGK has not pled anything to buttress its conclusory allegation that Mr. Lopez engaged in infringing activity.

Accordingly, we conclude that KGK has not asserted claims of patent infringement directly against Mr. Lopez, and that its patent infringement claims against him may not proceed unless KGK has adequately pled an alter ego claim. As we have explained above, KGK has failed to do so. For that reason, the patent infringement claims cannot survive the dismissal of the alter ego claim.

**2.**

In Counts V and VI, KGK alleges two claims for breach of contract. Those counts, like all the others, incorporate the alter ego allegations set forth in the "Facts" section of the pleading (Am. Third–Party Compl. ¶¶ 73 and 83). That said, as to t h ese counts, we agree that KGK has attempted to plead direct conduct by Mr. Lopez, and not simply an alter ego claim. But, for the reasons that follow, we conclude that KGK's allegations are insufficient to plead direct claims against Mr. Lopez.

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 60**

Not Reported in F.Supp.2d, 2009 WL 2192791 (N.D.Ill.)
**(Cite as: 2009 WL 2192791 (N.D.Ill.))**

In Count V, KGK alleges that Mr. Lopez breached the License Agreement, in which Mr. Lopez owed a duty to KGK to "use commercially reasonable efforts to promote sales of the Products during the Term" and "to use commercially reasonable efforts to effectively manufacture and market sufficient quantities of the Products to meet customer demands and to make the benefit of the Products known and available to the public" (*Id.* at ¶ 74–75) (quoting License Agreement, Compl., Ex. 1). KGK alleges that Mr. Lopez breached his contractual duties by "developing, promoting, and selling the family of products under the name Cholestrinol as direct competitors of KGK's Sytrinol product" (*Id.* at ¶ 76). The amended third-party complaint incorporates the License Agreement by reference (*Id.* at ¶ 10).

However, KGK does not allege that Mr. Lopez signed the License Agreement in his personal capacity. The License Agreement itself provides for signatures only by SourceOne and KGK, and not by Mr. Lopez in his individual capacity (Compl., Ex. 1). As a signatory to the License Agreement solely in his capacity as an officer of SourceOne, Mr. Lopez is protected by the corporate veil. *Tome, 1996 WL 172286 at \*3* (stating that corporate officers "are not generally liable for the corporation's debts and obligations"). Since KGK has not pled allegations sufficient to pierce the corporate veil, KGK's contract claim in Count V fails.

**\*8** In Count VI, KGK alleges that Mr. Lopez breached a Settlement Agreement, which KGK incorporates by reference into the third-party complaint (Am. Third–Party Compl. ¶ 12; Compl., Ex. 2). KGK alleges that Mr. Lopez signed the Settlement Agreement both on behalf of SourceOne and personally (Am. Third–Party Compl. at ¶¶ 14–15), an allegation that is borne out by the face of the Settlement Agreement. KGK specifically alleges that Mr. Lopez breached Paragraph 7 of the Settlement Agreement, winch provides, "Source One will not

retain any inventory of Sytrinol after the date of termination of the License Agreement" (*Id.* at ¶ 85), KGK alleges that Mr. Lopez—"and SourceOne as his alter ego"—breached Paragraph 7 by beginning to sell a rebranded Sytrinol product that directly competes with KGK's Sytrinol product during the term of the License Agreement (*Id.* ¶ 86–87).

Once again, by alleging conduct by Mr. Lopez "and SourceOne as his alter ego," KGK intertwines its charge against Mr. Lopez with its alter ego claim that has been rejected. However, we do not rely on that fact alone to dismiss Count VI, since it also is true that—unlike the case with the License Agreement at issue in Count V—Mr. Lopez signed the Settlement Agreement in his individual capacity as well as on behalf of SourceOne. But, the fact that Mr. Lopez signed the Settlement Agreement individually does not mean that he signed on to all of its terms.

Paragraph 7, the provision at issue in Count VI, states that *SourceOne* will not retain inventory, and *SourceOne* will be responsible for certain obligations. Paragraph 7 makes no reference whatsoever to Mr. Lopez. By contrast, the very next provision in the Settlement Agreement, Paragraph 8, obligates both SourceOne and Mr. Lopez to return or destroy confidential and proprietary technical information relating to Sytrinol and KGK.

When interpreting a contract as a matter of law, which we may do when the terms are clear and unambiguous, *Kaplan v. Shure Bros., Inc.*, 266 F.3d 598, 604 (7th Cir.2001), we strive to give the contract a common sense reading that gives effect to all of its terms. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 714 (7th Cir.2009). Here, the plain language of the Settlement Agreement reveals which terms would apply to SourceOne and which would apply to Mr. Lopez. The parties specified a provision—Paragraph 8—to which Mr. Lopez would be personally bound. KGK's allegations offer no plausible basis to read the

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 61**

Not Reported in F.Supp.2d, 2009 WL 2192791 (N.D.Ill.)
**(Cite as: 2009 WL 2192791 (N.D.Ill.))**

Settlement Agreement to impose obligations on Mr. Lopez beyond those established by the face of that agreement. We therefore reject KGK's argument t h at it may proceed on Count VI as a direct, rather than an alter ego, claim.

*CONCLUSION*

For the foregoing reasons, Mr. Lopez's motion to dismiss KGK's Amended Third–Party Complaint (doc. # 42) is granted.

N.D.Ill.,2009.
Source One Global Partners, LLC v. KGK Synergize, Inc.
Not Reported in F.Supp.2d, 2009 WL 2192791 (N.D.Ill.)

END OF DOCUMENT

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 62**



Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
TIMOTHY & THOMAS LLC, Plaintiff,
v.
VIRAL GENETICS, INC. and Haig Keledjian,
Defendants.[FN1]

> FN1. The clerk is directed to correct the
> docket to reflect that Viral Genetics and
> Haig Keledjian are the only defendants in
> the main case, and T & T is the sole counter-
> defendant.

Viral Genetics, Inc., Counterclaim Plaintiff,
v.
Timothy & Thomas LLC, Counterclaim Defendant.

No. 06 C 1813.
Aug. 10, 2010.

West KeySummary**Federal Civil Procedure 170A**
🔑 636

170A Federal Civil Procedure
    170AVII Pleadings
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and
Particularity
                170Ak636 k. Fraud, mistake and
condition of mind. Most Cited Cases
    Drug developer's allegation of fraud in the
inducement against partner failed to allege any
specific false statements made by partner prior to
entering into a contract. Drug developer claimed that
partner made false statements regarding its intent to

perform such contracts. Fed.Rules Civ.Proc.Rule
9(b), 28 U.S.C.A.

Mark Scott Bernstein, David M. Wiese, Rachael M.
Trummel, Sharon E. Calhoun, Barack, Ferrazzano,
Kirschbaum & Nagelberg LLP, Chicago, IL, for
Plaintiff/Counterclaim Defendant.

Elizabeth M. Bradshaw, Dewey & Leboeuf LLP,
Chicago, IL, Anita Jain, Paul Murphy, Robert L.
Meylan, Murphy Rosen & Meylan LLP, Santa
Monica, CA, for Defendants/Counterclaim Plaintiff.

**MEMORANDUM AND ORDER**
BLANCHE M. MANNING, District Judge.
    **\*1** Plaintiff Timothy and Thomas LLC ("T &
T") sued Viral Genetics, Inc. ("VGI") and Haig
Keledjian (VGI's CEO) asserting breach of contract
and fraud claims arising out of agreements between
the parties regarding the development and
commercialization of thymus nuclear protein as a
treatment for HIV/AIDS. In response, VGI filed
eleven counterclaims against T & T and its members
Timothy Wright and Thomas Little (collectively the
"T & T Parties") alleging fraud, conspiracy to
commit fraud, multiple breaches of contract, breach
of the implied covenant of good faith and fair
dealing, breach of fiduciary duty, aiding and abetting
breach of fiduciary duty, tortious interference with
contract, tortious interference with prospective
economic advantage, trade libel, and unfair business
practices. The T & T Parties' motion for summary
judgment on all of VGI's counterclaims is before the
court. For the following reasons, their motion is
denied in part and granted in part.

**I. Background**

**A. Local Rule 56**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

Local Rule 56.1 requires a party seeking summary judgment to submit a statement of material facts as to which the party contends there is no genuine issue and which entitle it to judgment as a matter of law. The rule also allows a responding party to submit a statement of additional facts that require the denial of summary judgment. The statements of fact must be concise and consist of "short numbered paragraphs." Without leave of court, the moving party's statement of fact cannot exceed 80 paragraphs, while the responding party is limited to 40 paragraphs. Both parties' submissions fail to comply with the rules governing summary judgment motions.

VGI submitted a statement of additional facts containing paragraphs that often addressed multiple unrelated facts and stretched on for nearly two pages each. *See, e.g.,* VGI's Additional Facts (Doc. 190) VGI Resp. to T & T Facts and VGI Additional Facts [docket # 186] at ¶ 18. Its effort is neither concise nor short. The kitchen sink approach also subverts Local Rule 56.1's goal of providing a structure that allows for efficient resolution of summary judgment motions. *See Markham v. White,* 172 F.3d 486, 489 (7th Cir.1999) ("the kind of organization the rules require must occur sooner or later, and the system as a whole is better served if it happens sooner").

With respect to the T & T Parties, they did not consistently attach the cited evidence supporting their denials of VGI's statements of fact as an exhibit to their response. Rule 56(e)(1) requires them to do so, and the failure to attach cited evidence makes it inadmissible for purposes of the summary judgment motion. *See Comm 2000, LLC v. Southwestern Bell Mobile Systems, LLC,* No. 05 C 457, 2009 WL 1851130, at *5 (N.D.Ill. Jun.29, 2009).

In addition, the T & T Parties accuse VGI of deluging the court with irrelevant facts and responses, but nevertheless submitted 137 objections to VGI's statement of additional facts, the vast majority of which were unfounded. *See* T & T Response to VGI's Additional Facts [dkt. # 190]. For instance, VGI's additional fact three states in its entirety: "VGI needed funding and had no choice but to sell T & T its distribution rights in Africa." Despite VGI's commendable brevity, the T & T Parties contend that this fact is not short and concise.

**\*2** Nevertheless, in the interests of expeditiously resolving the pending motion for summary judgment in this 2006 case, the court will not require the parties to redo their filings. It thus turns to the parties' objections to the opposing side's statements of fact. In doing so, it acknowledges that its discussion of specific objections prior to a summary of the facts is likely confusing to the reader. However, due to the generally chaotic state of the record, the court will forge on.

**B. Objections**

**1. VGI**

The T & T Parties' ¶ 12 states that the FDA rejected VGI's pre-IND meeting information package and cites to the testimony of Monica Ord, who was a consultant hired by VGI to raise funds for VGI .[FN2] T & T Facts in Supp. of SJ [dkt. # 18], Ex. 11 at 108:8–22. VGI contends that this paragraph misrepresents the cited testimony and that Ord lacks personal knowledge. *See* Fed.R.Evid. 602. In the cited testimony, Ord refers to the FDA's rejection of the IND, but does not specify whether she is referring to the pre-IND. Moreover, Ord's position at VGI required her to recruit investors, board members and scientists, so VGI has not provided the necessary foundation for Ord's testimony about the FDA approval process. *See* VGI Opp. to T & T MSJ [dkt. # 185], Ex. 37 at 37:3–6. Accordingly, the T & T Parties' ¶ 12 is stricken.

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 64**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

FN2. "IND" is an acronym standing for "for investigational new drug." The pre-IND package contains information about proposed new drugs. *See* Guidance for Industry: IND Information for Human Drugs and Biologics (2001), available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm070568.pdf (last visited July 26, 2010). Further submissions with unexplained acronyms or medical terms will be stricken, as this practice makes the parties' submissions unnecessarily confusing.

Second, VGI objects to the portion of the T & T Parties' ¶ 25, which provides that, "Ord has no evidence that the T & T Parties did anything to create the recruitment problems affecting the trial and Ord admits the trial was not delayed or destroyed as a result of Wright's handling of the amendment to the endpoint." FN3 *See* T & T Facts in Supp. of SJ [dkt. # 184]. According to VGI, this portion of ¶ 25 misrepresents Ord's testimony, is not supported by personal knowledge, and is inadmissible hearsay.

FN3. "Recruitment" refers to the process of locating patients who are willing to participate in drug tests in connection with clinical trials. An "endpoint" is the "[o]verall outcome that the protocol is designed to evaluate." *See* United States National Institutes of Health Glossary of Clinical Trials Terms, http://clinicaltrials.gov/ct2/info/glossary (last visited July 26, 2010).

When asked if Wright exacerbated the recruitment problems, Ord responded, "[c]ould be. I don't know. From what I know, yes, could be." VGI Opp. to T & T MSJ [dkt. # 185], Ex. 37 at 90:6–9.

The statement "Ord has no evidence" is literally true, as based on the current record, Ord stated that she did not know who was responsible for the recruitment problems and at best speculated that Wright caused them. The court will not consider Ord's speculation.

The second part of T & T's ¶ 25 states that Ord admits the trial was not delayed by Wright's handling of the amendment to the endpoint. This is also a fair characterization of Ord's testimony. *See* T & T Facts in Supp. of SJ [dkt. # 184], Ex. 11 at 211:22–212:4. Nevertheless, as noted by VGI, Ord lacks authority to make a binding admission given the scope of her employment as a consultant for VGI. Therefore, Ord's testimony on this issue reflects her opinion and is not an admission by VGI.

**2. The T & T Parties**

The T & T Parties raise the following objections to VGI's statement of additional facts.

*Objection No. 1—¶¶ 1–40 are not short and concise as required by Local Rule 56.1*

**\*3** The court agrees that portions of VGI's statement of additional facts are neither short nor concise. However, as discussed above, given the age of this case and in the interests of economy, the court will not require the parties to redo their briefs. Thus, this objection is overruled.

*Objection No. 2—¶¶ 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 26, 27, 28, 30, 31, 32, 34, 36 & 37 contain facts that are irrelevant*

The T & T Parties do not attempt to parse out the allegedly irrelevant facts and the court declines to speculate as to what their arguments might have been. In any event, objections to facts based on relevancy are improper. *Keefe v. Mega Enterprises, Inc.,* No. 02 CV 5156, 2005 WL 693795, at *1 (N.D. Ill Mar. 23, 2005). Thus, this objection is overruled.

*Objection No. 3—The evidence cited in ¶¶ 2, 4, 5, 6,*

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

*7, 8, 10, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39 & 40 does not support the fact asserted.*

The T & T Parties again failed to specifically identify the allegedly inaccurate portions of the specified paragraphs. Nevertheless, the court has carefully reviewed the parties' Rule 56 .1 statements and the corresponding portions of the record. To the extent that any fact is not supported by the evidence cited in support, it will be disregarded.

*Objection No. 4—¶¶ 4, 10, 21, 28, 30, 34 & 39 contains hearsay or lack foundation*

Yet again, the T & T Parties' general objection forces the court to speculate as to which portions of the record are, in their view, improper. To ensure that its ruling is based on admissible evidence and determine if genuine issues of material fact warrant a trial, the court will nevertheless comment on evidentiary issues to the extent that it can do so based on the parties' briefs. To the extent that the court has not correctly determined the basis for the T & T Parties' objections (for all of its objections, not just this particular group), any further objections raised in a motion to reconsider will be deemed waived.

The objection to ¶¶ 10 and 30 appears to take issue with Exhibit 27, a summary of damages memorandum prepared by Michael Capizzano (VGI's former Vice President of Finance, Business and Corporate Development). Because this document is not the sole basis for the facts in these paragraphs, the objection is overruled.

With respect to ¶ 21, the T & T Parties appear to be arguing that Exhibit 3, VGI's Form 10–KSB, is hearsay. *See* T & T Facts in Supp. of SJ [dkt. # 184], Ex. 3. This form is regularly made in the course of a publicly traded company's business and thus falls within the "records of regularly conducted activities" hearsay exception. *See* Fed.R.Evid. 803(6). It is also subject to judicial notice. *See, e.g., Benhabib v. Hughes Electronics Corp.,* No. CV–04–0095, 2007 WL 4144940 (C.D.Cal.2007). This objection is, therefore, overruled.

**\*4** Paragraph 28 is based on Keldejian's testimony that HPC Capital told him it would not loan another $2 million because the stock price dropped. *See* VGI Opp. to T & T's MSJ [dkt. # 185], Ex. 1 at ¶ 57; T & T Facts in Supp. of SJ [dkt. # 184], Ex. 5 at 645. HPC Capital's statement of why it chose not to loan additional money to VGI is an out of court statement made by someone other than the declarant (Keledjian) offered for the truth of the matter asserted. *See* Fed.R.Evid. 801(c) Therefore, this portion of ¶ 28 is hearsay and hence inadmissible.

Similarly, in VGI's ¶ 30, it states that according to Keledjian, "[it] had several prominent members in the pharmaceutical research industry on its Scientific Advisory Board and had obtained commitments from each of them, and others to be introduced to major drug companies for strategic partnership opportunities ...." *See* VGI Opp. to T & T MSJ [dkt. # 185], Ex. 1 (Keledjian Aff.) at ¶ 65; VGI Opp. to T & T MSJ [dkt. # 185], Ex. 32 at 666: 5–22. Keledjian may not testify about what members of the Scientific Advisory Board told him given that VGI is offering those statements for the truth of the matter asserted. *See* Fed.R.Evid. 801(c). Therefore, this objection is sustained and the portion of ¶ 30 addressing commitments to introduce VGI to drug companies is stricken.

The T & T Parties next challenge VGI's ¶ 34, which reflects Keledjian's personal opinion regarding what would have happened at VGI in the absence of the T & T Parties' alleged wrongful conduct. While speculative, this fact is supported by Keledjian's own testimony and hence is not hearsay. *See* Fed.R.Evid. 801(b)-(c).

With respect to ¶ 38, the T & T Parties provide a specific objection and contend that the portion of this

  © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.  **Exhibit 1 – Page 66**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

paragraph asserting that IDG backed out of a $4 million distribution deal with VGI because of the T & T Parties' conduct is based on hearsay. Their objection then falters as they provide an *id.* cite in support of their objection. This is unhelpful as the previous citation contains five citations, most of which appear to be unrelated to the contention at issue. The only reasonable option is Keledjian's statement that "[IDG] signed a term the term sheet. They did their due diligence, and they came back and talked about some of our reputation problems ..." VGI Opp. to T & T MSJ [dkt. # 185], Ex. 32 at 676:12–677:8. Keledjian's recitation of IDG's purported statements as to why it abandoned the deal is offered for the truth of the matter asserted and thus is inadmissible hearsay. *See* Fed.R.Evid. 801(c).

Finally, the T & T Parties take issue with VGI's ¶ 39, which states that the T & T Parties directly communicated with potential VGI investors and convinced them not to invest. This is based on VGI officers Keledjian and Capizzano's recitation about what investors told them and hence is inadmissible hearsay. *See* Fed.R.Evid. 801(c).

*Objection No. 5—¶¶ 4, 5, 12, 13, 14, 13, 15, 18, 20, 22, 27, 36, 37, 38 are supported by evidence that is not certified or otherwise authenticated.*

**\*5** The T & T Parties' fifth objection states in its entirety: "The T & T Parties object to VGI's Statement of Additional Facts in whole and in part to the extent the Additional Facts are based on purported evidence that is not certified or otherwise authenticated." Each of the listed paragraphs cite to multiple sources of evidence. This sweeping objection does not provide even a glimmer as to its basis and hence is overruled.

The court also notes that many of the paragraphs within the ambit of this objection are deposition transcripts that include a certification by a court reporter. A party does not act in good faith if it objects to a document it knows is authentic. *See*

*Fenje v. Feld*, 301 F.Supp.2d, 781, 789 (N.D.Ill.2003) (noting that such an objection is merely obstructive). There is no discernable basis for a challenge to the authenticity of deposition transcripts, so these objections are not well taken. Moreover, this kind of objection is particularly ill-advised given the general state of the record. The T & T Parties' attorneys proceed at their own risk if they continue in this vein.

*Objection No. 6—¶¶ 4, 10, 24, 25, 26, 27, 33, 35 contain improper lay opinion*

Yet again, the T & T Parties' blanket objection fails to identify what evidence is allegedly improper lay opinion. To the extent that the cited paragraphs cite to Keledjian and Capizzano's testimony, the objection is overruled as their opinions are based on their personal knowledge. *See* Fed.R.Evid. 701. To the extent that any other portions of these paragraphs allegedly are based on improper lay testimony, the objection is overruled as the court declines to look at all of the testimony in the cited paragraphs, locate opinions in that testimony, construct arguments as to the propriety of the opinions, and then rule on its own objections.

*Objection No. 7—¶¶ 10, 22, 24, 25, 26, 27, 29, 35, 39 and the evidence supporting them were not disclosed in the course of discovery*

In their final group of objections, the T & T Parties contend that certain paragraphs about damages must be stricken because VGI failed to supplement its disclosures. *See* Fed.R.Civ.P. 26(a)(1)(A) (iii). The court cannot ascertain what evidence allegedly flows from a discovery violation so the T & T Parties have waived this argument.

With these procedural ground rules in place, the court turns to the substance of the parties' Local Rule 56.1 submissions.

**C. Facts**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

**1. The Parties**

Plaintiff/counterclaim defendant T & T is an Illinois limited liability company with its principal place of business in Chicago, Illinois. T & T's members are Timothy W. Wright III and Thomas Little, both of whom are Illinois citizens. Defendant/counterclaim plaintiff VGI is a publicly owned drug development company organized under Delaware law with its principal place of business in California. Defendant/counterclaim plaintiff Haig Keledjian is VGI's president, CEO, and CFO and is a California citizen. Michael Capizzano served as VGI's Vice President of Finance, Business and Corporate Development for approximately six years and continues to act as a consultant.

**2. Initial Relationship Between the Parties**

**\*6** VGI was founded in 1995 and is engaged in the research and development of immune based therapies for HIV/AIDS. VGI pursued the development of an HIV/AIDS therapy based on drug compounds containing thymus nuclear protein ("TNP"). The particular drug compound at issue in this case was VGV–1. VGI stopped development of drugs based on TNP in mid–2006.

Dr. Harry Zhabilov, Sr. performed some of the earliest research into TNP-based treatments for HIV/AIDS. Zhabilov Sr. was VGI'S founder and its chief scientific officer. Zhabilov Sr. developed a secret, proprietary process for the extraction of TNP from thymus tissue. After Zhabilov Sr. died in 2003, his son, Harry Zhabilov, Jr., was the only person who knew how the process worked. In 2003, VGI employed Zhabilov Jr. to continue his father's work.

In early 2003, Richard Dent, former football player for the National Football League's Chicago Bears, introduced an unidentified person at VGI to attorney Timothy Wright. On April 3, 2003, VGI and

Wright entered into a consulting engagement agreement under which Wright agreed to, among other things, advise VGI regarding potential financing alternatives and assist VGI to develop strategic partnerships. The consulting agreement contained a choice-of-law provision which stated, "[t]his agreement shall be governed by the law of the State of California without regard to choice-of-law provisions." VGI Opp. to T & T MSJ [dkt. # 185], Ex. 2 at 2–8, ¶ 7.01.

During a trip to Africa in June of 2003 to promote VGI's product, Wright introduced unspecified VGI officers to Thomas Little, a principal of a large American demolition company who appears to have been vacationing in Africa at the time. In October of 2003, Little agreed to loan $200,000 to VGI in the form of a convertible debenture, which is a debt instrument that can be converted into stock at the option of the holder or the issuer.

**3. African Trial Approved**

In February of 2004, the Medicine Control Council of South Africa gave VGI approval to conduct a Phase III human clinical trial using VGV–1, which is an injectable form of TNP. The trial was designated TNP–001. VGI hired Dr. Ronald Moss to head VGI's scientific advisory board ("SAB") and provide advice for the clinical trial. VGI contends that at this time, it began to realize that its previous principal financier (a private citizen whose son had AIDS) would not be able to fund the trial. T & T Facts in Supp. of SJ [dkt. # 184], Ex. 2 at ¶ 124.

**4. T & T Negotiations**

On April 11, 2004, Wright told Keledjian that he intended to form a partnership with Little for the purpose of acquiring the distribution rights to VGV–1 in Africa from VGI. At approximately the same time, Little asked VGI to repay his $200,000 loan. According to VGI, it had no choice but to agree to the give up the distribution rights because it did not

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 68**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

have funds to repay the loan. The T & T Parties dispute this assertion.

**a. Africa Agreement**

**\*7** On May 7, 2004, T & T and VGI signed an agreement memorializing their discussions regarding the sale of the distribution rights for VGV–1 in Africa (the "Africa Agreement"). At an unspecified point, Viral Genetics South Africa ("VGSA") came into being. In exchange for the distribution rights, T & T agreed to fund up to $2,000,000 of VGSA's activities in Africa and to devote a portion of the $2,000,000 to "assure completion of the Clinical Trials provided the total cost of Clinical Trials shall not exceed $1,200,000." The parties dispute whether the reference to "Clinical Trials" in the Africa Agreement was limited to TNP–001.

The Africa Agreement also allowed VGI to elect to receive money from T & T in exchange for an assignment of VGI's ownership rights in VGSA to T & T. T & T Facts in Supp. of SJ [dkt. # 184], Ex. 7 at 2. It further provided:

Upon VGI's election to receive payment from [T & T] under this Agreement in the amount of $520,000, assign 90 percent of its ownership rights in VGSA to [T & T] and extend to [T & T] a perpetual right to purchase at any ownership rights [sic] to VGSA retained by VGI and later offered by VGI to any third party at terms and conditions offered to such third party.

*Id.*

**b. The Distribution Management Agreement**

In December of 2004, VGI and T & T entered into the Distribution Management Agreement ("DMA"). T & T Facts in Supp. of SJ [dkt. # 184], Ex. 8. The DMA superseded the Africa Agreement, but does not mention VGSA. T & T paid VGI $650,000 under the DMA.

The DMA defines "Clinical Trial" as:

The multi-center, randomized, double blind, placebo-controlled human clinical trial of a product named VGV–1 as approved by letter dated February 27, 2004, from the Medicines Control Council of South Africa to be performed in accordance with an agreement between Viral Genetics, Inc. and Virtus Clinical Development (Pty) Ltd. Dated August 1, 2003 including any amendments thereto.

T & T Facts in Supp. of SJ [dkt. # 184], Ex. 8. at 2. The DMA also contains a choice-of-law provision which states it "shall be construed and interpreted under the laws of the State of California, without regard to conflicts of law principles." T & T Facts in Supp. of SJ [dkt. # 184], Ex. 8. at 17.

Like the Africa Agreement, the DMA contained a provision requiring T & T to pay for portions of the Clinical Trial. Specifically, ¶ 15 of the DMA states:

A) T & T shall pay $1,600,000 [USD] to complete the Clinical Trial. T & T shall pay any additional costs in excess of $1,600,00 [USD] incurred to complete the Clinical Trial. VGI shall reimburse T & T in an amount equal to one half of any such additional costs in excess of $1,600,000 [USD] incurred to complete the Clinical Trial. Said reimbursements shall be tendered by VGI to T & T on a monthly basis on or before the 10th day of each calendar month in which said costs are paid to T & T.

B) T & T will cooperate and provide all assistance, and will cause each Distributor to cooperate and provide all assistance, reasonably requested by VGI in the design and implementation of any and all test, protocols, studies or trials of the Product in the Territory.

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

* * *

**\*8** D) In the event T & T concludes that it will be expedient or necessary, for the purpose of selling and distributing the Product in a significant part of the Territory, to retain the services of any third party to conduct part of or all of any future clinical trial services, the Parties hereto agree to share the cost of such third party services equally.

Again, as under the Africa Agreement, the parties dispute whether T & T's obligations were limited to TNP–001. According to T & T, it was only responsible for funding TNP–001 and any other activities were the sole responsibility of VGI unless they were approved by Wright in his capacity as president of VGSA. In contrast, VGI asserts that the language in ¶ 15(B) requiring T & T to provide assistance meant that T & T was required to fund more than just TNP–001. VGI also stresses that Keledjian testified that he believed Wright had approved funding of another trial for TNP–002. *See* VGI Resp. to T & T Facts and VGI Additional Facts [dkt. # 186] at ¶ 9; T & T Facts in Supp. of SJ [dkt. # 184], Ex. 5 at 757:11–758:22.

The DMA also required VGI to manufacture VGV–1 itself. *See* T & T Facts in Supp. of SJ [dkt. # 184], Ex. 8 at 6 ("VGI agrees to allocate and make available for delivery to all Distributors an absolute minimum delivery of fifty thousand (50,000) Treatment Units in each calendar month"). To comply with its manufacturing obligations, VGI commissioned the construction of a manufacturing facility in June of 2004.

Keledjian testified he did not want VGI to be in the manufacturing business. Thus, VGI's plan was to build a facility to satisfy the contract, but then convert it "into a full blown research laboratory or to produce trial grade TNP." T & T Facts in Supp. of SJ

[dkt. # 184], at ¶ 35; T & T Facts in Supp. of SJ [dkt. # 184], Ex. 8 at 518:16–519:14].

**5. The Clinical Trial**

The clinical trial in Africa did not proceed smoothly. First, the entity responsible for recruiting participants (the parties' use of the passive voice makes it impossible to ascertain who was responsible, but the parties generally appear to be casting blame for the recruitment issues on each other) experienced problems getting people to sign up to participate in the trial. Monica Ord, a consultant hired by VGI, opined that Wright did not exacerbate the recruitment problems.

Second, some of the patients' baseline data was missing. As with the recruitment situation, the parties dispute who was responsible as well as whether it was necessary to have all the baseline data. According to Keledjian, VGI needed accurate baseline data to compare the before and after effect of VGV–1 on certain immunological markers. On the other hand, the T & T Parties cite to the testimony of Dr. Moss (the head of VGI's scientific advisory board) that baseline data is not necessary for studies involving substances like TNP–001.

The parties also dispute when they learned that baseline data was missing. VGI asserts that the T & T Parties knew about the missing baseline data in June 2005, while the T & T Parties contend that VGI found out about the missing data in February of 2005.

**\*9** Third, the parties disagree about the trial's proper endpoint and its effect on the release of the clinical trial results. Dr. Moss recommended changing the study's endpoint to a lower endpoint (a term which the parties do not define) at least as early as May of 2005. According to VGI, Wright agreed to this change in May of 2005 but unbeknownst to VGI, failed to make the change. The T & T Parties disagree, asserting that Wright agreed to change the

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

endpoint only if Dr. Moss provided a rationale for doing so, and that he never did so.

On December 14, 2005, VGI issued a press release stating it anticipated it would disclose clinical trial results by March 31, 2006. VGI, however, released the clinical trial results in the Summer of 2006. The parties dispute whether the delay was caused by Wright's failure to amend the endpoint.

Finally, the clinical trial results were at best only moderately favorable. Dr. Moss testified that the results failed to meet even the amended endpoint and that the activity of the drug was weak compared to other HIV therapies. On a more positive note, however, Dr. Moss opined that VGI was on the right track regarding the execution of the trial, even if the results were not ideal.

**6. The Alleged Bankruptcy Plot**
VGI claims that the T & T Parties intended to force it into bankruptcy so they could acquire VGI's assets at a bargain price. VGI does not specify when the T & T Parties hatched this alleged plot, but the earliest materials it cites in support date from January of 2006. The T & T Parties deny that they formulated a plan to drive VGI into bankruptcy.

VGI also appears to be contending that as part of the alleged plot, the T & T Parties and Zhabilov, Jr. had discussions in 2005 about Zhabilov, Jr. working for T & T after his contract with VGI expired. According to VGI, following these discussions, Zhabilov, Jr. stopped performing his duties at VGI and thus failed to identify the mechanism of action for VGV–1, refused to provide information necessary for registration in Africa, and provided the T & T Parties with a list of VGI's creditors to assist the T & T Parties' purported plan to push VGI into bankruptcy.

**7. The Alleged Bankruptcy Push**

In March of 2006, the T & T Parties demanded that VGI repay $500,992.93 and threatened legal action if VGI failed to do so. VGI paid the full amount. The parties disagree as to whether this amount exceeded the amount of VGI's debt to the T & T Parties. The T & T Parties were aware that demanding repayment could be financially harmful to VGI, as if VGI did not pay, it might be forced into bankruptcy and if it did pay, the T & T Parties could still file suit.

**8. Aftermath**
To pay off the $500,992.93, VGI obtained $3 million in so-called death spiral financing from HPC Capital, with the potential for an additional $2 million. [FN4] HRC Capital received shares of VGI's stock each month to repay the loan. The number of the shares was based on the prior month's stock price, so if the stock value declined, HRC Capital received a higher number of shares. According to VGI, its stock declined in value during 2006 and 2007, but it paid off the loan by August of 2009.

> FN4. There are a variety of ways to obtain death spiral financing, but all are characterized by the significant risks they pose to cash strapped companies. One common method allows the company to raise money by issuing securities where the number of shares issued increase as the share price falls, which causes shareholders to greatly dilute their equity and potentially lose control of the company.

**\*10** In addition, at some point in the second half of 2006, VGI entered into a joint venture with the University of Colorado. Under the joint venture, the University obtained an interest in VGI and the University and its scientists agreed to study VGI's HIV/AIDS drugs. At about this time, VGI also decided to stop attempting to develop drug products derived from TNP. Approximately two months later, VGI decided to terminate Zhabilov Jr.

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 71**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

**9. VGI's Claimed Damages**

**a. General Assertions**

During discovery in this suit (which was extended several times), the T & T Parties submitted the following interrogatory to VGI seeking information about its counterclaims: "Describe in detail the damages You purportedly suffered as the result of the alleged conduct set forth in the Amended Counterclaim and provide a precise calculation of those damages." In response, VGI stated that:

among other things, as a result of Counterclaim Defendants' conduct, it: (1) lost significant investment capital; (2) saw its stock price drop significantly; (3) built and financed the construction of a manufacturing facility it did not need; (4) expended at least $607,329.36 unnecessarily as a result of T & T's mismanagement of the Phase III Clinical Trial of VGV–2 in South Africa and breach of the Distribution Management Agreement ... [footnote: VGI reserves its right to seek additional damages resulting from T & T's mismanagement of the Phase III Clinical Trial of VGV–1 in South Africa and breach of the Distribution Management Agreement]; (5) was forced to halt certain research and development that has caused, among other things, a substantial delay in approval for VGV–1; (6) is forced to recreate the data that Wright and VGSA failed to collect in connection with the PBMC test and the other immunological markers tests; (7) suffered the misappropriation of its confidential and proprietary business information; (8) suffered damage to its reputation and credibility; (9) was forced to accept "death spiral" financing arranged by HPC Capital; and (10) has been forced to divert resources from its day-to-day business to litigation costs and litigation-related activities.

Dkt. 184–17 at 3–4 & n. 2.

VGI also asserted that it incurred "at least $3,500,000 in actual damages, in addition to costs, reasonable attorney's fees, and punitive damages to be determined by a jury at trial."

Other evidence about VGI's alleged damages includes a document prepared by Michael Capizzano (VGI's Vice President of Finance, Business and Corporate Development at the time) summarizing his opinion regarding damages incurred by VGI. In the memorandum, Capizzano stated VGI's damages were "over $10 million—and I could make out a case for several hundred million." VGI Opp. to T & T MSJ [dkt. # 185], Ex.27 at 27–1. At his deposition, Capizzano explained that he arrived at the "several hundred million" estimate by totaling the prayers for compensatory and punitive damages in each counterclaim and considering "the damage to our market cap and the opportunity caused [sic] of delaying FDA studies by 18 to 24 months." VGI Opp. to T & T MSJ [dkt. # 185], Ex. 33 at 174:17–180:9.

**\*11** In addition, Keledjian (VGI's president, CEO and CFO) testified that VGI lost capital, sales, and the chance to engage in joint venture opportunities with other drug companies. T & T Facts in Supp. of SJ [dkt. # 184], Ex. 33 at 664:12–665:11. Keledjian, however, conceded that VGI did not have any indication from another drug company that they would have been willing to invest money, merge, or support sales if VGI had a registered product. *Id.* at 666:5–666:22. Instead, the company planned to meet larger companies at the point a drug was registered, who could then decide whether to pursue a relationship with VGI. *Id.*

Keledjian testified that he is the best person from VGI to answer questions regarding its damages,

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 72**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

except that Capizzano could better explain the stock market-related claims. *Id.* at 639:8. VGI did not retain an expert to testify about its alleged damages.

**b. Loss of Investment Capital**

VGI claims that it lost investment capital when its stock price declined because: (1) the drop scared additional investors away; and (2) some of its investors exercised their warrants and options. The only specific lost funding identified by VGI relates to the investor group represented by HPC Capital. T & T Facts in Supp. of SJ [dkt. # 184] at ¶ 20; VGI Opp. to T & T MSJ [dkt. # 185], Ex. 32. However, as discussed in connection with the T & T Parties' fourth objection, *supra,* no non-hearsay evidence supports these claims damages.

Additionally, Monica Ord, VGI's chief fundraiser, testified that she stopped trying to raise money for four or five days in October 2006 based on statements made to her by Wright. T & T Facts in Supp. of SJ [dkt. # 184] at ¶ 21; T & T Facts in Supp. of SJ [dkt. # 184], Ex. 11 at 255:16–224. Ord did not think she missed out on any funding because of this short delay. T & T Facts in Supp. of SJ [dkt. # 184] at ¶ 21; T & T Facts in Supp. of SJ [dkt. # 184], Ex. 11 at 255:16–224]. Ord also testified that VGI had difficulties raising capital before it became involved with the T & T Parties. T & T Facts in Supp. of SJ [dkt. # 184] at ¶ 22; T & T Facts in Supp. of SJ [dkt. # 184], Ex. 11 at 66:1–6.

Dr. Moss, the head of VGI's scientific advisory board, testified that since the 1990s, small biotech companies faced difficulties raising funds. He also opined that a small biotech company's failure to meet its defined endpoint is "somewhat disastrous" because it becomes "very difficult in terms of raising additional funds and confidence by investors." T & T Facts in Supp. of SJ [dkt. # 184] at ¶ 23 & Ex. 10 at 27:18–25.

**c. Drop in Stock Price**

VGI asserts that the three-month delay in releasing the results of the TNP–001 trials caused its stock price to drop. According to Ord, Wright's delay in amending the TNP–001 trial's endpoint almost destroyed the trial and thus also harmed VGI's stock price.

**d. Death Spiral Financing**

The parties agree that VGI's decision to accept death spiral financing contributed to the continuing decline of its stock price and dilution of shares. However, VGI did not quantify the harm caused by the death spiral financing. Specifically, Keledjian testified it would be very difficult to calculate the amount of money lost due to death spiral financing and that VGI had not attempted to make this calculation.

**e. Cost of Building a GMP–Compliant Facility**

**\*12** VGI contends that it is entitled to recover the cost of building a GMP-compliant facility in California.[FN5] According to Keledjian, damages associated with construction consist of: (1) direct construction costs paid by VGI; and (2) indirect costs, such as the cost of labor to work on building and the cost of equipment purchased for the facility.

> FN5. "GMP" stands for "good manufacturing practice." Facilities must meet the GMP standard to be used to produce or run clinical trials for pharmaceutical products.

Keledjian testified that VGI incurred approximately $1 million in direct damages. VGI also stresses that its March 31, 2006 Form 10–K SEC filing supports this estimate. The SEC filing represents that VGI made $1,251,697 in equipment and leasehold improvements and paid $149,616/year in rent from 2004 through 2007.[FN6]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.
**Exhibit 1 – Page 73**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

FN6. The parties agree that VGI is not currently using the manufacturing facility, as it abandoned it due to the University of Colorado research arrangement and turned over the building to the landlord when its lease expired.

The parties disagree as to how far VGI got with its construction project. Keledjian asserts that VGI did not finish or completely equip the manufacturing facility because it did not want to be in the manufacturing business as its corporate strategy was to remain a research and development company. On the other hand, the T & T Parties note that VGI's March, 31 2006 10–K statement represented that the facility was completed in January of 2005 and that once VGI's existing equipment was installed, the facility would be able to support the GMP manufacturing of VGV–1.

With respect to indirect damages caused by construction, VGI contends that it hired employees to work on the facility, who were paid with a combination of salary and stock. The T & T Parties dispute that all of the so-called construction employees worked solely on matters relating to construction.

**f. The South Africa Trial**

VGI next contends that it incurred $607,329.36 in unnecessary costs as a result of the T & T Parties' mismanagement of the South African VGV–1 clinical trials (specifically, the delays purportedly caused by the T & T Parties and alleged budget overruns). VGI also claims that it is entitled to expenses related to the TNP–002 trial. Approximately $571,447.71 of the $607,329.26 VGI claims it is owed by T & T relates to TNP–002.

In its response to the T & T Parties' statement of facts, VGI described its calculations as follows:

VGI based the amount owing on the T & T Parties' representation that the clinical trial expenses were $2,681,085.86. From that amount, VGI subtracted the amount T & T was obligated to pay under the DMA ($1.6 million) and payments VGI had already made to T & T. Thus, VGI arrived at the $35,881.65 figure. Then VGI added the $571,447.71 for primarily TNP–002 costs to come up with a total of $607,329.36 owed by T & T under the DMA.

VGI Resp. to T & T Facts and VGI Additional Facts [dkt. # 186], at ¶ 44; T & T Facts in Supp. of SJ [dkt. # 184], Ex. 1; VGI Opp. to T & T MSJ [dkt. # 185], Ex. 13–1 to 13–5.

The T & T Parties challenge these calculations, contending that Keledjian testified that VGI cannot produce documentation such as invoices or checks that supports the payments allegedly made under the DMA. They also assert that VGI incorrectly assessed the amount owed by T & T under the DMA. According to T & T, it was only responsible for funding TNP–001 and any other funding was the sole responsibility of VGI unless it was approved by Wright as president of VGSA.

**\*13** VGI also asserts that the T & T Parties spent money unnecessarily and thus unreasonably increased VGI's fifty percent share of the costs for the TNP–001 and TNP–002 trials. *See* VGI Opp. to T & T MSJ [dkt. # 185], Ex. 32 at 589:13–596:23. In support, VGI asserts that the T & T Parties spent $16,000 flying Keledjian to South Africa to prove he had sent a package of Bulgarian human and animal studies to Wright. Keledjian had in fact sent the package, but Wright apparently did not realize it was in his possession. Upon seeing it, he responded, "[w]ell, you know these kind of things happen." *Id.* Once Wright began reading the studies, he furiously called Keledjian (who apparently had returned home), accused him of tampering with the study, and ordered him to return to South Africa immediately.

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 74**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

VGI also appears to be contending that Wright and Little were living the good life at its expense. Keledjian commented that Wright had a very nice house and asked, "[d]o you really need to spend all of this money?" and "[w]hat's wrong with the Hilton, the hotels and stuff like that?" Little responded that T & T needed to "entertain people politically and so on." *See* VGI Opp. to T & T MSJ [dkt. # 185], Ex. 32 at 589:13–596:23.

**g. Delay of Regulatory Approval**
VGI contends that the T & T Parties wrongfully forced VGI to stop certain research and development projects which, in turn, caused a substantial delay in obtaining regulatory approval for VGV–1. Keledjian assesses these damages as the value of the 20–30 percent of the company VGI gave to the University of Colorado as part of the joint venture. He testified that this amount depended on VGI's worth, but that at a minimum, VGI lost $20 million.

VGI also asserts that it is entitled to damages for lost opportunities caused by the regulatory delays. According to Capizzano, T & T and Zhabilov Jr. were engaged in duplicitous conduct that delayed necessary studies about characterization, mechanism of action, and dosing. Capizzano testified that the cost of this to VGI was "significant and—difficult to estimate but significant ." T & T Facts in Supp. of MSJ [dkt. # 184], Ex. 12 at 179:18–180:4.

**h. Missing Baseline Data**
VGI has three categories of damages relating to the missing baseline data. First, it claims it paid $500,000 to conduct unnecessary studies. Second, a default judgment for approximately $210,000 was entered against it and in favor of one of the trial's vendors in South Africa in connection with the missing data. Third, it paid $500,000 to recreate an approximation of the data it would have received from the baseline studies.

**i. Misappropriation of Confidential Information**
VGI claims that the T & T Parties misappropriated VGI's confidential information. VGI appears to be contending that due to this alleged misappropriation, it was not required to repay the entire $500,992.93 made by the T & T Parties to VGI (the reader may recall that the demand for repayment of this amount caused VGI to obtain death spiral financing and thus experience significant financial woes). Keledjian testified that he could not quantify the amount of this category of damages, as the total depended on the outcome of this lawsuit.

**j. Reputational Damages**
**\*14** VGI claims that the T & T Parties' alleged misconduct damaged its reputation, causing potential investors to refuse to provide funding. As discussed in § I(B)(2), *supra,* VGI's evidence about reputational damages is hearsay, and it has not cited to any admissible evidence supporting the fact that potential investors refused to provide funding because of VGI's reputation.

Moreover, Keledjian—VGI's president, CEO and CFO—testified that VGI does not enjoy a good reputation in South Africa, and "all of the reputation that was created was created by Mr. Wright and VGSA and T & T." T & T Facts in Supp. of SJ [dkt. # 184], Ex. 5 at 677:4–8. He also testified that VGI had not quantified the amount for this item of damages but it was "still working on it." *Id.* at 677. Capizzano—VGI's Vice President of Finance, Business and Corporate Development at the relevant time—also testified that VGI could not quantify the amount of damages related to a contract with Natale, a potential investor.

**k. Diversion of Funds to Litigation**
VGI claims that it was forced to divert resources to litigation and thus had less money to spend on its efforts to work on VGV–1. When asked to quantify

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

this amount, Keledjian estimated VGI had spent $600,000 to $700,000 in legal fees plus the equivalent of fifty percent of his estimated $195,000 annual salary. However, he also testified that VGI had not yet attempted to calculate an exact amount of damages attributable to litigation costs.

**l. Lost Sales & Joint Venture Opportunities**

Finally, VGI claims it is entitled to recover damages for lost sales and joint venture opportunities. The parties disagree as to whether VGI's financial condition generally (not just issues relating to the drug trials that are the subject of this lawsuit) was responsible for the lack of sales and joint venture opportunities. Keledjian acknowledged that VGI has never made a profit or had a product registered and approved for commercial distribution. Dr. Moss explained that this was not unusual, given the high risk involved in drug development and the length of time necessary to bring a drug to market.

**D. The Parties' Claims**

As noted above, T & T contends that VGI and Keledjian defrauded it and breached agreements between the parties regarding the development and commercialization of various thymus nuclear protein drugs meant to treat HIV/AIDS. The T & T Parties have moved for summary judgment on all of VGI's counterclaims, contending that because VGI has not sufficiently established that it suffered damages, all of its counterclaims fail as a matter of law.

**II. Discussion**

**A. Standard for a Motion for Summary Judgment**

Summary judgment is proper when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2). A genuine issue of material fact exists

where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**\*15** When deciding if summary judgment is proper a court must accept the evidence of the non-moving party and draw all in inferences in favor of that party only when there is a genuine dispute as to those facts. Scott v. Harris, 550 U.S. 372, 382, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Moreover, when damages are an essential element of a party's claim, summary judgment must be entered against that party if it fails to produce sufficient evidence supporting the existence of damages. Dunkin' Donuts Inc. v. N.A.S.T. Inc., 428 F.Supp.2d 761, 767 (N.D.Ill.2005).

**B. Choice of Law**

In a diversity case, such as this one, the forum state's choice of law rules determine the applicable substantive law. See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Unfortunately, the parties gave little thought to this critical threshold issue. The T & T Parties merely "assume that California or Illinois law applies, cite the law of both jurisdictions in support of their Motion, and are not aware of any material distinction between the relevant laws of the two jurisdictions." T & T Mem. Supp. to T & T SJ [dkt. # 183] at 8, n. 4. VGI, on the other hand, asserts that the DMA is governed by California law but does not address the law to be applied to claims that are not based on the DMA. VGI Opp. to T & T MSJ [dkt. # 185] at 7, n. 4.

The DMA between T & T and VGI provides it "shall be construed and interpreted under the laws of the State of California, without regard to conflicts of law principles." T & T Facts in Supp. of SJ [dkt. # 184], Ex. 8 at ¶ 23(A). The consulting agreement between Wright and VGI provides that, "[t]his agreement shall be governed by the law of the State of California without regard to choice-of-law

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 76**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

provisions." VGI Opp. to T & T MSJ [dkt. # 185], Ex. 2 at 2–8, ¶ 7.01. Based on the plain language of these provisions, and because the parties do not contend that California and Illinois law differ, the court will use California law to interpret the DMA and when considering claims based on the consulting agreement.

This leaves numerous counterclaims which are outside the scope of the choice of law provisions. It appears that the choice of law issue only affects the result for VGI's eleventh counterclaim, which is based on California law. Thus, the court will apply Illinois law to the counterclaims that do not fall within the ambit of the choice of law provisions in the DMA and the consulting agreement, but will conduct a choice of law analysis when it reaches the eleventh counterclaim.

## C. VGI's Counterclaims

VGI filed eleven counterclaims: (1) fraud in the inducement and conspiracy to commit fraud against all counterclaim defendants (Counterclaim I); (2) breach of contract against T & T based on the DMA (Counterclaim II); (3) breach of the implied covenant of good faith and fair dealing against T & T based on the DMA (Counterclaim III); (4) breach of contract against Wright based on the consulting agreement (Counterclaim IV); (5) breach of the implied covenant of good faith and fair dealing against Wright based on the consulting agreement (Counterclaim V); (6) breach of fiduciary duty claim against Wright (Counterclaim VI); (7) breach of fiduciary duty against all counterclaim defendants (Counterclaim VII); (8) tortious interference with VGI's prospective economic advantage against all counterclaim defendants (Counterclaim VIII); (9) tortious interference with VGI's prospective economic advantage against all counterclaim defendants (Counterclaim IX); (10) trade libel against all counterclaim defendants (Counterclaim X); and (11) unfair business practices against all counterclaim defendants under the California Unfair Competition

Law (Counterclaim XI).

**\*16** The parties agree that the existence of damages is an essential element of each of the counterclaims. The T & T Parties thus contend they are entitled to summary judgment as to all of VGI's counterclaims because "VGI's claimed damages are speculative or otherwise not supported by admissible evidence." T & T MSJ on VGI's Counterclaims [dkt. # 182] at 1. The court must, therefore, determine if VGI has met its burden of proof for damages for each of its counterclaims. Unfortunately, the parties focused on the general categories of damages identified by VGI, but did not attempt to link those damages with specific counterclaims. This left the court with the unenviable task of attempting to match up categories of damages with VGI's counterclaims.

The court begins by considering the T & T Parties' view of the counterclaims. The T & T Parties correctly note that VGI's amended counterclaims state that VGI has suffered damages in an amount to be proved at trial or in an amount not fully known, but not less than $3,500,000. Second, they point to VGI's response to Interrogatory No. 15 which asked VGI to "describe in detail the damages [VGI] purportedly suffered as the result of the alleged conduct set forth in the amended countercomplaint and provide a precise calculation of those damages." VGI's response identified ten various broad categories of damages and provided the requested calculation for one of the categories.[FN7] Third, they highlight the testimony of Keledjian and Capizzano, the only witnesses to testify about VGI's alleged damages. In response to direct questions about damages, Keledjian and Capizzano repeatedly stated that various categories of damages had not been or could not be quantified. *See, e.g.,* VGI Opp. to T & T MSJ [dkt. # 185], Ex. 32 at 647:16–24; 648:13–20 ("I made some initial efforts to calculate what the stock value has been dropped based on certain actions, certain key dates of activities from your clients. In terms of the dollar lost on the deal that we took, we

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

are in the process. We haven't got to it.")

FN7. Specifically, VGI asserted that as a result of the T & T Parties' conduct it: (1) lost significant investment capital; (2) saw its stock price drop significantly; (3) built and financed the construction of a manufacturing facility it did not need; (4) expended at least $607,329.36 unnecessarily as a result of T & T's mismanagement of the Phase II Clinical Trial of VGV–1 in South Africa and T & T's breach of the DMA; (5) was forced to halt research and development that caused, among other things, a substantial delay in obtaining regulatory approval for VGV–1; (6) was forced to recreate the missing data; (7) suffered the misappropriation of its confidential and proprietary business information; (8) suffered damage to its reputation and credibility; (9) was forced to accept death spiral financing arranged through BPC Capital; and (10) was forced to divert resources for its day-to-day business to litigation. Additionally, VGI stated that it incurred at least $3,500,000 in actual damages, plus costs, reasonable attorney's fees and punitive damages.

**1. VGI's Burden of Proof for Damages**

Given the T & T Parties' arguments, VGI can survive summary judgment as to its counterclaims only if identifies evidence that would allow a reasonable jury to return a verdict in its favor. *See Outlaw v. Newkirk,* 259 F.3d 833, 837 (7th Cir.2001) (the moving party carries the burden of showing that insufficient evidence supports the nonmoving party's case); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248 (when a movant sustains its initial burden of production, the nonmoving party must point to evidence upon which a jury could base a verdict in the nonmovant's favor).

As the counterclaimant, VGI bears the burden of establishing "a reasonable basis for computing damages." *See Snelson v. Kamm,* 204 Ill.2d 1, 34, 272 Ill.Dec. 610, 787 N.E.2d 796 (Ill.2003) (internal quotations omitted); *see also Telemark Develop. Group Inc. v. Mengelt,* 313 F.3d 972, 983 (7th Cir.2002). However, VGI need not prove the exact amount of its loss. *See Beasley v. Pelmore,* 259 Ill.App.3d 513, 523, 197 Ill.Dec. 527, 631 N.E.2d 749 (4th Dist.1994). Instead, it must point to evidence that provides a basis to assess damages "with a fair degree of probability." *See id.; see also Kemper/Prime Indus. Partners v. Montgomery Watson Americas, Inc.,* 487 F.3d 1061, 1065 (7th Cir.2007). VGI must also show that it suffered harm that is causally linked to the specific wrongful conduct alleged in each of its counterclaims. *See Siegel v. Shell Oil Co.,* 656 F.Supp.2d 825, 834 (N.D.Ill.2009).

**\*17** For each counterclaim, the court will thus consider whether VGI has identified: (1) specific, allegedly wrongful conduct; (2) specific damages it seeks to recover based on that conduct; and (3) evidence sufficient for a trier of fact to find a causal link between the allegedly wrongful conduct and the claimed damages.

**2. VGI's Counterclaims**

**a. Fraud & Conspiracy to Commit Fraud (Counterclaim I)**

VGI contends that T & T Parties "entered into numerous agreements ... to induce VGI to provide [the T & T Parties] with the authority and information necessary to develop VGV–1 ...", that "[u]pon information and belief [the T & T Parties] did not intend to perform their obligations under these agreements" and that the T & T Parties made "false statements regarding their intent to perform such contracts." VGI and Keledjian's Amended Ans.

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

to T & T's Amended Counterclaims [dkt. # 95] at 36, ¶¶ 169–172. It then asserts that this conduct caused it to incur more than $3,500,000 in damages.

Thus, the first counterclaim appears to seek relief based on a fraud in the inducement theory. VGI has not pointed to any specific allegedly false statements made by the T & T Parties prior to entering any of the contracts at issue in this case. Instead, VGI paints with a very broad brush and makes repeated, general assertions of fraud. This is insufficient. *See, e.g., Windy City Metal Fabricators & Supply, Inc. v. CIT Technology,* 536 F.3d 663, 668 (7th Cir.2008).

Although it is not obligated to do so, the court culled VGI's responses to the T & T Parties' statement of facts [dkt. # 186], and VGI's statement of additional facts [dkt. # 186], in an attempt to locate misrepresentations by the T & T Parties that could support VGI's first counterclaim.[FN8] The only possible candidate is VGI's assertion that "[t]he T & T Parties devised a plan to put VGI in bankruptcy and pick up its assets—most notably patents relating to TNP—at a bankruptcy fire sale." VGI Resp. to T & T Facts and VGI Additional Facts [dkt. # 186] at ¶ 5; VGI Opp. to T & T MSJ [dkt. # 185]: Ex. 5–1 to 5–3; Ex. 6–1 to 6–6; Ex. 56; Ex. 39 at 461:3–454:11; Ex. 40 at 497:7–498:13 and 508:6–512:15; Ex. 41 at ¶¶ 17–20. In support, VGI cites to e-mails from Little and related testimony by Capizzano, Little and Wright. This evidence, however, postdates the agreements (the consulting agreement, Africa agreement, and DMA) and thus cannot support a claim of fraudulent inducement.

> FN8. The court has no duty to sift through the mud of the record to find a gold coin. *United States v. Lockheed–Martin Corp.,* 328 F.3d 374, 378 (7th Cir.2003). To the extent that VGI may wish to take issue with the court's efforts to reach the merits of its claims by attempting to match up factual allegations with each of the counterclaims, it

has forfeited any such arguments.

Moreover, it is impossible to tie VGI's alleged categories of damages to the allegations in the first counterclaim. VGI thus failed to carry its burden of tying the alleged wrongful conduct to VGI's claimed damages. Therefore, the T & T Parties are entitled to summary judgment as to VGI's first counterclaim.

**b. Breach of Contract (Counterclaim II)**

To prevail on a breach of contact action under California law, VGI must, among other things, establish that the breach caused it to incur damages. *See, e.g., Amelco Elec. v. City of Thousand Oaks,* 27 Cal.4th 228, 115 Cal.Rptr.2d 900, 38 P.3d 1120, 1129 (Cal.2002); *see also* Cal. Civ.Code § 3301–6 (2010) ( "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin").

**\*18** In its second counterclaim, VGI appears to be asserting that it was harmed when T & T: (1) failed to reimburse VGI $35,881.65 for excess payments it made for TNP–001 and (2) refused to pay VGI $571,447.71, which represents half the cost of the TNP–002 trial. *See* VGI Resp. to T & T Facts and VGI Additional Facts [dkt. # 186] at ¶¶ 40–44; T & T Facts in Supp. of SJ [dkt. # 184], Ex. 16; Ex 13–1 to 13–5. The T & T Parties dispute that T & T was responsible for funding the TNP–002 trial. *Id* at ¶ 18, 115 Cal.Rptr.2d 900, 38 P.3d 1120. However, they do not dispute that if TNP–002 had been approved, they would have been responsible for half of the trial cost. *Id.*

Here, assuming the finder of fact adopted VGI's view of the record, it could also award damages to VGI (albeit potentially not $3,500,000 as requested) since VGI has provided an estimate of its damages, supporting documents, and an understandable link between the alleged conduct and resulting damages. This is especially true given that T & T has admitted

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 79**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

it would be liable if it in fact was obligated to contribute to the cost of the TNP–002 trials. Thus, the T & T Parties are not entitled to summary judgment as to the second counterclaim.

**c. Breach of Implied Covenant of Good Faith & Fair Dealing Against T & T (Third Counterclaim)**

VGI's third counterclaim, which seeks at least $3,500,000, is a claim against T & T for the breach of the implied covenant of good faith and fair dealing in the DMA. As discussed above, because this claim is based on the DMA, California law applies.

The California Supreme Court has held that, "it is well established that a covenant of good faith and fair dealing is implicit in every contract. The essence of the implied covenant is that neither party to a contract will do anything to injure the right of the other to receive the benefits of the contract." *Cates Construction, Inc. v. Talbot Partners,* 21 Cal.4th 28, 43, 86 Cal.Rptr.2d 855, 980 P.2d 407 (1999). However, in California, recovery for a breach of the covenant of good faith and fair dealing is "limited to contract rather than tort remedies." *Id.* (internal citations and quotations omitted). The only exception to this rule is that "tort remedies are available for a breach of the covenant in cases involving insurance policies." *Id.* This is not an insurance case, so VGI's claim for breach of the covenant of good faith and fair dealing fails as a matter of law. Hence, summary judgment is granted as to this claim.

**d. Breach of Contract (Fourth Counterclaim)**

The fourth counterclaim contains VGI's standard request for "an amount not yet fully known, but believed to exceed $3,500,000," VGI and Keledjian's Amended Ans. to T & T's Amended Counterclaims [dkt. # 95] at ¶ 195, and is based on Wright's alleged breach of unspecified portion(s) of the consulting agreement. Yet again, VGI does not tie this counterclaim to any specific factual allegations.

The court has plucked out VGI's reference to the consulting agreement and Wright's obligation to advise it about potential financing and help it develop strategic partnerships as a possible basis for this counterclaim. T & T Reply to VGI Additional Facts [dkt. # 190] at ¶ 2; VGI Opp. to T & T MSJ [dkt. # 185], Ex. 1; Ex. 2–2; Ex. 33; Ex. 32. According to VGI, instead of performing his duties so VGI could obtain financing, Wright set up T & T with Little in an effort to obtain distribution rights for Africa and used confidential information about VGI's profit margins for T & T's benefit. Thus, VGI appears to be claiming that Wright breached the consulting agreement by: (1) forming T & T and obtaining the distribution rights for VGV–1; and (2) using confidential information to benefit T & T.

**\*19** According to Wright, as of 2006, the distribution rights to VGV–1 were worth between $12 to $14 million. T & T Reply to VGI Additional Facts [dkt. # 190] at ¶ 4; VGI Opp. to T & T MSJ [dkt. # 185], Ex. 1 at 44; Ex. 3:1–9; Ex. 4:1–6; Ex.39; Ex. 40; Ex. 41 ¶¶ 7–9. VGI does not appear to have disclosed in discovery that it was seeking damages based on the distribution rights. Instead, it mentioned the value of the distribution rights to support its claims regarding VGI's value as a company. *Id. at ¶ 27, 86 Cal.Rptr.2d 855, 980 P.2d 407;* T & T Reply to VGI Additional Facts [dkt. # 190], Ex. 3:1–9; Ex. 4:1–6; Ex. 39 at 507:8–513:22.

A party may not change theories after discovery has closed, so the value of the distribution rights cannot form the basis of a request for damages under a breach of contract theory. *See Oracle USA, Inc. v. SAP AG,* 264 F.R.D. 541, 549 (N.D.Cal.2009) (rejecting the plaintiffs' attempt to "rely on the vague, very general damages allegations in [the] initial complaint to preserve their new, more extensive damages theories, even though they failed to disclose those theories in discovery for over two years, despite Defendants' efforts from the outset to flesh out Plaintiffs' sketchy damages allegations through

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 80**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

appropriate discovery tools. To allow the belated disclosure of the new theories to trigger large new waves of expensive discovery and expert analysis at this late date based on vague allegations that Plaintiffs previously refused to elaborate on despite their ability to do so, would be simultaneously unfair to Defendants, very expensive and hugely time consuming, slowing down what is already very lengthy litigation").

With respect to damages VGI seeks based on Wright's allegedly wrongful use of confidential information, VGI provides a helpful clue about the basis for its alleged damages by including the category "Misappropriation of Confidential Information." VGI Opp. to T & T MSJ [dkt. # 185] at 14. In this section, VGI states, "[d]amages from the misappropriation amount to over $500,992.93," citing to additional fact 40 from VGI's statement of additional facts. *Id.* Additional fact 40 repeats the statement that damages flowing from the alleged misappropriation exceed $500,992.93 and clarifies that VGI paid this amount to settle with T & T when VGI found out that the T & T Parties had been in contact with its creditors. VGI Resp. to T & T Facts and VGI Additional Facts [dkt. # 186] at ¶ 40; VGI Opp. to T & T MSJ [dkt. # 185], Ex. 1 at ¶¶ 80–81; Ex. 32 at 666:23–667:24.

It also states it paid "more than it owed." *Id.* VGI thus appears to be admitting that a portion of the $500,992.93 was a legitimate debt owed to T & T. The alleged overpayment, by definition, must thus fall between 1¢ and $500,992.92. None of the evidence cited by VGI clarifies this issue. *See* VGI Opp. to T & T MSJ [dkt. # 185], Ex. 1 at ¶¶ 80–81 & Ex. 32 at at 666:23–667:24. Kelejdian's only explanation regarding the alleged overpayment is that, "[i]f there had been no real threat of involuntary bankruptcy, which I learned about when a VGI creditor informed me that the T & T Parties contacted him with a plan to bankrupt VGI, I would not have paid so much more than VGI owed." Dkt. 185, Ex. 1

at ¶¶ 80–81. This is inadequate.

**\*20** To the extent that VGI comments on the purported overpayment, it appears that VGI believes it overpaid a significant but unspecified amount. T & T Reply to VGI Additional Facts [dkt. # 190] at ¶ 40 ("If there had been no real threat of involuntary bankruptcy, VGI would not have paid so much more than VGI owed"); VGI Opp. to T & T MSJ [dkt. # 185], Ex. 1 at ¶¶ 80–81; Ex. 32 at 666:23–667:24. Thus, VGI has failed to carry its burden of pointing to evidence that a jury could use to determine the amount of the allegedly unnecessary payment. *See e.g., Acree v. Gen. Motors Acceptance Corp., 92 Cal.App.4th 385, 112 Cal.Rptr.2d 99, 110 (Ct.App.2001)* (although the amount of damages need not be calculated with certainty, the record must support "some reasonable basis of computation"); *McGlinchy v. Shell Chemical Co., 845 F.2d 802, 808–09 (9th Cir.1988).*

In any event, setting aside the computation problem, it appears that Zhabilov Jr.—not Wright—provided confidential information to T & T about VGI's creditors. T & T Reply to VGI Additional Facts [dkt. # 190] at¶ 40; VGI Opp. to T & T MSJ [dkt. # 185], Ex. 1 at ¶¶ 80–81; Ex. 32 at 666:23–667:24. To the extent that VGI is arguing that Wright provided confidential information, it does not specify what information is at issue or tie it to ascertainable damages. VGI has thus failed to establish causal links between Wright's conduct, the allegedly wrongful conduct that is at the heart of this counterclaim (using information about VGI's profit margins to benefit T & T when the DMA was negotiated in 2004), and some fraction of the $500,992.93 VGI allegedly overpaid in 2006. Thus, the T & T Parties are entitled to summary judgment as to this counterclaim.

**e. Breach of the Implied Covenant of Good Faith and Fair Dealing Against Wright (Fifth Counterclaim)**

VGI's fifth counterclaim is a claim for the breach

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 81**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

of the implied covenant of good faith and fair dealing against Wright based on the consulting agreement. VGI asserts that "[u]nder the Consulting Agreement, Wright owed to VGI an implied covenant of good faith and fair dealing. Among other things, Wright was obligated to refrain from conduct that would result in injuring or infringing on VGI's right to receive the benefits of the Consulting Engagement. As a direct and proximate result of Wright's aforesaid breach of the covenant of fair dealing, VGI has been damaged in an amount to be proven at trial, but reasonably believed to exceed $3,500,00." VGI and Keledjian's Amended Ans. to T & T's Amended Counterclaims [dkt. # 95] at ¶¶ 200–01.

The court has carefully reviewed VGI's filings in opposition to the motion for summary judgment. There is no discernable factual basis for this claim, as VGI has failed to identify specific conduct by Wright, let alone link this conduct to damages that could be established with reasonable certainty. Thus, VGI has not met its summary judgment burden and the T & T Parties' motion for summary judgment as to this counterclaim is granted.

**f. Breach of Fiduciary Duty (Sixth Counterclaim)**

**\*21** VGI's sixth counterclaim is a breach of fiduciary duty claim against Wright. Under Illinois law, to establish a breach of fiduciary duty, the movant must establish: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damages proximately caused by the breach. *See e.g., Neade v. Portes,* 193 Ill.2d, 433, 444, 250 Ill.Dec. 733, 739 N.E.2d 496 (2000).

According to VGI:

[b]ased on his participation in the plan and conspiracy of Counterclaim defendants as set forth herein, and based on Wright's acts and omissions, and usurpation of VGI's corporate business opportunities, Wright breached his fiduciary

obligations to VGI, causing harm to VGI as a direct result thereof. As a direct and proximate result of Wright's aforesaid breaches of his fiduciary duties to VGI, VGI has been damaged in an amount not yet fully known, but believed to exceed $3,500,000. The acts giving rise to Wright's breach of fiduciary duty were purposeful, willful, and wanton, and without regard to the rights of VGI. As a result, Wright is also liable to VGI for punitive and exemplary damages in an amount to be awarded at trial, but not less than $10 million.

VGI and Keledjian's Amended Ans. to T & T's Amended Counterclaims [dkt. # 95] at ¶¶ 206–08.

Once again, the court begins by attempting to identify the allegedly wrongful conduct that forms the basis of this counterclaim, as VGI has failed to do so. A possible basis for this counterclaim is VGI's statement that, "[l]ater, Wright became a board member with fiduciary duties to VGI. However, instead of performing his duties and helping VGI obtain financing, Wright set up his own company with Little—T & T—to usurp VGI's corporate opportunity to sell distribution rights for Africa and used confidential information about VGI's profit margins for T & T's benefit." T & T Reply to VGI. Additional Facts [dkt. # 190] at¶ 2; VGI Resp. to T & T Facts and VGI Additional Facts [dkt. # 186] at ¶ 13. VGI's countercomplaint clarifies that Wright's fiduciary duty flows from his service on VGI's board of directors from September of 2003 to June of 2004. T & T Facts in Supp. of SJ [dkt. # 184], Ex. 2 at ¶ 203.

VGI may only seek damages based on Wright's alleged breach of his fiduciary duties to VGI when those fiduciary duties existed. Therefore, VGI may not recover damages based on Wright's conduct after June of 2004. This means that VGI's contentions that Wright delayed the amendment of the endpoint in May of 2005 and failed to gather baseline data in June of 2005 are off the table. Damages based on the

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 82**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

value of the distribution rights for VGV–1 are also unavailable because, as discussed above, they were not included in the categories of damages identified in discovery.

The court will not engage in further speculation as to precisely what Wright might have done to breach his fiduciary duties, what harm this might have caused, and how the conduct and alleged harm is linked. Thus, the T & T Parties' motion for summary judgment as to this counterclaim is granted.

### g. Aiding and Abetting Breach of Fiduciary Duty (Seventh Counterclaim)

**\*22** VGI next contends that all of the defendants are liable for aiding and abetting a breach of fiduciary duty. To be liable for aiding and abetting a breach of fiduciary duty under Illinois law: "(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Thornwood, Inc. v. Jenner & Block,* 344 Ill.App.3d 15, 27–28, 278 Ill.Dec. 891, 799 N.E.2d 756 (1st Dist.2003) (internal citations and quotations omitted); *see also* Restatement (Second) of Torts § 876 (1979) (to recover under the theory of concert of action in Illinois, "one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person"). The aiding and abetting claim appears to be based on actions by T & T, Little, Wright, and Zhabilov Jr.

### i. T & T, Little, and Wright

First, VGI asserts that T & T and Little aided and abetted Wright in the breach of his fiduciary duty. As discussed above, however, the beach of fiduciary duty claim against Wright does not survive summary judgment. Thus, the aiding and abetting claim based on Wright's alleged breach of his fiduciary duties also must fall. *See Yates v. John Marshall Law School,* No. 08 C 4127, 2009 WL 1309516, at \*7 (N.D.Ill. May 11, 2009) (aiding and abetting claim cannot survive "without an underlying actionable tort that the defendant aided and abetted, resulting in his or her liability for that underlying tort") (internal quotations omitted).

### ii. T & T, Little, Wright, and Zhabilov Jr.

Second, VGI contends that T & T, Little and Wright aided and abetted Zhabilov Jr.'s breach of his fiduciary duty. Zhabilov Jr. was an officer and director of VGI. T & T Reply to VGI Additional Facts [dkt. # 190] at ¶ 6; VGI Opp to T & T MSJ [dkt. # 195], Ex. 39; Ex. 40; Ex. 38; Ex 7–1; Ex. 8–1; Ex. 10–1 to 10–2; Ex. 41. VGI asserts that Zhabilov Jr. breached his fiduciary duty by "misappropriating VGI's business, good will, trade secrets, business opportunities and intellectual property and by defrauding VGI in collusion with the other Counterclaim Defendants." VGI and Keledjian's Amended Ans. to T & T's Amended Counterclaims [dkt. # 95] at ¶ 211.

As noted above, one of the elements of an aiding and abetting claim is that "the party whom the defendant aids must perform a wrongful act which causes an injury." *Thornwood, Inc. v. Jenner & Block,* 344 Ill.App.3d at 27–28, 278 Ill.Dec. 891, 799 N.E.2d 756. The court will thus focus on whether there is a triable issue of fact based on Zhabilov Jr.'s alleged breach of his fiduciary duty that could support an aiding and abetting claim.

**\*23** While the court is not obligated to scour the record, it nevertheless reviewed VGI's Rule 56.1 submissions in an effort to locate facts that matched up with VGI's description of Zhabilov Jr.'s alleged

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.
**Exhibit 1 – Page 83**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

breach of fiduciary duty. The fruits of this effort are a single reference that is supported with a citation referring to Zhabilov Jr.: ¶ 40 of VGI's statement of facts, which asserts that Zhabilov Jr. gave the T & T Parties information, including a list of VGI's creditors, to further their plan to bankrupt VGI. T & T Reply to VGI Additional Facts [dkt. # 190] at ¶ 40 ("Harry gave a list of creditors to Tim and Tom"); VGI Opp. to T & T MSJ [dkt. # 186], Ex. 1 at ¶¶ 80–81; Ex. 32 at 666:23–667:24.

Setting aside the question of whether this conduct could support a claim for breach of fiduciary duty, the court turns to the now familiar exercise of attempting to identify damages allegedly flowing from this alleged breach of fiduciary duty. As noted above, VGI's response to the T & T Parties' statement of additional facts contains a section labeled "VGI Damages: VGI's Reputation and Prospects and Misappropriation of Confidential Information." T & T Reply to VGI Additional Facts [dkt. # 190] at 45–48. The only mention of Zhabilov Jr. and the list of creditors states that he harmed VGI by sharing the list because it forced VGI to pay $500,992.93 allegedly owed to T & T. As discussed above with respect to the fourth counterclaim, the record does not contain any evidence from which a factfinder could approximate the amount of the alleged overpayment. Thus, VGI has failed to carry its burden of establishing damages based on this alleged breach by Zhabilov Jr.

VGI contends elsewhere that Zhabilov Jr. was obligated to determine the mechanism of drug action while employed at VGI and that he failed to do so because of the T & T Parties' interference. In support, it directs the court to a portion of Keledjian's deposition. T & T Reply to VGI Additional Facts [dkt. # 190] at ¶ 28, 662:2–14; 663:2–666:22. The cited portions of Keledjian's deposition, however, do not refer to Zhabilov Jr. *See id.* Therefore, the T & T Parties cannot survive summary judgment based on this theory.

VGI may also be attempting to argue that Zhabilov Jr.'s conduct caused VGI to give up equity to the University of Colorado. The record, however, does not contain any details about the University of Colorado contract, such as when it was signed or what the terms were. It appears that the contract was executed at some point in the second half of 2006, but Keledjian testified that as of mid–2006, VGI was no longer seeking to develop drug products derived from TNP. He further testified that this decision was made approximately 60 days before Zhabilov Jr. was terminated. T & T Reply to VGI Additional Facts [dkt. # 190] at ¶ 28; VGI Opp. to T & T MSJ [dkt. # 185], Ex. 1 at ¶¶ 10, 57, 58, 60, 68; Ex. 32 at 663:15–664:11, 662:2–14, 663:2–666:22l; Ex. 5 at 644:7–648:20. A trier of fact could only conclude VGI suffered ascertainable damages related to the University of Colorado deal as a result of Zhabilov Jr.'s breach of a fiduciary duty if it resorted to speculation and conjecture. Thus, this theory also fails to rescue VGI's seventh counterclaim.

**\*24** Next, a search for the words "Zhabilov Jr." in VGI's Rule 56.1 filings unearthed VGI's contention that Zhabilov Jr. withheld information needed for registration in South Africa. T & T Reply to VGI Additional Facts [dkt. # 190] at ¶ 29; VGI Opp. to T & T MSJ [dkt. # 185], Ex. 1; Ex. 41; Ex. 32; Ex. 27–1 to 27–4; Ex. 41. Setting aside the question of whether this conduct could support a claim for aiding and abetting and whether T & T, Wright, or Little alleged aided and abetted Zhabilov Jr. in connection with this conduct, the record must contain evidence about damages caused by this conduct. VGI's Rule 56.1 submissions contain a section entitled "VGI's Damages: Delayed Regulatory Approval from Delayed Research & Development." T & T Reply to VGI Additional Facts [dkt. # 190] at 35–42. In this section, VGI mentions Zhabilov Jr.'s alleged withholding of information, but then cites to general allegations about VGI's damages that have no discernable link to the conduct at issue.

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 84**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

Moreover, VGI does not point to evidence that could provide a jury with the means to calculate the amount of damages based on Zhabilov Jr.'s withholding of information. See *Kemper/Prime Indus. Partners, 487 F.3d at 1065 (7th Cir.2007)* (noting that Illinois law requires the plaintiff's evidence to show a reasonable bias for the assessment of damages). Indeed, VGI itself seems to be unable to quantify this amount. *See e.g.,* T & T Facts in Supp. Of SJ [dkt. # 184] "the cost [of Zhabilov Jr.'s delays] was significant—and difficult to estimate but significant"); VGI Opp. to T & T MSJ [dkt. # 185], Ex. 27–4 ("I [Keldejian] can make several educated guesses about what the damages resulting from [Zhabilov Jr.'s actions] were, but let's just say we lost 18–24 months. What is VRAL worth with an FDA-approved study under its belt? With a Stanford University scientific publications [*sic*] published in peer-reviewed literature? Would we already be in partnership or talking to Big Pharma? Would we have NIH money? You get the idea. I don't know exactly, but I'm pretty sure we're farther ahead of where we are today").

Furthermore, if VGI is attempting to recover damages for its aiding and abetting claim based on lost opportunities, it has failed to point to admissible, non-speculative evidence, as discussed in connection with the T & T Parties' fourth objection, *supra.*

VGI also includes the drop in stock price in its list of alleged damages flowing from delayed research and development. However, VGI links this damage exclusively to Wright's failure to amend the endpoint rather than any conduct linking Wright and Zhabilov Jr. See VGI Opp. to T & T MSJ [dkt. # 185] at 13; T & T Reply to VGI Additional Facts [dkt. # 190] at ¶ 33 ("The late filing occasioned by Wright's failure to amend the endpoint led to VGI's inability to disclose the results as stated in the press release, which led to a drop in the stock price."); VGI Opp. to T & T MSJ [dkt. # 185], Ex. 1 ¶¶ 67–68; Ex. 41 ¶

37–44; Ex. 32 at 612:3–615:23, 657:13–666:5–22; Ex. 27–1 to 27–4. Therefore, these alleged damages cannot support a claim for Wright's aiding and abetting Zhabilov Jr.'s breach of fiduciary duty.

**\*25** Accordingly, VGI has failed to point to evidence sufficient to withstand summary judgment on its aiding and abetting breach of fiduciary duty counterclaim. Thus, the T & T Parties' motion for summary judgment is granted as to this counterclaim.

**h. Tortious Interference with Contractual Relationship (Eighth Counterclaim)**

In its eighth counterclaim, VGI asserts that Wright, Little, and T & T tortiously interfered with its contractual relationship with Zhabilov Jr. To prevail on this claim, VGI must establish: (1) the existence of a valid and enforceable contract between it and Zhabilov Jr.; (2) the defendants' awareness of the contract; (3) the defendants' intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by Zhabilov Jr.; and (5) damages suffered by VGI as a result of the breach. *See Strosberg v. Brauvin Realty Servs., Inc., 295 Ill.App.3d 17, 32–33, 229 Ill.Dec. 361, 691 N.E.2d 834 (1st Dist.1998).* Damages for a tortious interference with contract claim consist of the "pecuniary loss resulting from the failure of the third person to perform the contract." *Fellhauer v. City of Geneva, 142 Ill.2d 495, 513, 154 Ill.Dec. 649, 568 N.E.2d 870 (Ill.1991), citing* Restatement (Second) of Torts § 766 (1979).

VGI's tortious interference with contract counterclaim alleges that the T & T Parties "intentionally acted to induce Zhabilov Jr. to breach the Zhabilov Jr. Employment Agreement and/or to disrupt or interfere with the contractual relationship between VGI and Zhabilov Jr." VGI and Keledjian's Amended Ans. to T & T's Amended Counterclaims [dkt. # 95] at ¶ 221, *see also* ¶ 218–223. [FN9] To survive summary judgment, VGI must direct the court to relevant, admissible evidence. Pleadings,

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

such as VGI's tortious interference counterclaim, are insufficient. *See e.g., Keri v. Board of Trustees of Purdue University,* 458 F.3d 620, 651–52 (7th Cir.2006) ("[a]t the summary judgment junction, the Plaintiff may not rely only on the bare assertions of his pleadings"). VGI has not demonstrated that there is a genuine issue of material fact with respect to each element of a claim for tortious interference with contract. Thus, the T & T Parties' motion for summary judgment as to this counterclaim is granted.

> FN9. The logical starting point for consideration of this counterclaim is the Zhabilov Jr. Employment Agreement. Unaided by the parties, the court managed to locate the needle (the "Zhabilov Jr. Employment Agreement") in the haystack that is the summary judgment record. *See id.* at ¶¶ 95–101 (VGI's allegations about the "Zhabilov Jr. Employment Agreement"); *see also* T & T Resp. to VGI's Counterclaims [dkt. # 102] (answer to counterclaims denying ¶¶ 95–101 on various grounds).

**i. Tortious Interference with Prospective Economic Advantage (Ninth Counterclaim)**

VGI next generally contends that Wright, Little, and T & T tortiously interfered with VGI's prospective economic advantage. *See* VGI and Keledjian's Amended Ans. to T & T's Amended Counterclaims [dkt. # 95] at ¶¶ 224–229). "It is generally recognized by the Illinois courts ... that to prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must prove: (1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 511, 154 Ill.Dec. 649, 568 N.E.2d 870 (Ill.1991)

(collecting cases).

**\*26** Thus, among other things, to survive summary judgment, VGI must point to evidence supporting damages that arise from the T & T Parties' alleged interference with a prospective business relationship between VGI and Zhabilov Jr. As discussed above in connection with the seventh counterclaim, VGI has failed to link any of Zhabilov Jr.'s actions purportedly resulting from the alleged influence of the T & T Parties to its categories of damages.

Moreover, the allegedly wrongful actions taken by Zhabilov Jr. do not appear to be related to prospective business relationships between Zhabilov Jr. and VGI, as opposed to existing relationships. In any event, for the reasons discussed above, VGI has failed to carry its burden of pointing to evidence that supports its request for damages flowing from Zhabilov Jr.'s conduct. Thus, the T & T Parties' motion for summary judgment as to the ninth counterclaim is granted.

**j. Trade Libel (Tenth Counterclaim)**

In its tenth counterclaim, VGI asserts that T & T, Wright, Little, and unknown others published or caused to be published false information about VGI and Keledjian on the internet and thus are liable for trade libel.[FN10] VGI does not clarify whether it seeks relief under a trade libel per se or, in the alternative, per quod theory. More fundamentally, its summary judgment memorandum does not identify what statements are at issue or present any arguments about why those statements create a triable issue of material fact. The court will not guess as to what statements are at issue and construct VGI's arguments for it. Given the age of this action and the ample opportunities VGI had to litigate this issue, the court finds that VGI has waived any arguments it might have based on a trade libel theory. The T & T Parties' motion for summary judgment as to this counterclaim is, therefore, granted.

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 86**

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

FN10. Setting aside concerns regarding the statute of limitations, the inclusion of claims against unknown counterclaim defendants does not affect jurisdiction in this diversity case, as even if the unknown parties are not diverse, the court could exercise supplemental jurisdiction over the claims against them. *See* 28 U.S.C. § 1367; *Rothman v. Emory University,* 123 F.3d 446, 454 (7th Cir.1997).

**k. Unfair Business Practices (Eleventh Counterclaim)**

VGI's final counterclaim seeks relief under California's unfair competition statute, which makes any "unlawful, unfair or fraudulent business act or practice" actionable. *See* Cal. Bus. & Prof.Code § 17200. The basis for applying California law is unclear. *See* *Kamelgard v. Macura,* 585 F.3d 334, 340–41 (7th Cir.2009) (discussing choice of law analysis and application of Illinois' "most significant relationship" test to determine what law applies).

In any event, even if California law did apply, California's unfair competition statute is subject to the heightened pleading requirements of Rule 9(b). *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1125 (9th Cir.2009). The Ninth Circuit has explained that:

Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong. Averments of fraud must be accompanied by "the who, what, when, where, and how" of the misconduct charged.

**\*27** *Id.* 1124–25 (internal citations and quotations omitted).

The eleventh counterclaim plainly fails to meet this standard as it provides, in full:

ELEVENTH COUNTERCLAIM
(Unfair Business Practices Against All Counterclaim Defendants)

234. Counterclaim Plaintiffs repeats and realleges each and every allegation of the Amended Counterclaims contained in Paragraphs 1 through 233 as if fully set forth herein.

235. Under California law, unfair competition is any unlawful, unfair or fraudulent business act or practice. Cal. Bus. & Prof.Code § 17200, *et seq.*

236. The acts and omissions of Counterclaim Defendants complained of herein constitutes unfair competition and violates California law.

237. As a direct and proximate cause of Counterclaim Defendants' aforesaid unfair business practices, VGI has been damaged in an amount not yet fully known, but believed to exceed $3,500,000.

238. VGI is also entitled to recover from the Counterclaim Defendants treble damages and attorneys' fees by statute.

VGI and Keledjian's Amended Ans. to T & T's Amended Counterclaims [dkt. # 95] at ¶¶ 234–238.

These allegations clearly do not include "the who, what, when, where, and how" of the alleged fraud. *See* *Kearns v. Ford Motor Co.,* 567 F.3d at 1124–25. Indeed, they do not even include a bare bones summary of what specific conduct forms the basis of this counterclaim. The Ninth Circuit has noted that one of the purposes of Rule 9(b) is "to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Id.* 1125

Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)
**(Cite as: 2010 WL 3155972 (N.D.Ill.))**

(internal citations and quotations omitted). Given the age of this case and the lack of any motions to dismiss for failure to state a claim, it is fair to say that this goal has not been met, given that the eleventh counterclaim fails as a matter of law yet lingered on for four years. Be that as it may, to the extent that VGI can seek relief based on a California statute (an issue the court need not reach), the eleventh counterclaim would still be unavailing. Thus, the T & T Parties are entitled to summary judgment on the eleventh counterclaim.

**III. Conclusion**

For the above reasons, the T & T Parties' motion for summary judgment as to VGI's Counterclaims [dkt. # 182], is granted in part and denied in part. Specifically, the motion is denied as to counterclaim two (breach of contract against T & T) and granted as to counterclaims one and three through eleven. The clerk is directed to correct the docket to reflect that VGI and Haig Keledjian are the only defendants in the main case, and T & T is the sole counter-defendant.

This case is set for status on August 17, 2010 at 11:00 a.m. At that time, the parties should be prepared to agree to firm trial and related dates.

N.D.Ill.,2010.
Timothy & Thomas LLC v. Viral Genetics, Inc.
Not Reported in F.Supp.2d, 2010 WL 3155972 (N.D.Ill.)

END OF DOCUMENT



Not Reported in F.Supp., 1993 WL 424244 (N.D.Ill.)
**(Cite as: 1993 WL 424244 (N.D.Ill.))**

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
WESTERN MICROTECHNOLOGY, INC., Plaintiff,
v.
GOOLD ELECTRONICS CORPORATION, et al.,
Defendants.

No. 91 C 7119.
Oct. 19, 1993.

MEMORANDUM OPINION AND ORDER

HART, District Judge.

**\*1** This case involves the fraudulent purchase of, and failure to pay for, computer modules destined for the "gray market." Plaintiff, Western Microtechnology, Inc. ("Western") is an authorized distributor of electronic products manufactured by Mitsubishi Electronics of America, Inc.[FN1] Defendant, Goold Electronics Corporation ("Goold Electronics"), is also engaged in the business of distributing electronic components such as computer memory modules from numerous manufacturers to other manufacturers and authorized distributors.[FN2] Defendant, Oliver Goold,[FN3] is the president, director and 50% shareholder of Goold Electronics. Defendant, Carol Claussen, a/k/a Caroline V. Weinman ("Claussen")[FN4] was a vice president of Goold Electronics. Defendant, Univision Technologies, Inc. ("Univision"),[FN5] is engaged in the sale and manufacture of electronic equipment. Defendant, Nissim Shani ("Shani"),[FN6] was a vice president and part owner of Univision.

Plaintiff's diversity action alleges tortious interference with contract, fraud, breach of contract and breach of fiduciary duties. Before the court are

motions by defendants, Goold Electronics and Oliver Goold, to dismiss Counts I and IV of the amended complaint[FN7] and by defendants, Univision and Shani, to dismiss Count I. On a motion to dismiss, all well-pleaded factual allegations are accepted as true and are construed in favor of the claimant. *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992). "Dismissal of the complaint is proper only if it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Id.*

According to Western's amended complaint, Western and Goold Electronics were both authorized distributors of electronic products manufactured by Mitsubishi Electronics and others. Both distributors had lines of credit with Mitsubishi. Around July, 1991, Goold Electronics was nearing its credit limit and Mitsubishi refused to ship or fill additional purchase orders submitted by Goold Electronics. On July 20, 1991, Oliver Goold, as president of Goold Electronics, contacted Marshall Cox, an officer with Western, and requested that Western, using its line of credit, purchase 20,000 computer parts from Mitsubishi for Goold Electronics. Oliver Goold further stated that Goold Electronics would buy these parts to fill an existing purchase order Goold Electronics had received from Sears for 20,000 units. On July 24, 1991, Oliver Goold sent Cox a letter specifying the purchase prices of the modules.

In response to Oliver Goold's request, Western shipped 16,849 units of computer modules on July 24, 1991 and an additional 3,131 units on July 31, 1991 for an invoice price of $963,980.00 plus $1,845.52 shipping charges and interest at 1.5% per month. Goold Electronics never resold the computer modules to Sears. Instead, Goold Electronics sold the modules to Univision, which distributed them into the gray market.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.
**Exhibit 1 – Page 89**

Not Reported in F.Supp., 1993 WL 424244 (N.D.Ill.)
**(Cite as: 1993 WL 424244 (N.D.Ill.))**

MOTION TO DISMISS BY UNIVISION AND
SHANI

**\*2** Univision and Shani argue that Western fails to state a claim for intentional interference with contract, that this court lacks personal jurisdiction over Univision and Shani and that plaintiff's conspiracy charge does not allege fraud with the particularity required by Fed.R.Civ.P. 9(b). Because Western fails to state a claim for intentional interference with contract against Univision and Shani, defendants' personal jurisdiction arguments need not be addressed.

Univision and Shani argue Western has failed to state a cause of action for tortious interference with contractual relations.[FN8] Under Illinois law, the elements of a tortious interference with contract claim are: (1) the existence of a valid and enforceable contract between the plaintiff and a third party; (2) defendant's awareness of that contractual relationship; (3) defendant's intentional and unjustified inducement of a breach by the third party; (4) a subsequent breach by the third party; and (5) damages resulting from the breach. *Wheel Masters, Inc. v. Jiffy Metal Prods. Co.,* 955 F.2d 1126, 1129 (7th Cir.1992). Defendants argue Western has failed to allege that either Univision or Shani intentionally induced Goold's breach of the contract with Western. *R.E. Davis Chemical Corp. v. Diasonics,* 826 F.2d 678, 685 (7th Cir.1987).

In *R.E. Davis,* the Seventh Circuit upheld the district court's dismissal of an intentional interference claim against two doctors. *Id.* The two doctors breached their contract with a medical equipment supplier to lease expensive medical equipment. As a result of the doctors' breach, the medical equipment supplier breached its financing contract with the manufacturer of the medical equipment. *Id.* at 680. Although the doctors were aware of the contract between the supplier and manufacturer, and could be reasonably certain that their breach would cause the

supplier to breach the financing contract, plaintiff failed to allege that the doctors in any way intended that result. The claim was dismissed because plaintiff failed to adequately allege that the doctors' intent in breaching their contract was to induce a breach of the supplier's contract with the manufacturer. *Id.* at 685–87. "The element of 'inducement' in the context of a claim for intentional interference with contractual relations requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another." *Id.* at 687.

Not only must plaintiff allege an intention to induce the breach, plaintiff must also allege facts indicating this intention and may not merely rest on conclusory allegations. *Gold v. Wolpert,* 876 F.2d 1327, 1332 (7th Cir.1989) (allegation that defendant "intentionally and unjustifiably induced [third party] to breach an agreement or understanding with plaintiffs" insufficient); *Zamouski v. Gerrard,* 1 Ill.App.3d 890, 897–98, 275 N.E.2d 429, 433–34 (2d Dist.1971) (allegation that defendants "carried on a series of systematic and intentional activities to induce the repudiation of" contract insufficient). Although the court must accept as true plaintiff's well-pleaded facts, it need not accept mere legal conclusions made without factual support. *Paul v. Premier Elec. Constr.,* 581 F.Supp. 721, 725 (N.D.Ill.1984). Defendants argue the amended complaint merely recites in conclusory fashion that the alleged scheme amounts to intentional interference with the Western—Goold Electronics contract.

**\*3** According to defendants, Western has failed to allege any facts showing "that Univision or Shani desired Goold [Electronics] to breach its contract" with Western or "that the purpose of the scheme was to induce such a breach." Univision Mem. at 8. Although plaintiff has alleged a scheme to fraudulently procure computer modules for resale on the "gray market," plaintiff has alleged no facts establishing an intent on the part of Univision or

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 90**

Not Reported in F.Supp., 1993 WL 424244 (N.D.Ill.)
**(Cite as: 1993 WL 424244 (N.D.Ill.))**

Shani to induce Goold Electronics *not to pay for the goods received under the scheme.* The failure to pay is the only breach that Univision and Shani are alleged to have induced. Although Western alleges an intent on the part of Goold Electronics and Oliver Goold to fraudulently induce Western to sell the computer modules, *see* Am.Compl.Count II, neither Univision nor Shani are named in Count II. Therefore, Western has failed to state a claim for intentional interference with contract against Univision and Shani and they will be dismissed.

GOOLD ELECTRONICS' AND OLIVER GOOLD'S
MOTION TO DISMISS

Defendants Goold Electronics and Oliver Goold also move to dismiss Counts I (tortious interference) and IV (breach of duty) of Western's amended complaint. The Goold defendants argue that the Goold Corporation cannot be liable for tortious interference with its own contract and that Oliver Goold, as a corporate officer of Goold Electronics, also cannot be held liable for tortious interference with Goold Electronic's contract.

Generally, a party, including a corporation, cannot be held liable for tortious interference with its own contract. *George A. Fuller Co. v. Chicago Col. of Osteopathic Medicine,* 719 F.2d 1326, 1334 (7th Cir.1983); *F.E.L. Publications Ltd. v. Catholic Bishop of Chicago,* 754 F.2d 216, 221 (7th Cir.1985); *Brown v. Keystone Consol. Indus., Inc.,* 680 F.Supp. 1212, 1223 n. 7 (N.D.Ill.1988). However, Illinois does recognize a cause of action for conspiring with a third party to breach one's own contract. *Blivas & Page, Inc. v. Klein,* 5 Ill.App.3d 280, 286, 282 N.E.2d 210, 214 (2d Dist.1972); *J.F. Equipment, Inc. v. Owatonna Mfg. Co., Inc.,* 143 Ill.App.3d 208, 217, 494 N.E.2d 516, 522 (2d Dist.1986); *Walsh v. Franslow,* 123 Ill.App.3d 417, 462 N.E.2d 965 (1st Dist.1984); [FN9] *Bailey v. Meister Brau, Inc.,* 535 F.2d 982 (7th Cir.1976); *Burton v. Hitachi Am. Ltd.,* 504 F.2d 721, 726–27 (7th Cir.1974); *Hawthorne Partners v. AT & T Technologies, Inc.,* No. 91 C

7167, 1992 WL 53684, at *5 (N.D.Ill. Mar. 11, 1992); *F & D Group Ltd. v. American Autofran, Inc.,* No. 89 C 3621, 1990 WL 205839, at *6 (N.D.Ill. Nov. 30, 1990); *BMC Prods. v. HMK Group Cos., Inc.,* No. 89 C 4849, 1986 WL 13535 (N.D.Ill. Nov. 24, 1986); *Laser Indus., Ltd. v. Eder Instrument Co., Inc.,* 573 F.Supp. 987, 993 (N.D.Ill.1983); *Robb Container Corp. v. Sho–Me Co.,* 566 F.Supp. 1143, 1151 (N.D.Ill.1983). *But see DP Service, Inc. v. AM Int'l,* 508 F.Supp. 162, 168 (N.D.Ill.1981) (holding no such cause exists). As the court stated in *F & D Group:*

**\*4** [I]t would seem that the breaching party is liable for contract damages and only the interfering third person can be liable in tort. (Can a wife conspire with her lover to alienate her own affections?) Nevertheless, the fact that [a party] could not itself commit the tort does not logically preclude its conspiring to commit it. As a matter of policy it may be questionable to hold a party liable only for contract damages if he simply breaches his contract, however capriciously, but mulct him for punitive damages if he conspires with the interferor—who may have done no more than offer him a better deal.

As a federal court sitting in diversity such matters are not our concern when Illinois courts have spoken. [citing *Blivas & Page* ]

1990 WL 205839, at *6.

The Goold defendants argue that, even if Illinois recognizes a cause of action for conspiracy to tortiously interfere, Western has failed to plead adequately its elements. Defendants argue, similar to Univision and Shani, that Western only alleges a conspiracy to procure computer modules for the gray market and not a conspiracy to breach the contract by not paying for those modules. Western notes that one of the purposes of the alleged conspiracy was to

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 91**

Not Reported in F.Supp., 1993 WL 424244 (N.D.Ill.)
**(Cite as: 1993 WL 424244 (N.D.Ill.))**

obtain computer parts at costs below the prices at which they could be resold and distributed on the gray market and that not paying Western for the parts "certainly advances that purpose." Pl.s' Ans.Br. at 6.

For the same reasons that Western fails to state a claim for intentional interference against Univision and Shani in Count I, Western's amended complaint also fails to state a claim against Goold Electronics for conspiracy to interfere in Count I. There is simply no allegation that the alleged scheme has anything whatsoever to do with Goold Electronics' alleged breach—the failure to pay for the modules. Therefore, Count I fails to state a claim for conspiracy to interfere against Goold Electronics.

Ordinarily, corporate officers, such as Oliver Goold, cannot be held liable for tortiously interfering with one of their corporation's contracts. *George A. Fuller, 719 F.2d at 1332–33; Medina v. Spotnail, Inc., 591 F.Supp. 190, 197 (N.D.Ill.1984).* In *Fuller*, the Seventh Circuit upheld the lower court's dismissal of plaintiff's claim that the president and vice president of the defendant corporation had tortiously interfered with a contract between the defendant corporation and plaintiff. 719 F.2d at 1328–32. The court noted that in order to maintain such an action, plaintiff must allege that the officers induced the breach to further personal goals or injure the other party to the contract and acted contrary to the best interests of the defendant corporation. 719 F.2d at 1333. Oliver Goold argues that Western's complaint fails to allege that his actions were for his own personal gain and contrary to the best interests of Goold Electronics.

Western argues that defendants misconstrue the applicable standard. The relevant inquiry, Western argues, is the "good faith" of the party inducing the breach. *Bailey v. Meister Brau, Inc., 535 F.2d 982, 987 (7th Cir.1976); Swager v. Couri, 77 Ill.2d 173, 395 N.E.2d 921, 927 (1979)* (limited privilege of officers to interfere with corporation's contracts does

not extend to malicious interference); *Loewenthal Securities Co. v. White Paving Co., 351 Ill. 285, 299–301, 184 N.E. 310 (1932)* (purpose of corporate officers' privilege is to protect those who exercise business judgment on behalf of their corporations in good faith). Western argues that the allegations of the amended complaint demonstrate that Oliver Goold's actions were outside of his corporate authority and beyond the protection of the corporate officers' privilege.

**\*5** The very brief and general passage in *Bailey,* that "good faith" is the relevant standard for interference claims, does not address actions of officers, but rather those of third party inducers and does not support Western's position. 535 F.2d at 987. In *Swager v. Couri,* the Appellate Court rejected a narrow construction of the limited liability of corporate officers. 77 Ill.2d 173, 395 N.E.2d 921, 928 (1979). If good faith governed the limited liability of corporate officers, the exception for malicious actions by a corporate officer "would quickly swallow the rule itself in the case of most closely held corporations." *Id.; see also Fuller, 719 F.2d at 1333* (corporate officers are not outsiders meddling in the business affairs of the corporation but rather are privileged to act on behalf of the corporation using business judgment and discretion). Oliver Goold is president and 50% shareholder of Goold Electronics. His interests and those of his company are most likely one and the same. Even without such an assumption, however, the amended complaint fails to allege that Oliver Goold's actions were contrary to the interests of Goold Electronics. Therefore, Count I fails to state a claim for tortious interference by Oliver Goold.

In Count IV, Western alleges that Oliver Goold and other officers of Goold Electronics breached their "duties," allowing Goold Electronics to commit fraud in the formation of its contract with Western. Oliver Goold argues that Western lacks standing to assert a claim against Oliver Goold for breach of fiduciary

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.
**Exhibit 1 – Page 92**

Not Reported in F.Supp., 1993 WL 424244 (N.D.Ill.)
**(Cite as: 1993 WL 424244 (N.D.Ill.))**

duties owed to Goold Electronics. Goold also notes that business relationships do not of themselves create fiduciary obligations. Western argues that Goold has misread the amended complaint and misconstrued the claim.

Western argues that Count IV seeks damages against Oliver Goold and the other named officers and directors for the breach of duties owed to Western as a creditor of Goold Electronics. Citing *Chicago Title & Trust Co. v. Munday,* 297 Ill. 555, 131 N.E.2d 103 (1921), and *Delano v. Case,* 121 Ill. 247, 12 N.E. 676 (1887), Western argues that as directors and officers of Goold Electronics, Oliver Goold and the other named defendants are considered by Illinois law to be trustees for the corporate creditors. Neither case cited by Western supports the existence or recognition of such a duty. *Munday* is an action by the trustee in bankruptcy against former directors of a bank. Likewise, *Delano* is a one-page case from 1887 discussing the duty of *bank officers* to depositors. This court has not found, and Western has not shown, that any such duty exists on the part of officers of corporations to creditors. Although Goold's motion seeks dismissal of Count IV pursuant to Fed.R.Civ.P. 12(b)(1) for lack of "standing," Goold's argument actually establishes that Western fails to state a claim and it is on this basis that Count IV will be dismissed. Fed.R.Civ.P. 12(b)(6).

### GOOLD ELECTRONICS' MOTION TO ADD CROSS–CLAIMS

**\*6** The Goold defendants move to amend their answer to include cross-claims against Univision, Shani, and Claussen and to add additional parties Galaxy Electronics, Inc., Galaxy Electronics of Woodmere, Inc., Jerry Denker and Gail Denker. The proposed cross-claims mirror the claims raised in another action in this court, *Goold Electronics Corp. v. Galaxy,* 92 C 8023. That action has been dismissed for failure to state a federal claim and the state law claims were dismissed without prejudice. Goold's motion must be denied to the extent that it seeks to

add RICO claims which are *res judicata.*

Defendants Univision and Shani will be dismissed, *see supra,* from the Western complaint. Therefore, as to Univision and Shani, Goold's motion must be considered one for leave to assert third-party claims. Fed.R.Civ.P. 14. Rule 14(a) allows third-party complaints where the third-party defendant is or may be liable to the third-party plaintiff for all or a part of plaintiff's claim against the third-party plaintiff. The Galaxy, Denker and Shani defendants argue that the proposed cross-claims do not arise out of the same transaction or occurrence that is the subject matter of Western's complaint. Shani argues that a legal obligation on the part of the Goold defendants to pay Western establishes no liability on the part of Shani or the rest of the third-party defendants to Goold.

Contrary to the briefs in opposition to Goold's motion, Western's complaint continues to allege more than simple nonpayment in breach of contract on the part of the Goold defendants. The same transactions which are the subject of the Western complaint are also those sued on in the proposed cross-claims. In Count II of Western's amended complaint, Western alleges fraud on the part of the Goold defendants. Goold's motion argues that by reason of this fraud perpetrated on Goold, the third-party defendants may be liable over to Goold to the extent Goold is found liable to Western.

A district court has subject matter jurisdiction over third-party supplemental claims when those supplemental claims do not destroy the diversity between Western and all other defendants. 28 U.S.C. § 1367(b). Since all third-party defendants are of diverse citizenship to Western, this court has supplemental jurisdiction over Goold's third-party claims against the third-party defendants. The Goold defendants' motion to add state-law third-party claims will be granted.

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 93**

Not Reported in F.Supp., 1993 WL 424244 (N.D.Ill.)
**(Cite as: 1993 WL 424244 (N.D.Ill.))**

IT IS THEREFORE ORDERED that the motion of defendants Univision and Shani to dismiss Count I of the amended complaint [40] is granted. The claims in Count I of the amended complaint against defendants Univision and Shani are dismissed with prejudice. The motion of defendants Oliver Goold and Goold Electronics to dismiss Counts I and IV [57] is granted. The claims in Count I against Goold Electronics and Oliver Goold are dismissed with prejudice. Count IV is dismissed with prejudice. The Goold defendants' motion to amend answer to file cross-claims [67] is granted in part and denied in part. Goold is granted leave to amend its answer to include its third-party state-law claims. The parties are to appear on status October 26, 1993 at 9:15 a.m.

FN1. Western is a California corporation with its principal place of business in California.

FN2. Goold Electronics is an Illinois corporation with its principal place of business in Illinois.

FN3. Oliver Goold is a resident of Illinois.

FN4. Claussen is a resident of Illinois.

FN5. Univision is a Massachusetts corporation with its principal place of business in Massachusetts.

FN6. Shani is an Israeli citizen residing in Massachusetts.

FN7. Goold Electronics and Oliver Goold also move to amend their answer to include certain cross-claims.

FN8. Univision and Shani also argue, for the

first time in their reply brief, that Western's allegations do not comply with Fed.R.Civ.P. 9(b). This argument was neither raised in the motion nor dependent upon Western's answer brief and, therefore, will not be considered. *Snider v. Consolidated Coal Co.,* 973 F.2d 555, 561 (7th Cir.1992).

FN9. Defendants argued, erroneously, in their reply brief that the First District had never recognized such a cause of action.

N.D.Ill.,1993.
Western Microtechnology, Inc. v. Goold Electronics Corp.
Not Reported in F.Supp., 1993 WL 424244 (N.D.Ill.)

END OF DOCUMENT

 © 2013 Thomson Reuters. No Claim to Orig. US Gov. Works. **Exhibit 1 – Page 94**