# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GoHealth, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 02334 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| Paul Simpson, Joseph LoConti, | ) | |
| Jake Mendell, Zoom Health, Inc., | ) | |
| Lighthouse Insurance Group, LLC, | ) | |
| Chuck Farro, and Jason Farro, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff GoHealth, LLC brings this lawsuit against Defendants Zoom Health, Inc., Paul Simpson, Joseph LoConti, and Jake Mendell (collectively, the Zoom Defendants), and against Lighthouse Insurance Group, LLC, Jason Farro, and Chuck Farro (collectively, the Lighthouse Defendants), asserting a variety of Illinois state-law claims arising out of a failed business relationship between GoHealth and Defendants.[1]

---

[1]Diversity jurisdiction supplies subject matter jurisdiction over this case. 28 U.S.C. § 1332. Specifically, GoHealth is a citizen of Illinois because its sole member, Norvax LLC, is a citizen of Illinois. R. 71, Second Am. Compl. ¶¶ 2, 10. Although the Second Amended Complaint does not identify Norvax LLC's individual members, Defendants' earlier-filed Amended Notice of Removal explains that Norvax's members, Brendon M. Cruz and Clint Jones, are citizens of Illinois. R. 8 ¶ 3. Likewise, Lighthouse Insurance Group, LLC is a citizen of Ohio because its sole member, Chuck Farro, is a citizen of Ohio. Second Am. Compl. ¶¶ 7, 10. And Zoom Health, Inc. is a citizen of California (where it is incorporated and has its principal place of business). Id. ¶¶ 6, 10. As for the individual parties, Simpson and Mendell are citizens of California, LoConti is a citizen of Ohio, and the Farros are citizens of Ohio. Id. ¶¶ 2-5, 8-10. So there is complete diversity of citizenship between the parties. The amount-in-controversy requirement is also satisfied, because GoHealth alleges that Defendants owe GoHealth over $1.2 million. See id. ¶ 72. Defendants' counterclaims are covered by supplemental jurisdiction, 28 U.S.C. § 1367, and anyway themselves seek damages in excess of $17.5 million, see R. 22, Countercl. at 69.

R. 71, Second Am. Compl. GoHealth's claims include breach of contract, breach of fiduciary duty, fraud, and other business torts. *Id.* ¶ 1. For their part, the Zoom and Lighthouse Defendants have counterclaimed against GoHealth, bringing similar state-law claims of their own. R. 22, Countercl. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants have filed a partial motion to dismiss GoHealth's complaint and GoHealth has filed a motion to dismiss all of Defendants' counterclaims. R. 11; R. 29. For the reasons that follow, the motions are granted in part and denied in part.

## I. Background

In evaluating the parties' motions to dismiss, the Court accepts as true the factual allegations in the complaint and counterclaims and draws reasonable inferences in GoHealth's and Defendants' favor (respectively). *Ashcroft v. Al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2079 (2011).

## A. GoHealth's Complaint

In April 2011, GoHealth and the Zoom Defendants entered into a business venture together to sell health insurance. Second Am. Compl. ¶¶ 16-19. Specifically, GoHealth and Zoom signed a Business Development Services Agreement, which required the parties to "work together to generate a high volume of sales of individual health insurance policies." *Id.* ¶ 17 (internal quotation marks omitted). Defendants Simpson and Mendell, who were licensed health insurance agents in Illinois, signed separate Agent Producer Agreements with GoHealth that authorized the two to "market and sell insurance products offered by and through GoHealth and its

authorized carriers." *Id.* ¶¶ 18-19. These agreements required GoHealth to provide health-insurance sales leads to Zoom in exchange for a fee per lead. *See id.* ¶ 20.

Initially, all went according to plan. From March to June 2012, GoHealth provided health insurance leads to Zoom and Zoom paid GoHealth for those leads. *Id.* ¶¶ 20-21. GoHealth also provided Zoom, Simpson, and Mendell advance commissions for the policies that Simpson and Mendell sold, which were considered loans to Zoom, Simpson, and Mendell. *Id.* ¶ 22. But at some point, the relationship soured. Zoom allegedly stopped paying GoHealth for sales leads, leaving an outstanding balance of $214,092.50. *Id.* ¶ 21. And Zoom, Simpson, and Mendell allegedly stopped repaying GoHealth's sales-commission loans, resulting in a balance of $1,244,063. *Id.* ¶ 23. The Zoom Defendants have also allegedly failed to pay $35,231 in administrative and processing fees. *Id.* ¶ 24.

In an effort to resolve these disputes, the parties started to negotiate in June 2012. *Id.* ¶ 25. GoHealth claims that it twice reached agreements with Zoom and LoConti (one of Zoom's principals and owners) to settle the unpaid amounts, but Zoom and LoConti subsequently reneged on these agreements. *See id.* ¶¶ 25-31. Instead of honoring these settlement agreements, GoHealth alleges that Zoom began to secretly transfer its assets to Lighthouse Insurance Group, LLC, in order to avoid Zoom's obligations to GoHealth while these negotiations were ongoing. *See id.* ¶¶ 32-33. GoHealth alleges that the Zoom and Lighthouse Defendants executed a sham transaction in which Zoom's assets were transferred to Lighthouse for a nominal sum and Zoom's principals, employees, and operations moved to Lighthouse but remained

3

under Zoom's control. *Id.* ¶ 34. As part of the deal, in August, LoConti informed GoHealth representatives that Zoom had sold its primary assets to Lighthouse for $500,000 and that the proceeds were insufficient to cover the debts Zoom allegedly owed to GoHealth. *Id.* ¶ 37. Simpson and Mendell, moreover, allegedly accepted control positions at Lighthouse, and Simpson and LoConti allegedly became Lighthouse owners. *Id.* ¶ 40. Several former Zoom employees likewise took "virtually identical" positions in Lighthouse. *Id.* ¶ 41. To ensure that Zoom had no remaining assets to pay GoHealth with, Zoom and Lighthouse allegedly negotiated with insurers to assign Zoom's commissions and other payables to Lighthouse. *Id.* ¶¶ 43-44. Because of this alleged misconduct, GoHealth, despite being Zoom's largest creditor, has not received any payments from Zoom. *Id.* ¶ 38.

One of GoHealth's claims asks to recoup the costs it incurred in dealing with an investigation of Zoom's sales practices. Specifically, in December 2011, GoHealth claims it learned of a North Carolina Department of Insurance investigation into the sales practices of Zoom, including the alleged use of improperly licensed agents and non-approved sales scripts. *Id.* ¶¶ 102-04. GoHealth later hired legal counsel to represent its interests. *Id.* ¶ 105. GoHealth alleges that its contracts with Zoom, Simpson, and Mendell require that they indemnify GoHealth for its legal expenses stemming from this investigation. *See id.* ¶¶ 100-01. GoHealth further alleges that "it was agreed that Zoom and/or Simpson and Mendell would indemnify and defend GoHealth against any cost or expenses related to this investigation," *id.* ¶ 106, but Zoom, Simpson, and Mendell have allegedly failed to indemnify GoHealth, *id.* ¶ 110.

4

After all this, GoHealth filed a lawsuit, which was removed to federal court. R. 1. The currently operative complaint is the second amended complaint, which has eleven counts. Counts One and Two allege that the Zoom Defendants breached their contracts with GoHealth. *Id.* ¶¶ 45-72. Count Three alleges that LoConti, Simpson, and Mendell breached their fiduciary duty to GoHealth, because GoHealth was Zoom's creditor. *Id.* ¶¶ 73-84. In Count Four, GoHealth urges this Court to pierce Zoom's corporate veil and hold Simpson and LoConti responsible for Zoom's liabilities. *Id.* ¶¶ 85-98. In Count Five, GoHealth asserts a claim for indemnity against Zoom, Simpson, and Mendell for GoHealth's legal expenses in dealing with the North Carolina investigation. *Id.* ¶¶ 99-111. GoHealth also alleges that the Zoom Defendants (in Count Six) and the Lighthouse Defendants (in Count Nine) violated the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* Countercl. ¶¶ 112-22, 137-149. Count Seven alleges civil conspiracy and Count Eight alleges aiding and abetting a breach of fiduciary duty against all Defendants. *Id.* ¶¶ 123-36. Finally, Counts Ten and Eleven are directed toward the Lighthouse Defendants: Count Ten asks this Court to pierce Lighthouse's corporate veil and hold the Farros personally liable, *id.* ¶¶ 150-59, and Count Eleven alleges that the Lighthouse Defendants tortiously interfered with GoHealth's contracts with the Zoom Defendants, *id.* ¶¶ 160-66. Defendants have moved to dismiss Counts Three (breach of fiduciary duty), Four (veil piercing of Zoom), and Five (indemnity). R. 11.[2]

---

[2]The motion to dismiss was filed before the filing of the Second Amended Complaint, but as discussed at the November 6, 2013 status hearing, the Second Amended Complaint does

5

## B. Defendants' Counterclaims

Defendants have a different view of their business relationship with GoHealth. (On the motion to dismiss the counterclaims, the shoe is on the other foot and the Court assumes the truth of the counterclaims' allegations.) Defendants allege that the relationship actually began in March 2010, when Simpson became an independent contractor with GoHealth to market and sell health insurance. Countercl. ¶¶ 20-24. But Simpson and his partner, LoConti, soon concluded that a telephone call center they had planned to build in order to sell insurance policies for GoHealth would not be profitable, and ended their association with GoHealth in July 2010. *Id.* ¶¶ 25-27. Around October, GoHealth (through its representative, Mike Owens) told Simpson that GoHealth would soon be adding a new insurance carrier, Assurant, Inc., whose fixed-indemnity health insurance policy could make Simpson and LoConti's planned telephone call center profitable. *Id.* ¶ 28. GoHealth and Owens told Simpson that the sales process for fixed-indemnity policies (like Assurant's policies) was shorter than the sales process for other types of plans, and insurance sales agents could expect high commissions, strong renewal rates, and higher approval rates for fixed-indemnity policies. *Id.* ¶ 30. Specifically, GoHealth provided Simpson, at his request, with data about the "persistency rate" of the Assurant fixed-indemnity policy, which is the rate at which purchased Assurant policies remain in force for their full twelve-month term

---

not change the evaluation of the dismissal motion addressed by this Opinion. Defendants have filed another motion to dismiss other counts in the Second Amended Complaint, and that will be decided in another opinion after briefing.

after purchase (the higher the persistency rate, the higher the agent commissions). *Id.*
¶¶ 36-38. In mid-March 2011, GoHealth eventually delivered sales projection data to
Simpson, which included a 60% persistency rate, and assured Simpson that the data
was "very conservative." *Id.* ¶¶ 38-39.

Based on GoHealth's projections for the Assurant policies, Simpson and LoConti
formed Zoom, built a telephone call center, and contracted to purchase sales leads from
GoHealth. *See id.* ¶¶ 46-54. Again, at the outset of this relationship, business was good.
Defendants claim that Zoom's call-center operation was immediately successful in
using their "innovative and proprietary telephone call center processes and technology"
to generate more and quicker responses from GoHealth's sales leads, convert those
responses to policy sales at rates far above the average, and sell high volumes of
Assurant policies. *Id.* ¶¶ 55-56. In fact, GoHealth representatives began making
regular visits to the Zoom call-center facility to observe the call-center operation and
monitor live calls with sales agents to learn from Zoom's success. *Id.* ¶ 58. And in
October 2011, Zoom actually expanded its call center. *Id.* ¶ 69.

But again, the GoHealth-Zoom relationship went south. Defendants allege that
GoHealth relocated its Ohio call center to Chicago and started incorporating Zoom's
proprietary call-center processes and technology into its new Chicago call center. *Id.*
¶¶ 59-67. Zoom also eventually found out that the Assurant persistency rate was
actually closer to 20%, rather than the 60% that GoHealth represented it would be. *Id.*
¶ 41. And beginning in December 2011, Defendants allege, GoHealth began
withholding, without warning or explanation, sales commissions that were due to Zoom

pursuant to its contract. *Id.* ¶¶ 72-73. They further complain that GoHealth improperly retained Zoom's so-called "book of business," or the renewal commissions for insurance policies originally sold and submitted by Zoom. *Id.* ¶ 76. Defendants also claim that GoHealth breached its contract with Zoom in other ways, including not providing detailed statements of business production, *id.* ¶ 77, inflating the amount of advanced-commission loans owed by Zoom to GoHealth, *id.* ¶¶ 78-82, delivering an insufficient volume of sales leads, *id.* ¶ 84, charging improper rates, *id.* ¶ 85, selling Zoom duplicate leads, *id.* ¶¶ 87-88, delaying the delivery of leads, *id.* ¶¶ 89-93, and erroneously insisting that all sales agents be licensed in every state that Assurant policies were sold, *id.* ¶¶ 94-100. Finally, when Assurant notified Zoom that it was terminating Zoom as a sales agent, GoHealth again allegedly misrepresented to Zoom that a replacement fixed-indemnity insurance product sold by Loyal American Life Insurance Co. "could be sold as quickly and as efficiently as the Assurant policies had been sold" and that the Loyal American commission rates "were as comparable to those of Assurant." *Id.* ¶¶ 101-02.

Defendants also allege that GoHealth interfered with a potential sale of Zoom assets. In December 2011 or January 2012, Insphere Insurance Solutions, Inc., one of GoHealth's competitors, allegedly expressed an interest in acquiring Zoom's assets, including its call-center processes and technology. *Id.* ¶¶ 106-07. Defendants allege that GoHealth was aware of this overture and took "affirmative steps to undermine Zoom's business" in order to make Zoom less attractive to Insphere and other potential purchasers. *Id.* ¶¶ 108-09. Defendants claim that GoHealth influenced Assurant to

8

terminate Zoom as its sales agent, refused to provide a comparable substitute for the Assurant product, and withheld compensation that Zoom was earning. *Id.* ¶¶ 111-13. And they allege that GoHealth eventually tried to buy Zoom itself, but changed the terms of the deal at the last minute. *Id.* ¶¶ 115-16. Zoom was therefore "left with no alternative" but to accept Lighthouse's purchase price of $500,000, far short of the $18 million that Insphere was willing to offer Zoom. *Id.* ¶¶ 117-18. And, for good measure, Defendants allege that GoHealth tried to poach Zoom employees away in violation of GoHealth's contract with Zoom. *Id.* ¶¶ 119-23.

Defendants therefore filed a variety of counterclaims against GoHealth. Defendants allege in Counts One and Two that GoHealth breached the Zoom Agreement and Simpson Agreement, respectively. *Id.* ¶¶ 124-47. In Counts Three and Four, Defendants claim that GoHealth fraudulently and negligently misrepresented the Assurant persistency rate and the quality of the Loyal American policies. *Id.* ¶¶ 148-80. In Count Five, Defendants claim GoHealth violated the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/1 *et seq.,* by allegedly misappropriating Zoom's call-center technology and processes, Countercl. ¶¶ 181-90. In Count Six, Defendants claim GoHealth violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq.,* by selling Zoom duplicate sales leads instead of unique sales leads. Countercl. ¶¶ 191-98. Count Seven alleges that GoHealth was unjustly enriched by improperly retaining Zoom's so-called "book of business." *Id.* ¶¶ 199-204. And, finally, Count Eight alleges that GoHealth interfered with Zoom's prospective

economic advantage by meddling with Zoom's potential sale to Insphere. *Id.* ¶¶ 205-15. GoHealth has moved to dismiss all counts. R. 29.

## II. Standard of Review

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. And the allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 679.

Ordinarily, under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But claims alleging fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure Rule 9(b), which requires that "[i]n alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). Thus, Rule 9(b) requires that fraud claims "state the identity of the person making the misrepresentation, the time, place, and content of the

10

misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (internal quotation marks omitted). Put differently, fraud claims "must describe the who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441-42 (internal quotation marks and citation omitted).

## III. Analysis

### A. Defendants' Motion to Dismiss GoHealth's Complaint

Defendants move to dismiss Counts Three (breach of fiduciary duty), Four (veil piercing of Zoom), and Five (indemnity) of GoHealth's Second Amended Complaint for failure to state a claim upon which relief can be granted. The Court takes up the arguments count-by-count.

### 1. Count Three: Breach of Fiduciary Duty

In Count Three, GoHealth alleges that LoConti, Simpson, and Mendell owed a fiduciary duty to GoHealth (as Zoom's largest creditor), and they breached that duty by divesting Zoom of its assets in a self-serving transaction instead of repaying GoHealth. *See* Second Am. Compl. ¶¶ 73-84. In response, Defendants argue that the Court should dismiss Count Three because GoHealth lacks "standing" to bring this breach of fiduciary duty claim. R. 12, Defs.' Br. at 4-7. The Court agrees that GoHealth cannot bring this claim. In Illinois, the well-established rule is that the officers of a corporation do not owe a fiduciary duty to the corporation's creditors. *In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018 (Ill. 1994); *Beach v. Miller*, 22 N.E. 464, 466 (Ill. 1889). In special circumstances, such as insolvency of the

corporation, however, directors do owe creditors a fiduciary duty. *Beach*, 22 N.E. at 466; *Prime Leasing, Inc. v. Kendig*, 773 N.E.2d 84, 96 (Ill. App. Ct. 2002); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 384 (7th Cir. 2008). But that does not mean that *individual* creditors have standing to assert a breach of a special-circumstances fiduciary duty. Rather, one Illinois appellate court decision reasoned that the special-circumstances fiduciary duty is owed to all creditors as a *group* and held that only the corporation or the corporation's bankruptcy representative can bring a claim for a breach of that duty. *Prime Leasing*, 773 N.E.2d at 97. Under *Prime Leasing*, then, only Zoom (as the corporation) may bring a claim for a breach of fiduciary duty on behalf of all of its creditors. GoHealth—an individual creditor—may not.

GoHealth asserts that a recent Illinois appellate court decision, *Workforce Solutions v. Urban Services of America, Inc.*, 977 N.E.2d 267 (Ill. App. Ct. 2012), overruled *Prime Leasing*. *See* R. 21, Pl.'s Resp. Br. at 8-9. In *Workforce Solutions*, the appellate court reversed a dismissal of a breach of fiduciary duty claim, holding that a corporation's directors owe a fiduciary duty to the corporation's creditors if the corporation becomes insolvent. 977 N.E.2d at 284. But that is the exact same legal principle that *Prime Leasing* applied, *see* 773 N.E.2d at 96, which is why *Workforce Solutions* explained that "*Prime Leasing* does not hold to the contrary." 977 N.E.2d at 284. Unlike *Prime Leasing*, *Workforce Solutions* never analyzed whether individual creditors have standing to bring a claim for a breach of that duty once owed. Instead, the reasoning in *Workforce Solutions* began and ended with the existence of a fiduciary

duty; *Workforce Solutions* never took the extra step of deciding *who* can enforce that duty once it is deemed to have arisen.[3] *See id. Workforce Solutions*, then, did not overrule *Prime Leasing*'s specific holding that only the corporation, suing on behalf of all of the corporation's creditors, has standing to enforce that duty.

But it is true that Illinois's highest court has not decided whether individual creditors have standing—*Prime Leasing* is an Illinois appellate court case—so this Court must predict what the Illinois Supreme Court would do. *See, e.g.*, *Mindgames, Inc. v. W. Publ'g Co., Inc.*, 218 F.3d 652, 655-56 (7th Cir. 2000). At least one other case from this District has predicted that the Illinois Supreme Court would follow *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007), and hold that individual creditors of a corporation do not have standing to bring a breach of fiduciary duty claim after a corporation's insolvency. *See, e.g.*, *RMB Fasteners, Ltd. v. Heads & Threads Int'l, LLC*, No. 11 CV 02071, 2012 WL 401490, at *15 (N.D. Ill. Feb. 7, 2012). In *Gheewalla*, the Delaware Supreme Court explained that during a corporation's insolvency, the corporation's creditors step into the shoes of its shareholders as the beneficiaries of any increase in the corporation's value. 930 A.2d at 101. Once that happens, the corporation's officers owe the creditors a fiduciary duty. *See id.* But *Gheewalla* recognized the very real possibility that recognizing a fiduciary duty to creditors would conflict with the officers' preexisting fiduciary duty to exercise

---

[3]*Workforce Solutions* is not the only Illinois appellate court case to allow individual creditors to bring breach of fiduciary duty claims without specifically considering standing. *See, e.g.*, *O'Connell v. Pharmaco, Inc.*, 493 N.E.2d 1175, 1181-82 (Ill. App. Ct. 1986); *Circle Sec. Agency, Inc. v. Ross*, 425 N.E.2d 1283, 1286 (Ill. App. Ct. 1981).

their business judgment in the best interest of the insolvent corporation as a whole. *Id.* at 103. In particular, the Delaware Supreme Court was concerned that directors, acting out of fear of being sued for a fiduciary-duty breach, might favor particular creditors over other creditors or even over the interests of the corporation during what otherwise should be good-faith insolvency negotiations. *See id.* Accordingly, *Gheewalla* held that individual creditors of an insolvent corporation do *not* have standing to assert a direct claim for a breach of fiduciary duty against corporate officers, but must instead bring (1) a derivative claim on behalf of the insolvent corporation or (2) any other direct nonfiduciary claim. *Id.*

If confronted with this question, the Illinois Supreme Court would likely adopt the holding and reasoning of *Gheewalla*, for two reasons. First, Illinois courts are often guided by the decisions of other jurisdictions in making corporate law regarding directors' fiduciary duties, *Treco, Inc. v. Land of Lincoln Sav. & Loan*, 749 F.2d 374, 379 (7th Cir. 1984), and other state courts have expressly adopted or cited *Gheewalla* approvingly. *See, e.g.*, *Sanford v. Waugh & Co., Inc.*, 328 S.W.3d 836, 846 (Tenn. 2010) ("We agree with and adopt the Delaware Supreme Court's reasoning and holding in *Gheewalla*."); *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 809 (Minn. Ct. App. 2007) (stating that Minnesota law is not in conflict with *Gheewalla*'s holding and citing Delaware law as "more clearly developed" on the issue); *Metcoff v. Lebovics*, 977 A.2d 285, 290 (Conn. Super. Ct. 2007) ("[T]he reasoning of [*Gheewalla*] is persuasive and dispositive . . . ."). And second, the primary rationale behind *Gheewalla*'s holding—eliminating officer conflicts of interest arising from individual-creditor

14

standing—is consistent with a long-standing line of Illinois Supreme Court cases holding that the assets of an insolvent company are held in trust for payment to *all* creditors *pro rata* and *without* preference. *See, e.g.*, *Atwater v. Am. Exch. Nat'l Bank of Chicago*, 38 N.E. 1017, 1020 (1893); *Roseboom v. Warner*, 23 N.E. 339, 341 (1890); *Beach*, 22 N.E. at 466. It would make little sense to deem that corporate assets are held in trust for all creditors, without preference, but then allow one creditor (or a subset of creditors) to sue and, in effect, jump ahead of other creditors. Accordingly, the Illinois Supreme Court would likely follow *Gheewalla* and hold that GoHealth cannot assert a fiduciary-duty breach claim as a creditor.

It is worth noting that, although a creditor cannot sue in that capacity (that is, as a creditor), *Gheewalla* does recognize that a creditor can bring a *derivative* claim on behalf of the insolvent corporation (rather than as a direct claim as a creditor) and can sue—derivatively—an officer or director for a breach of special-circumstances fiduciary duty. *See* 930 A.2d at 103. As noted above, when a corporation sinks into insolvency, the creditors step into the shoes of the shareholders, because the creditors should reap the value of the corporation's assets. Ordinarily, however, derivative suits are brought by a shareholder, and in a derivative suit brought by a shareholder, the corporation itself obtains the damages if the shareholder prevails, *see Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998), and then presumably distributes those damages its shareholders *pro rata*. But what happens when the corporation is insolvent, creditors have stepped into the shareholders' shoes, and creditors want to bring a derivative claim? *Gheewalla* does not describe in detail what that type of derivative claim would

15

look like. If GoHealth were to bring a derivative suit on behalf of the insolvent Zoom and win, it is not obvious how the judgment should be fashioned to ensure that damages paid by the defendants end up in the pockets of GoHealth (and any other creditors), especially if the first stop for damages payments is the insolvent corporation itself. It should be possible to order an appropriate judgment-collection process, perhaps by ordering payments directly to creditors on a *pro rata* basis. In any event, GoHealth has not brought a derivative claim, and so for now this issue need not be addressed further.

One final point worth making, as *Gheewalla* does, is that creditors, unlike shareholders, receive protection through "contractual agreements, fraud and fraudulent conveyance law, . . . and other sources of creditor rights." 930 A.2d at 99. GoHealth may therefore choose to stick with its direct *non*fiduciary claims (like breach of contract, fraud, and fraudulent conveyance) rather than bring a new derivative fiduciary claim, which might only unnecessarily complicate the litigation. What GoHealth cannot do is bring a *direct* fiduciary claim, so Count Three is dismissed with prejudice.

### 2. Count Four: Veil Piercing

In Count Four, GoHealth seeks to pierce Zoom's corporate veil and hold LoConti and Simpson personally liable for Zoom's debts. *See* Second Am. Compl. ¶¶ 85-98. At the outset, Defendants assert that this claim should be dismissed because it is not an independent cause of action as a matter of Illinois state law, citing *International Financial Services Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731 (7th Cir.

16

2004). *See* R. 62 at 3-4. In that case, the Seventh Circuit held that piercing the corporate veil under Illinois law is an equitable remedy, so the Seventh Amendment right to a jury trial does not apply to veil-piercing claims. *Chromas Techs.*, 356 F.3d at 739. So yes, there is no independent legal cause of action for veil piercing, but veil piercing is still an equitable remedy for a specific theory of personal liability. The Court therefore construes Count Four not as a standalone legal claim, but as a theory of personal liability for the other legal claims in the Second Amended Complaint. In other words, because GoHealth could just as easily have inserted the veil-piercing allegations into each of the other counts (rather than making it a freestanding Count Four), the Court construes Count Four as alleging that LoConti and Simpson are personally liable for the judgment if Zoom is found liable on the other substantive counts (for example, breach of contract). The alternative—dismissing Count Four out of hand simply because it is pled as a freestanding count—puts form over substance and just invites an unnecessary amendment (the third) to the complaint.

Turning to the merits of GoHealth's veil-piercing allegations, generally, officers of a corporation are not liable for the corporation's debts and obligations. *Macaluso v. Jenkins*, 420 N.E.2d 251, 254 (Ill. App. Ct. 1981). If the corporation is merely the alter ego of its officers, however, a court may disregard the corporate form and pierce the corporate veil of limited liability to hold the officers personally liable. *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 941 (Ill. App. Ct. 2007). Specifically, courts may pierce the corporate veil if (1) there is such a unity of interest and ownership that the corporation and its officers are no longer separate

17

personalities, and (2) maintaining the fiction of a separate corporation would promote injustice or inequitable circumstances. *Id.*

On the first prong, unity of interest, Illinois law considers numerous factors, including:

(1) inadequate capitalization, (2) failure to issue stock, (3) failure to observe corporate formalities, (4) nonpayment of dividends, (5) insolvency of the debtor corporation, (6) nonfunctioning of the other officers or directors, (7) absence of corporate records, (8) commingling of funds, (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, (10) failure to maintain arm's-length relationships among related entities, and (11) whether the corporation is in fact a mere facade for the operation of the dominant stockholders.

*Fontana v. LTD Builders, Inc.*, 840 N.E.2d 767, 778 (Ill. App. Ct. 2005). GoHealth has adequately alleged several of these factors. GoHealth plausibly alleges that LoConti and Simpson devised a plan to sell Zoom's assets secretly to Lighthouse, at a sham price, in order to avoid repaying debts owed to GoHealth, Second Am. Compl. ¶ 34, which plausibly pleads that LoConti and Simpson personally diverted Zoom corporate assets to the detriment of Zoom's corporate creditors (factor nine). What's more, LoConti and Simpson allegedly personally prevented even the proceeds from the Zoom asset sale ($500,000) from being paid to GoHealth, and instead redirected those proceeds into their own pockets. *Id.* ¶¶ 93-94. GoHealth further alleges that LoConti and Simpson endeavored to keep Zoom wholly liquidated and inadequately capitalized by negotiating with insurers to assign Zoom commissions and payables to Lighthouse (factor one). *See id.* ¶¶ 43-44. And LoConti allegedly used staff from his other ventures—rather than Zoom employees—to audit Zoom and propose solutions to

18

Zoom's financial problems, *id.* ¶ 91, which demonstrates that LoConti failed to maintain an arm's-length relationship between Zoom and his other business entities (factor ten). Viewing these factors together—and treating no single factor or absence of a single factor as dispositive, *see Fontana*, 840 N.E.2d at 778—GoHealth has plausibly pled that a unity of interest exists between LoConti, Simpson, and Zoom.

On the second prong, preventing injustice or inequitable circumstances, "[s]ome element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest must be present in order to disregard or pierce the corporate veil." *Berlinger's, Inc. v. Beef's Finest, Inc.*, 372 N.E.2d 1043, 1048 (Ill. App. Ct. 1978). The injustice need not rise to the level of fraud (in the legal meaning of the word); relevant here, "an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation" is an injustice that warrants piercing the corporate veil. *See Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 524 (7th Cir. 1991) (discussing *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565 (7th Cir. 1985)). In this case, GoHealth has plausibly pled a similar scheme to squirrel assets away from Zoom (and GoHealth, its creditor) and hide them in Lighthouse, as discussed above. Indeed, all of the aspects of the sham transaction that GoHealth has alleged LoConti and Simpson were personally involved in devising—the pittance of a purchase price, the availability of equivalent jobs at Lighthouse for Zoom employees, and the assignments of all Zoom commissions and payables to Lighthouse, *see* Second Am. Compl. ¶¶ 33-44—plausibly illustrate that piercing Zoom's corporate

19

veil is necessary to avoid an injustice to GoHealth.[4] Whether GoHealth can prove any of this is a matter for discovery and then possibly further fact-finding, but in light of the plausible factual allegations, Defendants' motion to dismiss is denied as to Count Four.

### 3. Count Five: Indemnification

Finally, in Count Five, GoHealth seeks indemnification from Zoom, Simpson, and Mendell for its legal expenses arising from a North Carolina investigation into Zoom's sales practices. Second Am. Compl. ¶¶ 99-111. Defendants assert that this count is duplicative of the breach of contract claims (Counts One and Two), Defs.' Br. at 10-11, but it is not. Counts One and Two seek the repayment of debts owed from advanced sales commissions, *see id.* ¶¶ 45-72, while Count Five seeks the repayment of legal expenses from defending a state investigation into whether Zoom sales agents were properly licensed in North Carolina or were using approved sales scripts, *see id.* ¶¶ 102-11. Indeed, because the injuries are different, the damages are different. *Compare id.* ¶ 59 (seeking $1.5 million in unpaid debts for Count One), *with id.* ¶ 111 (seeking $40,000 in legal expenses for Count Five). Count Five thus does *not* allege the same injury to GoHealth as Counts One and Two simply because "money [was] lost as a result of a breach of the Agreements" in all three counts. Defs.' Br. at 11. Count Five is therefore not duplicative of the breach of contract claims.

---

[4]These affirmative actions that LoConti and Simpson allegedly took also differentiate this case from *First Place Bank v. Skyline Funding, Inc.*, No. 10 CV 2044, 2011 WL 824612, at *5 (N.D. Ill. Mar. 4, 2011), where there were no allegations of misconduct beyond simply liquidating a company without prior notice to creditors.

Defendants' alternative argument for dismissal of the indemnification claim is that the contracts never contemplated indemnification for regulatory investigations. But that argument fails in light of the contractual language in the Business Development Services Agreement and Agent Producer Agreements. That language expressly requires Zoom, Simpson, and Mendell to indemnify GoHealth from *all* expenses, including *attorney fees*, arising out of the actions or wrongful actions of the indemnifying party. R. 71, Pl.'s Exh. A ¶ 15; Pl.'s Exh. B ¶ 13; Pl.'s Exh. C ¶ 13. Given this language, the allegations that GoHealth incurred legal expenses arising out of an investigation into Zoom's sales practices plausibly trigger the Agreements' indemnification provisions.

Accordingly, Defendants' motion to dismiss Count Five is largely denied, with one caveat: to the extent that Count Five relies on the Brooks Pierce retention agreement as the basis for indemnification, *see* Second Am. Compl. ¶¶ 105-06, that theory is barred by North Carolina's parol evidence rule.[5] As Defendants point out, the Brooks Pierce retention agreement does not include an indemnification provision, and it also includes a merger clause declaring that the retention agreement is the entire agreement of the parties. *See* Defs.' Exh. A-1 ¶ 15. So North Carolina's parol evidence rule precludes GoHealth from asserting that Defendants agreed to indemnify GoHealth after an extrinsic modification of the retention agreement. *See Phelps-Dickson Builders, LLC v. Amerimann Partners*, 617 S.E.2d 664, 670 (N.C. Ct. App. 2005) ("The

---

[5]North Carolina law applies due to the retention agreement's choice-of-law provision. *See* R. 12-1, Defs.' Exh. A-1 ¶ 17.

parol evidence rule excludes prior or contemporaneous oral agreements which are inconsistent with a written contract if the written contract contains the complete agreement of the parties." (internal quotation marks omitted)); *see also* Defs.' Br. at 13-15 (invoking the parol evidence rule). GoHealth failed to respond to this argument in its response brief, *see* Pl.'s Resp. Br. at 14-15, so it appears to concede the point. On that understanding (the Brooks Pierce retention agreement is not a basis for the indemnification claim), Defendants' motion is denied.

### B. GoHealth's Motion to Dismiss Defendants' Counterclaims

In its motion, GoHealth moves to dismiss all of Defendants' counterclaims for failure to meet the pleading standards set forth by Federal Rules of Civil Procedure 8(a) and 9(b).

As a threshold matter, GoHealth asserts that Rule 9(b)'s heightened pleading standard applies to all of Defendants' counterclaims because they *all* sound in fraud, primarily relying on *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007), and *Association Benefit Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841 (7th Cir. 2007). *See* R. 29, Pl.'s Mot. Dismiss at 7-10. The Court rejects this sweeping argument. For one, *Caremark* is a summary-judgment case, *see* 493 F.3d at 844, so it did not, as GoHealth says, "apply[] Rule 9(b)'s heightened pleading standard." Pl.'s Mot. Dismiss at 7. And *Caremark* explained that when an alleged fraud claim does not pan out in summary judgment, a theory of unjust enrichment based on those allegedly fraudulent dealings is no longer viable, 493 F.3d at 855, which makes sense because the unjust enrichment claim in *Caremark* specifically alleged that the defendant had

22

procured a benefit *through* alleged fraudulent dealings with the plaintiff, *see id.* at 848. Thus, under *Caremark*, Rule 9(b) can certainly apply to non-fraud claims that could not exist without allegations of fraudulent conduct, but *Caremark* does not hold that Rule 9(b) is automatically triggered by complaints simply containing unrelated counts of unjust enrichment and fraud. Likewise, in *Borsellino*, the Seventh Circuit applied Rule 9(b) to ostensibly non-fraud claims because they were *all* "premised upon a course of fraudulent conduct." *See* 477 F.3d at 507. Again, applying Rule 9(b) there makes sense—even if the parties in *Borsellino* had not agreed that Rule 9(b) applied—because the plaintiffs had accused the defendant of committing wholesale "fraud and racketeering activity" to such great extent that "this theory *pervade[d] their entire case.*" *Id.* at 507-08 (emphasis added). In fact, the Seventh Circuit expressly cautioned that "Rule 9(b) applies to '*averments* of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations." *Id.* (emphasis added). Under *Caremark* and *Borsellino*, individualized analysis of each claim is necessary to determine whether Defendants' non-fraud claims depend on fraud-based allegations, thus triggering Rule 9(b). Rule 9(b) does not automatically apply to the entirety of Defendants' counterclaims.

### 1. Count One: Breach of Contract (Zoom Agreement)

In Count One, Defendants allege that GoHealth breached its contract with Zoom by (1) failing to provide insurance sales leads to Zoom in the quantities requested and at the rates specified under the Zoom Agreement, (2) unilaterally modifying the pricing terms for the insurance sales leads in violation of the Agreement, (3) selling duplicate

23

sales leads to Zoom, (4) withholding compensation to Zoom, (5) retaining renewal commissions, (6) failing to provide detailed statements of Zoom's business activity, and (7) hiring away Zoom employees. Countercl. ¶¶ 130-36. These allegations have nothing to do with fraud (at least not to the exclusion of other non-fraud theories and non-fraud allegations), so Rule 8(a), not 9(b), applies to this claim.

Specifically, in Illinois, to establish a breach of contract claim, "the plaintiff must show the existence of a valid and enforceable contract, performance of the contract by the plaintiff, breach of the contract by the defendant, and resulting injury to the plaintiff." *Sherman v. Ryan*, 911 N.E.2d 387, 397 (Ill. App. Ct. 2009). Here, Defendants identify the Zoom Agreement, Countercl. ¶ 52, allege that it is valid and enforceable, *id.* ¶ 127, allege that they fulfilled their end of the bargain by selling insurance policies, *see id.* ¶¶ 55-56, 68, allege that GoHealth breached the contract in the ways discussed above, *see id.* ¶¶ 130-36, and allege that they have been harmed in the amount of $766,000, *see id.* ¶ 82. These allegations plausibly plead a breach of contract, so GoHealth's motion to dismiss is denied as to Count One

### 2. Count Two: Breach of Contract (Simpson Agreement)

GoHealth's motion is also denied as to Count Two, which alleges that GoHealth breached its contract with Simpson by denying Simpson a supervisor. *See id.* ¶¶ 144-45. Again, that is not an allegation of fraud, so Rule 9(b) does not apply. And as in Count One, the four elements of a breach of contract claim are plausibly pled: Defendants identify the Simpson Agreement, *see id.* ¶ 20, allege that the Agreement was valid and enforceable, *id.* ¶ 141, allege that Simpson sold insurance for GoHealth

but that GoHealth never provided Simpson a supervisor as it was required to do, *id.* ¶¶ 24, 33-35, 51, 144-45, and allege that Simpson was injured,[6] *id.* ¶ 147.

### 3. Count Three: Fraudulent Misrepresentation

In Count Three, Defendants allege that GoHealth fraudulently misrepresented to Defendants that the persistency rate of the Assurant fixed-indemnity insurance would "very conservatively" be 60% (when it turned out to be 20%), and fraudulently misrepresented that the Loyal American product could be sold by Zoom "as quickly and efficiently" as the Assurant product. *Id.* ¶¶ 41, 151-59. As Defendants acknowledge, *see* R. 52, Defs.' Resp. Br. at 5, Rule 9(b) applies to Count Three.

To state a claim for fraudulent misrepresentation, Defendants must plead with particularity "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Doe v. Dilling*, 888 N.E.2d 24, 35-36 (Ill. 2008). Here, Defendants' claim is based on alleged fraudulent misrepresentations relating to both the Assurant and Loyal American insurance products. First, Defendants allege that GoHealth told them that the Assurant fixed-indemnity policy would have a persistency rate of 60% even though it actually turned out to be 20%. Countercl. ¶ 41. But to satisfy Rule 9(b), fraud claims must plead who was responsible for the fraud,

---

[6]It is not entirely clear how Simpson was damaged simply from GoHealth's failure to provide him a supervisor, but because GoHealth's motion does not question how Simpson was injured, the Court will not address it further.

*Pirelli*, 631 F.3d at 441-42, and Defendants only allege that GoHealth—the general corporate entity—provided the persistency rate data. *See id.* ¶¶ 38-39. "References to the name of a company as being the source of misrepresentation, without identifying the parties to them, [are] not enough to meet Rule 9(b)'s pleading standard." *Nalco Co. v. Chen*, No. 12 C 9931, 2013 WL 4501425, at *4 (N.D. Ill. Aug. 22, 2013) (collecting cases); *see also Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago*, 927 F.2d 988, 993 (7th Cir. 1991) ("Moreover, its complaint is devoid of any mention of the time and place of the relevant misrepresentations or the *individuals* party to them." (emphasis added)). Although Defendants assert in their response brief that Mike Owens was the GoHealth employee who provided them the Assurant persistency rate data, *see* Defs.' Resp. Br. at 6, "[b]riefs are not pleadings." *Entrust Mgmt. Co. v. Gold*, No. 84 C 7029, 1986 WL 5668, at *1 n.1 (N.D. Ill. May 1, 1986). Rather, Defendants' *counterclaims* must allege the specific person or people who provided them the persistency rate data, and their failure to do so falls short of Rule 9(b)'s high bar.

There is also a larger problem with Count Three: the alleged misrepresentations regarding the 60% persistency rate projections are not actionable. A fraudulent misrepresentation claim must concern a statement of fact, not opinion, and financial projections are generally considered to be statements of opinion. *Lagen v. Balcor Co.*, 653 N.E.2d 968, 973 (Ill. App. Ct. 1995); *see also Murphy v. Walters*, 410 N.E.2d 107, 113 (Ill. App. Ct. 1980) ("It is obvious that the Financial Projection in question here is not a statement of fact but is a calculation based on assumptions."). Here, Defendants themselves plead that the 60% persistency rate data was a financial projection—the

26

prediction that 60% of future Assurant fixed-indemnity insurance policies would remain in force for their full term. *See, e.g.*, Countercl. ¶ 38 ("Specifically, GoHealth delivered *sales projection data* to Simpson, *which included* a 60 percent persistency rate, meaning that Simpson *could expect* that 60 percent of all Assurant policies sold would remain in force for their full 12-month term . . . ." (emphases added)); *id.* ¶ 40 ("Simpson reasonably relied on its representation about the persistency rate of the Assurant product, as well as the *other data incorporated in the sales projection* information it prepared and provided." (emphasis added)). The way that Defendants worded these allegations can only be interpreted to say that GoHealth provided Defendants with its *predictions* on what the persistency rate of the Assurant policies would be in the future, rather than what the persistency rate actually was in the past. *Cf. Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 390 N.E.2d 393, 403 (Ill. App. Ct. 1979) ("Illinois law is well settled, holding consistently that although representations of future income are not actionable, representations as to past income of a business constitute statements of fact."). Indeed, Defendants also allege that they expected that this 60% persistency rate "was easily attainable and likely to be surpassed," Countercl. ¶ 39, which further alleges that Defendants believed that the Assurant persistency rate would exceed 60% *in the future*. And it was not until several months of selling the Assurant product that Defendants realized that the persistency rate was far shorter than what was predicted. *See id.* ¶ 41. Because of this additional deficiency, Defendants' fraudulent misrepresentation claim fails as to the Assurant persistency rate projections.

Second, Defendants allege that GoHealth fraudulently misrepresented that the Loyal American insurance policies, a substitute for Assurant policies, "could be sold as quickly and as efficiently as the Assurant policies had been sold, and thereby assured Zoom that it could sell the Loyal American policies in sufficient volume to remain profitable." *Id.* ¶ 102. Again, this allegation fails to plead with specificity *who* at GoHealth gave them these assurances. And this allegation also pleads that GoHealth *predicted* to Defendants that Loyal American policies would, in the future, be as profitable as Assurant policies, which is not an actionable representation. Even if it were actionable, although Defendants generally allege that "the Loyal American fixed indemnity policies could not be sold by Zoom as quickly and efficiently—and thus, as profitably—as had been the Assurant fixed indemnity policies," *id.* ¶ 158, Defendants lack *specific* details about the falsity of the Loyal American representations. How much less profitable were the Loyal American policies than the Assurant policies? How much slower did Defendants sell Loyal American policies compared to Assurant policies? How much less efficiently? Because Defendants do not plead these specific facts about the Loyal American predictions, their fraud claim as to the Loyal American policies also fail.

Accordingly, Count Three is dismissed. But because it is possible that Defendants may be able to fix the deficiencies highlighted above, dismissal shall be without prejudice.

### 4. Count Four: Negligent Misrepresentation

In Count Four, Defendants plead, in the alternative to Count Three, that GoHealth negligently (instead of fraudulently) made the Assurant and Loyal American misrepresentations. GoHealth asserts that this claim triggers Rule 9(b) because it relies on the same factual allegations as Count Three, relying solely on a Fifth Circuit case. *See Lone Star Fund V (U.S.), LP v. Barclays Bank PLC,* 594 F.3d 383, 387 n.3 (5th Cir. 2010); *see also* R. 53 at 6. But the Seventh Circuit has flatly said that a negligent misrepresentation claim "is *not* governed by the heightened pleading standard of Rule 9(b)." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007). Indeed, one of the purposes of Rule 9(b) is to protect a defendant's reputation from harm by making allegations of fraud more difficult to bring, *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994), and claims alleging simple negligence do not categorically diminish a defendant's reputation as much as claims alleging fraud do. The Court therefore applies Rule 8(a) to this claim.

The elements of a negligent misrepresentation claim are identical to that of a fraudulent misrepresentation claim except that the defendant need not know that the statement—which must be a statement of fact, not opinion—was false (carelessness or negligence in ascertaining the truth suffices), and the defendant must owe a duty to the plaintiff to communicate accurate information. *Bd. of Educ. of City of Chicago v. A, C & S, Inc.*, 546 N.E.2d 580, 591 (Ill. 1989). Because a negligent misrepresentation claim still requires a statement of fact, this claim fails for the same reason that Defendants' fraudulent misrepresentation claim fails: it is based on future projections

of Assurant and Loyal American policy performance, which are not actionable representations. It is still worth discussing the duty question, however, for the sake of completeness.

Even if Defendants had pled that GoHealth made false statements of fact, Count Four would still fail because GoHealth did not owe a duty to Zoom to communicate accurate information. Under the *Moorman* line of cases—which neither side discusses—a plaintiff may bring a negligent misrepresentation claim and seek economic damages only if the defendant is "in the business of supplying information for the guidance of others in their business transactions." *Moorman Mfg. Co. v. Nat'l Tank Co.,* 435 N.E.2d 443, 452 (Ill. 1982). Put differently, only those in the business of supplying information for the guidance of others in their business transactions owe a duty to others to communicate accurate information. Accordingly, Illinois courts have applied the *Moorman* exception[7] to a variety of commercial information providers, such as accountants, banks that provide credit information, product and real-estate inspectors, title insurers, and stockbrokers. *See Fox Assocs.,* 777 N.E.2d at 607 (collecting cases). The commonality between these different types of information suppliers is the product they provide: pure information (and not a tangible product) that their clients specifically purchase from them. *See id.* (discussing *Tolan & Son, Inc.*

---

[7]This doctrine is really an exception to the economic loss doctrine, which bars recovery in tort when a defect in a product is qualitative in nature, relates to a consumer's expectation that the product is of a particular quality, and results in pure economic loss without personal injury or property damage. *Fox Assocs., Inc. v. Robert Half Int'l, Inc.*, 777 N.E.2d 603, 606 (Ill. App. Ct. 2002).

*v. KLLM Architects, Inc.*, 719 N.E.2d 288, 297 (Ill. App. Ct. 1999)). In contrast, GoHealth did not provide that type of product. GoHealth was not in the business of supplying Assurant persistency rate projections or Loyal American sales predictions to clients like Zoom. To the contrary, GoHealth was in the business of supplying insurance policy *sales leads* to Zoom. Indeed, that is precisely what Defendants contracted with GoHealth to purchase. *See, e.g.*, Countercl. ¶¶ 53-54. At most, the Assurant persistency rate projections or Loyal American sales predictions may have influenced Defendants to purchase sales leads from GoHealth or provided information related to those leads, but parties that supply "information . . . [that] is merely ancillary to the sale of a product or service or in connection with the sale" of that product are not considered to be in the business of providing that ancillary information and are not liable for any negligent misrepresentation of that ancillary information. *See Fox Assocs.*, 777 N.E.2d at 607. Accordingly, GoHealth did not owe Defendants a duty to communicate accurate information, so Defendants' negligent misrepresentation claim fails. Count Four is dismissed with prejudice.

### 5. Count Five: Illinois Trade Secrets Act

In Count Five, Defendants allege that GoHealth stole trade secrets relating to Zoom's call-center operations and used them in GoHealth's own call center in violation of the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/1 *et seq.* Countercl. ¶¶ 182-90. Specifically, Defendants allege that GoHealth accessed their trade secrets by visiting Zoom's call-center facility and selling Zoom "bogus leads" with contact information for GoHealth personnel rather than actual insurance customers. *Id.* ¶¶ 186-87. Although

GoHealth again argues that this claim is also subject to Rule 9(b), Pl.'s Mot. Dismiss at 9, the sole case it cites did not apply Rule 9(b) to an ITSA claim. *See Maclean-Fogg Co. v. Edge Composites, LLC*, No. 08 C 6367, 2009 WL 1010426, at *6 (N.D. Ill. Apr. 14, 2009). And basing factual allegations "on information and belief" does not fail Rule 8(a) when the conduct alleged is uniquely within the defendant's knowledge, as it is here. *See, e.g.*, *Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005). After all, whether GoHealth misappropriated trade secrets in the ways that Defendants allege, or actually incorporated Defendants' trade secrets in GoHealth's own call center, *see* Countercl. ¶ 61, is uniquely within GoHealth's knowledge, not Defendants'. Although it is true that one manner of alleged misappropriation—that GoHealth sold Defendants "bogus leads"—perhaps borders on an allegation of fraudulent conduct, the statutory elements of an ITSA claim (more on this below) do not require fraudulent conduct. A plausible ITSA claim here thus does not depend on making an allegation of fraud, and GoHealth does not cite a case holding otherwise. Indeed, this case illustrates that principle: Defendants could still bring a plausible ITSA violation without including the "bogus lead" allegations simply by alleging that GoHealth personnel accessed Defendants' trade secrets during their visits to the Zoom call center. Count Five therefore does not sound in fraud, so Rule 9(b) does not apply.

To state a claim for the violation of the ITSA under Rule 8(a), "a plaintiff must establish that the information at issue was (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business." *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 772 N.E.2d 768, 780 (Ill. App. Ct. 2002). And the statute in turn defines a trade secret as:

32

information . . . that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d).

In this case, Defendants have plausibly pled an ITSA violation. On the trade-secret prong, Defendants allege that they maintained "valuable and proprietary trade secret processes, systems, and technology" for their call center that allowed them to "generate more and quicker responses . . . than typical sales agents, and was able to convert those responses to sales of policies at rates far above the average." Countercl. ¶¶ 56, 182. Defendants thus plausibly allege that the secrecy of their call-center technology helps them derive actual economic value by allowing them to outperform competitor sales agents. Defendants also plausibly allege that they took reasonable efforts to maintain the secrecy of these call-center processes by inserting nondisclosure clauses in employment agreements and in the Zoom Agreement and keeping these processes secret from even their own employees. *Id.* ¶¶ 63-66, 184-85. Defendants next satisfy the misappropriation prong by alleging that (1) GoHealth personnel accessed the trade secrets during in-person visits to the Zoom call center, and (2) GoHealth sold Defendants leads to GoHealth personnel instead of bona fide insurance costumers. *Id.* ¶¶ 58, 67, 186-87. Finally, Defendants allege that GoHealth incorporated these trade secrets into its new Chicago call-center facility, which plausibly pleads that

33

GoHealth used Defendants' trade secrets in GoHealth's business. *Id.* ¶¶ 61, 189. Accordingly, this Court denies GoHealth's motion to dismiss Count Five.

## 6. Count Six: Illinois Consumer Fraud and Deceptive Business Practices Act

In Count Six, Defendants allege that GoHealth violated the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 *et seq.*, by selling Defendants duplicate sales leads instead of unique leads. Countercl. ¶¶ 193-97. The parties agree that ICFA claims must meet Rule 9(b)'s pleading standard, *see Pirelli*, 631 F.3d at 441, but they disagree whether Defendants have standing to sue GoHealth under the ICFA. Citing to no case, GoHealth asserts that only consumers may sue under the ICFA, Pl.'s Mot. Dismiss at 10, but that is wrong: "The protections of the [ICFA] are not limited to consumers." *Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.*, 573 N.E.2d 1370, 1376 (Ill. App. Ct. 1991); *see also Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 40 (Ill. App. Ct. 1989) ("With the exception of the statement in *Allcare, Inc.*, which was dicta, no cases have held that the [ICFA] protects only consumers."). Indeed, the ICFA prohibits unfair methods of competition and unfair or deceptive acts or practices if the methods or practices mislead, deceive, or damage any "person," 815 ILCS 505/2, and "person" is further defined as any natural person, partnership, corporation, company, or other business entity, 815 ILCS 505/1(c). This broad definition of "person" is not limited to "consumers"—a term that is *separately* defined in the ICFA, *see* 815 ILCS 505/1(e)—which indicates that anyone, nonconsumers and consumers alike, may sue

34

under the ICFA. Even if the ICFA only protected consumers, moreover, Zoom was a consumer of GoHealth's sales leads. The ICFA defines a consumer as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use," 815 ILCS 505/1(e), and "merchandise" expressly includes "intangibles," 815 ILCS 505/1(b). Here, Zoom allegedly contracted with GoHealth to purchase sales leads—intangible information—which it did not in turn resell to third parties, but instead used in the ordinary course of its business to sell insurance policies. *See, e.g.*, Countercl. ¶¶ 53-56. In other words, GoHealth's sales leads were inputs into Zoom's day-to-day business in the same way that steel is an input into the manufacturing of cars. So either way, Defendants may sue under the ICFA.

To bring a claim under the ICFA, Defendants must allege with particularity: (1) a deceptive act or practice by GoHealth, (2) GoHealth's intent that they rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to them (5) proximately caused by the deception. *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002). Defendants have adequately pled these elements. Defendants allege that the April 2011 Zoom Agreement itself is the required act, where GoHealth (through its signatory, Mike Owens) agreed to provide Defendants with unique sales leads at specific prices. *See* Compl. ¶¶ 54, 195; R. 71, Pl.'s Exh. A at 6 (signature of Mike Owens). And they specifically allege how this act was deceptive: many of the promised leads (at least 42,000) were not unique, but had been churned and sold to Defendants multiple times (as many as a dozen).

35

*Id.* ¶ 197. That takes care of the first element. On the second element, the purpose of the April 2011 agreement was to formalize a working relationship to provide sales leads to Defendants in order to "generate a high volume of sales of individual health insurance policies." *Id.* ¶¶ 53-54. These allegations specifically indicate that GoHealth intended for Defendants, its contractual counterparty, to rely on GoHealth's unique sales leads to generate insurance sales. These sales leads, moreover, occurred in the course of commerce, which satisfies the third element of an ICFA claim. And Defendants have pled that this deception proximately caused them damages when they paid multiple times for each lead that was sold to them more than once—at a rate ranging between $0.50 to as much as $25 per lead. *Id.* ¶¶ 88, 198. Defendants have pled all five elements of an ICFA claim with specificity, so GoHealth's motion to dismiss is denied as to Count Six.

### 7. Count Seven: Unjust Enrichment

In Count Seven, Defendants allege that GoHealth unjustly enriched itself by retaining Defendants' so-called "book of business." Countercl. ¶¶ 201-03. Specifically, GoHealth has allegedly retained all of the policies that Zoom successfully sold and has not paid Defendants any of the renewal commissions from those successful sales. *See id.* ¶ 76. So this claim is duplicative of Defendants' breach of contract claim in Count One, which likewise alleges that GoHealth withheld renewal commissions for sold insurance policies. *See, e.g., id.* ¶ 133 ("And despite the terms of the Zoom Agreement establishing that Zoom is entitled to renewal commissions earned for any policies originally sold by Zoom, GoHealth has taken for itself and retained all of Zoom's

36

submitted policies, and thus, all renewal commissions earned on those policies."). Accordingly, Defendants' unjust enrichment claim must be dismissed. *See, e.g.*, *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 2005) ("[W]here there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application." (internal quotation marks omitted)). Recognizing this, Defendants argue that Claim Seven is brought in the alternative to Claim One, Defs.' Resp. Br. at 13, but parties who plead unjust enrichment in one count and breach of contract in another cannot include, in the unjust enrichment count, allegations of an express contract. *Guinn*, 836 N.E.2d at 704. And it is the Zoom Agreement—an express contract—that obligates GoHealth to pay Zoom the allegedly withheld renewal commissions that are at the heart of Count Seven. *See, e.g.*, Countercl. ¶¶ 70, 76. Count Seven is therefore not truly independent of Count One, which is the claim alleging breach of the Zoom Agreement. GoHealth's motion to dismiss Count Seven is therefore granted with prejudice.

### 8. Count Eight: Interference with Prospective Economic Advantage

Finally, in Count Eight, Defendants allege that GoHealth interfered with a potential sale of Zoom assets to Insphere, GoHealth's competitor, by influencing Assurant to terminate Zoom and ensuring that Zoom could not sell substitute insurance policies. *Id.* ¶¶ 206-12. Defendants allege this interference cost them $17.5 million (the difference between a sale to Insphere and a sale to Lighthouse, their eventual buyer). *Id.* ¶¶ 213-15. This claim, as pled, does not sound in fraud, so Rule 9(b) does not apply.

Under Rule 8(a), Defendants have plausibly pled this business tort. To state a claim for interference with a prospective economic advantage, a plaintiff must plead: "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991). Here, Defendants claim that Zoom had a reasonable expectation of selling its assets to Insphere once Insphere proposed a deal for $18 million. Countercl. ¶¶ 208-09. They allege GoHealth knew about the potential transaction in January 2012. *Id.* ¶ 210. They further allege that GoHealth purposely interfered with the transaction by influencing Assurant to terminate Zoom as a sales agent and ensuring that Zoom could not sell substitute insurance policies, thus reducing the value of Zoom's assets. *Id.* ¶¶ 211-12. And Defendants finally claim that they were damaged to the tune of $17.5 million from GoHealth's interference. *Id.* ¶¶ 213-15. Defendants plausibly plead these four elements, so GoHealth's motion to dismiss Count Eight is denied.

## IV. Conclusion

For the reasons stated above, Defendants' motion to dismiss is granted in part and denied in part: Count Three of GoHealth's Second Amended Complaint is dismissed with prejudice. GoHealth's motion to dismiss Defendants' counterclaims is likewise granted in part and denied in part: counterclaim Count Three is dismissed without prejudice, and Counts Four and Seven are dismissed with prejudice. If

Defendants wish to re-plead Count Three, they must file a motion for leave to amend their counterclaims. The status hearing on January 16, 2014 at 8:30 a.m. remains in place.

ENTERED:

\_\_\_\_\_s/Edmond E. Chang\_\_\_\_\_
Honorable Edmond E. Chang
United States District Judge

DATE: November 26, 2013